## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RALPH ROBERTS REALTY, LLC, *et al.*[1] | ) | Case No. 12-53023 |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Judge Thomas J. Tucker |
| | ) | |

## ~~FOURTH~~

## FIFTH AMENDED COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT OF RALPH ROBERTS REALTY LLC AND RALPH R. ROBERTS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

GOLD, LANGE & MAJOROS, P.C.
Hannah Mufson McCollum (P67171)
24901 Northwestern Hwy., Suite 444
Southfield, MI 48075
Telephone: (248) 350-8220
Facsimile: (248) 350-0519

COUNSEL FOR RALPH ROBERTS REALTY, LLC
AND RALPH R. ROBERTS

Dated: ~~November 26~~December 5, 2012

---

[1] This case is jointly administered with the case of Ralph R. Roberts, Case No. 12-53024.

## TABLE OF CONTENTS

**ARTICLE I** DEFINITIONS AND CONSTRUCTION OF TERMS ............................... 2

   1.1.    Definitions ............................................................................................ 2
   1.2.    Interpretation; Application of Definitions and Rules of Construction ............... 7

**ARTICLE II** TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND DIP FACILITY CLAIMS ............................. 7

   2.1.    Non-Classification ................................................................................ 7
   2.2.    Administrative Expense Claims ............................................................... 7
   2.3.    Professional Compensation and Reimbursement Claims ................................ 7
   2.4.    Priority Claims .................................................................................... 8

**ARTICLE III** CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ............ 8

**ARTICLE IV** TREATMENT OF CLAIMS AND EQUITY INTERESTS ................... 10

   4.1.    Class 1 – Realty Hadel Secured Claims .................................................... 10
   4.2.    Class 2 – Realty Bloodworth Secured Claims ............................................. 11
   4.3.    Class 3 – Realty Gio Investments Secured Claims ....................................... 11
   4.4.    Class 4 – Realty Belcastro Secured Claims ............................................... 12
   4.5.    Class 5 – Realty Forgione Secured Claims ................................................ 12
   4.6.    Class 6 – Realty Huffer Secured Claims ................................................... 12
   4.7.    Class 7 – Realty Wilson Secured Claims .................................................. 12
   4.8.    Class 8 – Realty Brauning Secured Claims ............................................... 12
   4.9.    Class 9 – Realty Unsecured Claims ........................................................ 13
   4.10.  Class 10  –  Roberts Ally Secured Claims ................................................. 13
   4.11.  Class 11  –  Roberts Unsecured Claims ................................................... 13
   4.12.  Class 12 – Interdebtor Claims ............................................................... 14
   4.13.  Class 13  –  Equity Interests ................................................................. 14

**ARTICLE V** PROVISIONS GOVERNING ACCEPTANCE OR REJECTION OF THE PLAN ................................................................................................ 14

   5.1.    Voting of Claims ................................................................................ 14
   5.2.    Elimination of Vacant Classes ............................................................... 15
   5.3.    Nonconsensual Confirmation ................................................................ 15

**ARTICLE VI** .......................................................................................... 15

**PROVISIONS GOVERNING AUCTION** ...................................................... 15
   6.1.    Auction of Assets and Stalking Horse Bidder ........................................... 15
   6.2.    Assets To Be Auctioned ...................................................................... 16
   6.3.    Notice of Auction .............................................................................. 17
   6.4.    Bidding Procedures ............................................................................ 17
   6.5.    Auction ........................................................................................... 21
   6.6.    Proceeds of AuctionSale Authority ....................................................... 22

**ARTICLE VII** ~~PROVISIONS GOVERNING DISTRIBUTIONS~~............................6.7. Proceeds of Auction ......................................................................................... 23

7.1. ~~Distributions for Claims Allowed as of the Effective Date~~ .......... **ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS** ................................. 23

7.2. ~~Prepayment Right~~ ........................................................................7.1. Distributions for Claims Allowed as of the Effective Date ......................................................................................... 23

7.3. ~~Disbursements, Generally~~ ..........................................................7.2. Prepayment Right ........................................................................................... 24

7.4. ~~Setoffs~~ .........................................................................................7.3. Disbursements, Generally ........................................................................................... 24

**ARTICLE VIII** ~~PROCEDURES FOR RESOLVING AND TREATING DISPUTED ADMINISTRATIVE EXPENSE CLAIMS AND CLAIMS~~ ....................... 7.4. Timing of Distributions. ........................................................................................... 24

8.1. ~~Objections to and Resolution of Administrative Expense Claims and Claims.~~ ...............................................................7.5. Setoffs ........................................................................................... 24

8.2. ~~No Distribution Pending Allowance~~ ........**ARTICLE VIII PROCEDURES FOR RESOLVING AND TREATING DISPUTED ADMINISTRATIVE EXPENSE CLAIMS AND CLAIMS** ................................. 24

8.3. ~~Estimation~~ ..................................................................................8.1. Objections to and Resolution of Administrative Expense Claims and Claims. ........................................................................................... 24

**ARTICLE IX** ~~EXECUTORY CONTRACTS AND UNEXPIRED LEASES~~ .......... 8.2. No Distribution Pending Allowance ........................................................................................... 25

9.1. ~~Assumption of Executory Contracts and Unexpired Leases~~ ...........................................................................8.3. Estimation ........................................................................................... 25

9.2. ~~Rejection of Certain Contracts~~ ......**ARTICLE IX EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................. 25

9.~~3.~~ ~~Approval of~~ 1. ............. Assumption and Assignment of Executory Contracts and Unexpired Leases ................................. 25

9.~~4.~~ ~~Cure~~2. ...................................................Rejection of ~~Defaults~~Certain Contracts ........................................................................................... 25

**ARTICLE X** ~~MEANS FOR IMPLEMENTATION OF THE PLAN~~................9.3. Approval of Assumption and Assignment of Executory Contracts and Unexpired Leases ................................. 26

10.1.    Funding9.4. ........................................................................ Cure of the PlanDefaults
.............................................................................................................................. 26

10.2.    Roberts' Payments Under the Plan............................... ARTICLE X MEANS FOR
IMPLEMENTATION OF THE PLAN ................................................................. 26

ARTICLE XI EFFECT OF CONFIRMATION OF PLAN ..................................... 10.1.
................................................................................................. Funding of the Plan
.............................................................................................................................. 26

11.1.    Term of Bankruptcy Injunction or Stays ............................................... 10.2.
.......................................................................... Roberts' Payments Under the Plan
.............................................................................................................................. 27

11.2.    Causes of Action Reserved and Preserved....................................... 10.3.
........................................................................................ Direction to Parties. .
.............................................................................................................................. 27

11.3.    Discharge of DebtorsARTICLE XI EFFECT OF CONFIRMATION OF PLAN
.............................................................................................................................. 27

11.4.    1. ................................................................Term of Bankruptcy Injunction or Stays
.............................................................................................................................. 27

11.5.    Comprehensive Settlement2. .....................Causes of ClaimsAction Reserved and
ControversiesPreserved .................................................................................... 27

11.6.    Binding Effect3................................................................ Discharge of Debtors
.............................................................................................................................. 27

ARTICLE XII EFFECTIVENESS OF THE PLAN ............................................... 11.4.
...................................................................................................................Injunction
.............................................................................................................................. 28

12.1.    Conditions Precedent to Confirmation.......................................................... 11.5.
.................................................Comprehensive Settlement of Claims and Controversies
.............................................................................................................................. 28

12.2.    Conditions Precedent to Occurrence of Effective Date ................................. 11.6.
..................................................................................................Binding Effect
.............................................................................................................................. 28

12.3.    Waiver of Conditions ..........ARTICLE XII EFFECTIVENESS OF THE PLAN
.............................................................................................................................. 29

ARTICLE XIII RETENTION OF JURISDICTION ............................................... 12.1.
......................................................................... Conditions Precedent to Confirmation
.............................................................................................................................. 29

13.1.    Jurisdiction of Bankruptcy Court.................................................................. 12.2.
.................................................Conditions Precedent to Occurrence of Effective Date
.............................................................................................................................. 29

ARTICLE XIV MISCELLANEOUS PROVISIONS .............................................. 12.3.
......................................................................................... Waiver of Conditions
.............................................................................................................................. 29

14.1.    Effectuating Documents and Further Transactions ...................... ARTICLE XIII
RETENTION OF JURISDICTION ................................................................... 30

-iii-

14.2. Committee ................................................................................13.1. Jurisdiction of Bankruptcy Court ................................................................. 30

14.3. Post Effective Date Fees and Expenses..... **ARTICLE XIV** MISCELLANEOUS PROVISIONS ...................................................................... 31

14.4. Payment of Statutory Fees .................................................................14.1. Effecting Documents and Further Transactions ......................................................... 31

14.5. Effect of Conversion.2......................................................... Committee ................................................................. 31

14.6. Amendment or Modification of the Plan ....................................................14.3. Post Effective Date Fees and Expenses ......................................................... 31

14.7. Severability4. ............................................................. Payment of Statutory Fees ................................................................. 31

14.8. Revocation or Withdrawal5. ...................................Effect of the PlanConversion. ................................................................. 31

14.9. Notices .................................................................14.6. Amendment or Modification of the Plan ......................................................... 32

14.10. Governing Law7............................................................... Severability ................................................................. 32

14.11. Withholding and Reporting Requirements .......................................14.8. Revocation or Withdrawal of the Plan ......................................................... 32

14.12. Headings9........................................................................... Notices ................................................................. 32

14.13. Exhibits10............................................................... Governing Law ................................................................. 33

14.14. Filing of Additional Documents .........................................................14.11. Withholding and Reporting Requirements ......................................................... 33

14.15. Plan Controls12. ............................................................... Headings ................................................................. 33

14.16. Section 1125(e) of the Bankruptcy Code.....................................................14.13. Exhibits ................................................................. 33

14.17. Return14. .................................Filing of Security DepositsAdditional Documents ................................................................. 33

14.18. Bar Date for Administrative Expense Claims ...............................................14.15. Plan Controls ................................................................. 33

14.19. Tax Liability...........................................................................14.16. Section 1125(e) of the Bankruptcy Code ......................................................... 33

-iv-

14.20.  Time .................................................................................................... 14.17.
................................................................. Return of Security Deposits
.............................................................................................................. 34
14.18.  Bar Date for Administrative Expense Claims ................................................. 34
14.19.  Tax Liability ........................................................................................ 34
14.20.  Time .................................................................................................... 34

**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RALPH ROBERTS REALTY, LLC, *et al.*[1] | ) | Case No. 12-53023 |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Judge Thomas J. Tucker |
| | ) | |

~~**FOURTH**~~

**FIFTH** AMENDED PLAN OF REORGANIZATION OF
**RALPH ROBERTS REALTY, LLC AND RALPH R. ROBERTS UNDER CHAPTER 11
OF THE BANKRUPTCY CODE**

Ralph Roberts Realty, LLC and Ralph R. Roberts (collectively, the "Debtors") propose the following ~~third~~fifth amended plan of reorganization under ~~sections~~Sections 1121(a) and 1123 of title 11 of the United States Code.

The Debtors are the proponents of the Plan (as such term is defined below) within the meaning of ~~section~~Section 1129 of the Bankruptcy Code (as such term is defined below). Reference is made to the Disclosure Statement (as such term is defined below), distributed contemporaneously herewith, for a discussion of the Debtors' history, properties, results of operations, historical financial information, projections and risk factors, and for a brief summary of certain of the Plan terms and an analysis of the effect of the Plan and certain related matters. All holders of Claims who are entitled to vote on the Plan are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan.

---

[1] This case is jointly administered with the case of Ralph R. Roberts, Case No. 12-53024.

# ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

      1.1.   Definitions.  As used herein, the following terms have the respective meanings specified below:

      1.1.1.  Administrative Expense Claim means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases under ~~sections~~Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' bankruptcy estate, (b) any actual and necessary costs and expenses of the Debtors, (c) any costs and expenses of the Debtors in connection with the administration and implementation of the Plan, (d) all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under ~~sections~~Sections 330 or 503 of the Bankruptcy Code, and (e) any fees or charges assessed against the Debtors under ~~section~~Section 1930 of chapter 123 of title 28 of the United States Code.

      1.1.2.  Accounts means all accounts receivable of Realty including accounts as defined in the Uniform Commercial Code and all book debts, notes, drafts and other obligations or indebtedness owing to Realty arising from the sale, lease or exchange of goods or other property by Realty or the performance of services by Realty.

      ~~1.1.2.~~ 1.1.3.  Allowed means (i) with reference to any Claim, (a) any Claim against the Debtors which has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (b) any Claim Allowed hereunder, (c) any Claim which is not Disputed, (d) any Claim that is compromised, settled or otherwise resolved pursuant to a Final Order of the Bankruptcy Court or under the Plan, or (e) any Claim which, if Disputed, has been Allowed by Final Order; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court ~~shall~~will not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" ~~shall~~will not, for any purpose under the Plan, include Postpetition Interest, punitive damages or any fine or penalty on such Administrative Expense Claim or Allowed Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there ~~shall~~will be deducted therefrom an amount equal to the amount of any claim which the Debtors may hold or assert against the holder thereof, to the extent such claim may be set off by the Debtors pursuant to ~~sections~~Sections 502(d) or 553 of the Bankruptcy Code.

      1.1.4.  Assets means the assets of Realty as set forth in Section 6.2 below.

      1.1.5.  Auction means the public sale of all of the assets of Realty pursuant to the Purchase Agreement to the highest bidder as set forth in Article VI below.

1.1.3. 1.1.6.  **Ballot** means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan, on which is to be indicated acceptance or rejection of the Plan as to eligible creditors in Classes 1 and 2.

1.1.4. 1.1.7.  **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time.

1.1.5. 1.1.8.  **Bankruptcy Court** means the United States Bankruptcy Court for the Eastern District of Michigan, having jurisdiction of and over this bankruptcy case and, to the extent of any reference under section Section 157 of title 28 of the United States Code, the unit of such District Court under section Section 151 of title 28 of the United States Code.

1.1.6. 1.1.9.  **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section Section 2075 of title 28 of the United States Code, as amended from time to time, and any Local Rules of the Bankruptcy Court.

1.1.10.  **Bidding Procedures** means the bidding procedures for the Auction set forth in Article VI below.

1.1.7. 1.1.11.  **Business Day** means any day other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order, and the Friday after Thanksgiving.

1.1.8. 1.1.12.  **Cash** means legal tender of the United States of America or a wire transfer from a domestic bank.

1.1.9. 1.1.13.  **Causes of Action** means, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of this bankruptcy case, including through the Effective Date, including, without limitation, all avoidance actions arising under Chapter 5 of the Bankruptcy Code.

1.1.10. 1.1.14.  **Chapter 11 Case** means the jointly administered case under chapter 11 of the Bankruptcy Code commenced by the Debtors captioned *In re Ralph Roberts Realty, LLC and Ralph R. Roberts*, Chapter 11 Case No. 12-53023 currently pending before the Bankruptcy Court.

1.1.11. 1.1.15.  **Claim** has the meaning set forth in section Section 101(5) of the Bankruptcy Code.

1.1.12. 1.1.16.  **Class** means a category of holders of Claims as set forth in Article III of the Plan.

1.1.13. 1.1.17.  **Collateral** means any property or interest in property of the Debtors' bankruptcy estate subject to a Lien to secure the payment or performance of a Claim,

which Lien or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

~~1.1.14.~~ 1.1.18.  **Committee** means the Official Committee of Unsecured Creditors that was appointed by the Office of the United States Trustee on June 20, 2012.

~~1.1.15.~~ 1.1.19.  **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

~~1.1.16.~~ 1.1.20.  **Confirmation Hearing** means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to ~~section~~Section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

~~1.1.17.~~ 1.1.21.  **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to ~~section~~Section 1129 of the Bankruptcy Code.

~~1.1.18.~~ 1.1.22.  **Confirmed** means that the Confirmation Order has been entered on the docket of the Bankruptcy Court.

~~1.1.19.~~ 1.1.23.  **Cure** means, subject to ~~section 8~~Section 9.4 of the Plan, the distribution within thirty (30) days after the Effective Date of Cash, or such other property as may be agreed upon by the Debtors and the non-Debtor party or ordered by the Bankruptcy Court, with respect to the assumption of an executory contract or unexpired lease, pursuant to ~~section~~Section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law.

~~1.1.20.~~ 1.1.24.  **Debtors** means Ralph Roberts Realty, LLC and Ralph R. Roberts.

~~1.1.21.~~ 1.1.25.  **Debtors in Possession** means the Debtors in their capacity as debtors in possession in the Chapter 11 Case pursuant to ~~sections~~Sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

~~1.1.22.~~ 1.1.26.  **Disclosure Statement** means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or modified from time to time, and as approved by the Bankruptcy Court pursuant to ~~section~~Section 1125 of the Bankruptcy Code.

~~1.1.23.~~ 1.1.27.  **Disputed** means every Claim which has been or hereafter is listed in the Debtors' Schedules as unliquidated, disputed or contingent or which is not listed in the Debtors' Schedules, or which is disputed under the Plan or as to which the Debtors have interposed a timely objection ~~and/~~or request for estimation in accordance with ~~section~~Section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection ~~and/~~or request for estimation has not been withdrawn or determined by a Final Order, and any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed.  A Claim that is Disputed by the Debtors as to its amount only,

~~shall~~will be deemed Allowed in the amount the Debtors admit is owing, if any, and Disputed as to the excess.

~~1.1.24.~~ 1.1.28.  Effective Date means the date that is 10 days after the Confirmation Order becomes a Final Order.

~~1.1.25.~~ 1.1.29.  Entity ~~shall~~will have the meaning set forth in ~~section~~Section 101(15) of the Bankruptcy Code.

~~1.1.26.~~ 1.1.30.  Final Order means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing ~~shall~~will then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehearing ~~shall~~will have been waived in writing in form and substance satisfactory to the Debtors, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction ~~shall~~will have been upheld by the highest court to which such order was appealed, or from which certiorari, reargument or rehearing was sought and the time to take any further appeal, petition for certiorari or move for reargument or rehearing ~~shall~~will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order ~~shall~~will not cause such order not to be a Final Order.

~~1.1.27.~~ 1.1.31.  First Distribution Date means the date that is sixty (60) days after the Effective Date, or, if such date is not a Business Day, the next succeeding Business Day.

1.1.32.  Group means Ralph Roberts Realty Group, LLC, the stalking horse bidder at the Auction.

~~1.1.28.~~ 1.1.33.  Lien has the meaning set forth in ~~section~~Section 101(37) of the Bankruptcy Code.

~~1.1.29.~~ 1.1.34.  Person ~~shall~~will have the meaning set forth in ~~section~~Section 101(41) of the Bankruptcy Code.

~~1.1.30.~~ 1.1.35.  Petition Date means May 25, 2012, the date the Debtors filed their voluntary chapter 11 petitions.

~~1.1.31.~~ 1.1.36.  Plan means this ~~fourth~~fifth amended chapter 11 plan of reorganization, including, without limitation, any exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time.

~~1.1.32.~~ 1.1.37.  Postpetition Interest means interest, commencing on the Commencement Date, on the then outstanding principal amount of an Allowed Claim at the rate determined in accordance with applicable nonbankruptcy law, subject to the Bankruptcy Code.

1.1.38.  Potential Bidder means a party interested in participating in the Auction.

~~1.1.33.~~ 1.1.39.  Priority Claim means any Claim of a governmental unit of the kind specified in ~~sections~~Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

~~1.1.34.~~ 1.1.40.  Pro Rata means, when used with reference to a distribution of property to holders of Allowed Claims or Allowed Equity Interests in a particular Class or other specified group of Claims pursuant to Article III, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims.

1.1.41.  Purchase Agreement means the asset purchase agreement by and between Group and Realty executed on December 5, 2012 pursuant to which Group agrees to serve as the stalking horse bidder for the purchase of Realty's assets.

~~1.1.35.~~ 1.1.42.  Realty means Ralph Roberts Realty, LLC, one of the Debtors in these jointly administered Chapter 11 Cases.

~~1.1.36.~~ 1.1.43.  Roberts means Ralph R. Roberts, the individual debtor in these jointly administered Chapter 11 Cases.

~~1.1.37.~~ 1.1.44.  Schedules means the schedules of assets and liabilities, the lists of holders of Equity Interests and the statements of financial affairs filed by the Debtors under ~~section~~Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto through and including the date by which objections to Claims must be filed with the Bankruptcy Court pursuant to ~~section~~Section 7.1 of the Plan.

~~1.1.38.~~ 1.1.45.  Secured Claim means any Claim, to the extent reflected in the Debtors' Schedules or a proof of claim as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with ~~section~~Section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under ~~section~~Section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.1.46.  Split Contracts means all contracts with investors of Realty, both informal and reduced to writing, that exist as of December 1, 2012, regarding properties purchased by investors to which Realty is entitled to a share of the profits upon the sale of such property by such investor.

~~1.1.39.~~ 1.1.47.  Unsecured Distribution means the total pool of money received from the liquidation of all of the Debtors' non-exempt assets at the ~~auction~~Auction that ~~shall~~will take place in accordance with ~~Section ____~~Article VI hereof, less the payment of all Allowed Administrative Expense Claims and Allowed Professional Compensation and Reimbursement Claims, which ~~shall~~will be distributed ~~pro rata~~Pro Rata to all members of Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, and 11 under the terms of this Plan.

-6-

1.2.    Interpretation; Application of Definitions and Rules of Construction.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural ~~shall~~will include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender ~~shall~~will include the masculine, feminine and neuter.  Unless otherwise specified, all ~~section~~Section, article, schedule or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code ~~shall~~will apply to the construction of the Plan.  A term used herein that is not defined herein, but that is used in the Bankruptcy Code, ~~shall~~will have the meaning ascribed to that term in the Bankruptcy Code.  The headings in the Plan are for convenience of reference only and ~~shall~~will not limit or otherwise affect the provisions of the Plan.

# ARTICLE II

## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND DIP FACILITY CLAIMS

2.1.    Non-Classification.  As provided in ~~section~~Section 1123(a) of the Bankruptcy Code, Administrative Expense Claims and Priority Claims are not classified for the purposes of voting on or receiving distributions under the Plan.  All such Claims are instead treated separately pursuant to the terms set forth in this Article II.

2.2.    Administrative Expense Claims.  Except to the extent that any Entity entitled to payment of an Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim (save only Allowed Administrative Expense Claims for professional compensation and reimbursement of expenses that are specifically addressed in ~~section~~Section 2.3 below) ~~shall~~will receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is ~~practicable~~practical; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course by the Debtors ~~shall~~will be paid in full in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.  The language in this paragraph is not applicable to any amounts owed to the Office of the United States Trustee.

The Debtors are aware of no Allowed Administrative Expense Claims as of the date of filing of this Plan.

2.3.    Professional Compensation and Reimbursement Claims.  All Entities seeking an award by the Bankruptcy Court of compensation for services rendered and reimbursement of expenses incurred through and including the Effective Date under ~~sections~~Sections 330 or 331 of the Bankruptcy Code or entitled to the priorities established

pursuant to ~~sections~~Sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code ~~shall~~will (a) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date which is forty five (45) days after the Effective Date, or such other date as may be fixed by the Bankruptcy Court and (b) if granted such an award by the Bankruptcy Court, be paid in full in Cash in such amounts as are Allowed by the Bankruptcy Court, (i) on the later of the Effective Date and the date upon which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is ~~practicable,~~practical, or (ii) upon such other terms as may be mutually agreed upon between such holder of an Administrative Expense Claim and the Debtors~~, or (iii) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court~~.

The Debtors anticipate that Professional Compensation and Reimbursement Claims will be filed by Gold, Lange & Majoros, P.C. in the approximate amount of $70,000, Sirianni & Company, PLLC in the approximate amount of $35,000, and the Law Office of Robert A. Novak, PLLC, in an unknown amount, all of which may be subject to objection. The Debtors further anticipate that Carson Fischer, PLLC, attorneys for the Committee, will file a Professional Compensation and Reimbursement claim in an unknown amount, but which will not be less than $30,000, and which may be subject to objection.

        2.4.    <u>Priority Claims</u>. Except to the extent that a holder of an Allowed Priority Claim has been paid prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Claim ~~shall~~will receive, in full and complete settlement, satisfaction and discharge of its Allowed Priority Claim, equal annual Cash payments commencing on the first anniversary of the Effective Date totaling the amount of the Allowed Priority Claim, together with interest, over a period not exceeding five years. The Debtors, however, ~~shall~~will have the right to pay any Allowed Priority Claim, or any remaining balance, in full, at any time on or after the Effective Date, without premium or penalty.

The Debtors are unaware of any Allowed or allowable Priority Claims.

## ARTICLE III

## <u>CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS</u>

        Claims, other than Administrative Expense Claims and Priority Claims are classified for all purposes, including voting, confirmation and distribution pursuant to the Plan, below.

| <u>Class</u> | <u>Class Composition</u> | <u>Amount of Claims in Class (Approx.)</u> | <u>Status</u> |
|---|---|---|---|
| Class 1 – Realty Hadel Secured Claims | Claims of Dennis Hadel, an investor in Realty, which are secured by rights of setoff. | Claims in Class 1 are approximately $5,000. | Impaired – May Vote |

| | | | |
|---|---|---|---|
| Class 2 – Realty Bloodworth Secured Claims | Claims of Gary Bloodworth, an investor in Realty, which are secured by rights of setoff. | Claims in Class 2 are approximately $5,000. | Impaired – May Vote |
| Class 3 – Realty Gio Investments Secured Claims | Claims of Gio Investments, LLC, an investor in Realty, which are secured by rights of setoff. | Claims in Class 3 are approximately $2,500. | Impaired – May Vote |
| Class 4 – Realty Belcastro Secured Claims | Claims of Kimberly Belcastro, an investor in Realty, which are secured by rights of setoff. | Claims in Class 4 are approximately $5,000. | Impaired – May Vote |
| Class 5 – Realty Forgione Secured Claims | Claims of Larry Forgione, an investor in Realty, which are secured by rights of setoff. | Claims in Class 5 are approximately $5,000. | Impaired – May Vote |
| Class 6 – Realty Huffer Secured Claims | Claims of Michael Huffer, an investor in Realty, which are secured by rights of setoff. | Claims in Class 6 are approximately $5,000. | Impaired – May Vote |
| Class 7 – Realty Wilson Secured Claims | Claims of David Wilson, an investor in Realty, which are secured by rights of setoff. | Claims in Class 7 are approximately $20,000. | Impaired – May Vote |
| Class 8 – Realty Brauning Secured Claims | Claims of William and Vena Brauning, which are secured by a ½ interest in residential real | Claims in Class 8 are approximately $20,000. | Impaired – May Vote |

| | property located at 22054 Donald, Eastpointe, MI. | | |
|---|---|---|---|
| Class 9 – Realty Unsecured Claims | All general unsecured claims against Realty, including, but not limited to, the claims listed on Realty's Schedule F. | Claims in Class 9 are approximately $12 million. | Impaired – May Vote |
| Class 10 – Roberts Ally Secured Claim | Secured claim of Ally Financial. | Claims in Class 10 are approximately $55,000. | Impaired – May Vote |
| Class 11 – Roberts Unsecured Claims | All unsecured claims that have been or could be asserted against Mr. Roberts individually. | Claims in Class 11 are approximately $12 million. | Impaired – May Vote |
| Class 12 – Interdebtor Claims | Claims that Mr. Roberts holds against Realty and claims that Realty holds against Mr. Roberts. | Claims in Class 13 are approximately $1.35 million. | Impaired – Deemed to Reject |
| Class 13 – Roberts Equity Interests | Claims arising from ownership interests in Realty. | N/A | Impaired – Deemed to Reject |

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1.    Class 1 – Realty Hadel Secured Claims

(a)    Impairment and Voting.  Class 1 consists of the claims of Dennis Hadel, an investor in Realty, which are secured by rights of setoff, and which are impaired.  As Realty is not continuing in business, Mr. Hadel is undersecured.  Each holder of an Allowed Class 1 Claim is entitled to vote on the Plan.

-10-

(b)     <u>Treatment</u>.  Each holder of an Allowed Class 1 Claim ~~shall~~will, on account of its claim, be paid a pro-rata share of the Unsecured Distribution.  The treatment set forth herein is in full satisfaction of the Allowed Claims of Class 1.

4.2.     <u>Class 2 – Realty Bloodworth Secured Claims</u>

(a)     <u>Impairment and Voting</u>.  Class 2 consists of the claims of Gary Bloodworth, an investor in Realty, which are secured by rights of setoff, and which are impaired.  As Realty is not continuing in business, Mr. Bloodworth is undersecured.  Each holder of an Allowed Class 2 Claim is entitled to vote on the Plan.

(b)     <u>Treatment</u>.  Each holder of an Allowed Class 2 Claim ~~shall~~will, on account of its claim, be paid a pro-rata share of the Unsecured Distribution. The treatment set forth herein is in full satisfaction of the Allowed Claims of Class 2.

4.3.     <u>Class 3 – Realty Gio Investments Secured Claims</u>

(a)     <u>Impairment and Voting</u>.  Class 3 consists of the claims of Gio Investments, LLC, an investor in Realty, which are secured by rights of setoff, and which are impaired.  As Realty is not continuing in business, Gio Investments, LLC is undersecured.  Each holder of an Allowed Class 3 Claim is entitled to vote on the Plan.

(b)     <u>Treatment</u>.  Each holder of an Allowed Class 3 Claim ~~shall~~will, on account of its claim, be paid a pro-rata share of the Unsecured Distribution.  The treatment set forth herein is in full satisfaction of the Allowed Claims of Class 3.

4.4.  Class 4 – Realty Belcastro Secured Claims

(a)  Impairment and Voting.  Class 4 consists of the claims of Kimberly Belcastro, an investor in Realty, which are secured by rights of setoff, and which are impaired.  As Realty is not continuing in business, Ms. Belcastro is undersecured.  Each holder of an Allowed Class 4 Claim is entitled to vote on the Plan.

(b)  Treatment.  Each holder of an Allowed Class 4 Claim ~~shall~~will, on account of its claim, be paid a pro-rata share of the Unsecured Distribution.  The treatment set forth herein is in full satisfaction of the Allowed Claims of Class 4.

4.5.  Class 5 – Realty Forgione Secured Claims

(a)  Impairment and Voting.  Class 5 consists of the claims of Larry Forgione, an investor in Realty, which are secured by rights of setoff, and which are impaired.  As Realty is not continuing in business, Mr. Forgione is undersecured.  Each holder of an Allowed Class 5 Claim is entitled to vote on the Plan.

(b)  Treatment.  Each holder of an Allowed Class 5 Claim ~~shall~~will, on account of its claim, be paid a pro-rata share of the Unsecured Distribution.  The treatment set forth herein is in full satisfaction of the Allowed Claims of Class 5.

4.6.  Class 6 – Realty Huffer Secured Claims

(a)  Impairment and Voting.  Class 6 consists of the claims of Michael Huffer, an investor in Realty, which are secured by rights of setoff, and which are impaired.  As Realty is not continuing in business, Mr. Huffer is undersecured.  Each holder of an Allowed Class 6 Claim is entitled to vote on the Plan.

(b)  Treatment.  Each holder of an Allowed Class 6 Claim ~~shall~~will, on account of its claim, be paid a pro-rata share of the Unsecured Distribution.  The treatment set forth herein is in full satisfaction of the Allowed Claims of Class 6.

4.7.  Class 7 – Realty Wilson Secured Claims

(a)  Impairment and Voting.  Class 7 consists of the claims of David Wilson, an investor in Realty, which are secured by rights of setoff, and which are impaired.  As Realty is not continuing in business, Mr. Wilson is undersecred.  Each holder of an Allowed Class 7 Claim is entitled to vote on the Plan.

(b)  Treatment.  Each holder of an Allowed Class 7 Claim ~~shall~~will, on account of its claim, be paid a pro-rata share of the Unsecured Distribution.  The treatment set forth herein is in full satisfaction of the Allowed Claims of Class 7.

4.8.  Class 8 – Realty Brauning Secured Claims

(a)  Impairment and Voting.  Class 8 consists of the claims of William and Vena Brauning, investors in Realty, which are secured by a ½ interest in residential real

-12-

property located at 22054 Donald Avenue, Eastpointe, Michigan (the "Donald Property"). The Braunings are owed approximately $8,000 by Realty, and Realty is owed $5,000 with respect to the Donald Property transaction. Realty is entitled to split the profit from the sale of the Donald home with the Braunings after they recover their principal investment. The Debtors believe that the Braunings are oversecured. Each holder of an Allowed Class 8 Claim is entitled to vote on the Plan.

(b)    Treatment. Each holder of an Allowed Class 8 Claim ~~shall~~will retain its collateral and ~~shall~~will be paid by deducting the total amount of its claim from the total profit after the Braunings' principal investment is paid, crediting the amount owed to Realty as a finders' fee and then splitting the remainder in equal shares with Realty. The treatment set forth herein is in full satisfaction of the Allowed Claims of Class 8, which ~~shall~~will not be entitled to any distribution on account of any potential deficiency claim.

4.9.    Class 9 – Realty Unsecured Claims

(a)    Impairment and Voting. Class 9 consists of all general unsecured claims against Realty and is impaired by the Plan. Each holder of an Allowed Class 9 Claim is entitled to vote to accept or reject the Plan.

(b)    Treatment. All holders of Class 9 - Realty Unsecured Claims will be paid, in full and complete settlement, satisfaction and discharge of their claims, a pro-rata share of the Unsecured Distribution.

4.10.    Class 10   –  Roberts Ally Secured Claims

(a)    Impairment and Voting. Class 10 consists of the claim of Ally Financial and is impaired by the Plan. Each holder of an Allowed Class 10 Claim is entitled to vote to accept or reject the Plan.

(b)    Treatment. Ally Financial, the only claimant in Class 10, ~~shall~~will retain, on the Effective Date, a lien on its prepetition collateral. Ally Financial ~~shall~~will also retain all payments received by it during this chapter 11 case. The total value of the GMC Yukon, which secures Mr. Roberts' debt to Ally Financial, is approximately $39,378 as of the Petition Date. Accordingly, Ally Financial will receive a new five-year note in the amount of $39,378, providing for interest at 3% and total monthly payments, including interest, of $707.57 in full satisfaction of ~~its~~Ally Financial's claim and ~~its~~Ally Financial's claim against any guarantors, including personal guarantors. Ally Financial's unsecured deficiency claim ~~shall~~will be paid as a Class 11 Roberts Unsecured Claim. The foregoing ~~shall~~will be in full and complete settlement, satisfaction and discharge of the Claim of Ally Financial.

4.11.    Class 11   –  Roberts Unsecured Claims

(a)    Impairment and Voting. Class 11 consists of all general unsecured claims against Mr. Roberts. Each holder of an Allowed Class 11 Claim is entitled to vote to accept or reject the Plan.

-13-

(b)     Treatment.  All holders of Class 11 - Roberts Unsecured Claims will be paid, in full and complete settlement, satisfaction and discharge of their claims, a pro-rata share of the Unsecured Distribution..

### 4.12.   Class 12 – Interdebtor Claims

(a)     Impairment and Voting.  Class 12 consists of all claims held by the Debtors against each other.  On a net basis, Mr. Roberts holds unsecured claims against Realty, which total approximately $1,350,000 and Realty holds unsecured claims against Mr. Roberts, which total approximately $0.00.  The holders of Class 12 – Interdebtor Claims are conclusively presumed to have voted to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

(b)     Treatment.  Holders of Class 12 – Interdebtor Claims~~, shall~~ will receive no distribution on account of their claims.  Upon entry of the Confirmation Order, all Class 12 Interdebtor Claims ~~shall~~will be cancelled.

### 4.13.   Class 13   –   Equity Interests

(a)     Impairment and Voting.  Class 13 consists of all equity interests in Realty, which are currently held 20% by Mr. Roberts and 80% by Rowland Family, LLC.  This class is impaired by the Plan.  The holders of Class 13 – Equity Interest are conclusively presumed to have voted to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

(b)     Treatment.  Holders of Class 13 – ~~Interdebtor Claims, shall~~Equity Interests will receive no distribution on account of their ~~claims~~interests.  Upon entry of the Confirmation Order, all Class 13 Equity Interests ~~shall~~will be cancelled and will receive no distribution.  After the entry of the Confirmation Order, Realty will file dissolution paperwork with the State of Michigan and any equity interests remaining will vest in the General Unsecured Creditors of Realty and Roberts.


**ARTICLE V**

**PROVISIONS GOVERNING ACCEPTANCE OR REJECTION OF THE PLAN**

### 5.1.   Voting of Claims

(a)     Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Articles III and IV of the Plan ~~shall~~will be entitled to vote to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Bankruptcy Court.

(b)     All votes on the Plan ~~shall~~will be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies

-14-

~~sections~~Sections 1129(a)(8) and~~/or~~ (10) of the Bankruptcy Code.  If no holders of Claims or Equity Interests eligible to vote in a particular Class vote to accept or reject the Plan, the Plan ~~shall~~will be deemed accepted by the holders of such Claims or Equity Interests in such Class.

5.2.    Elimination of Vacant Classes.  Any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by the holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class entitled to vote on the Plan) ~~shall~~will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to ~~section~~Section 1129(a)(8) of the Bankruptcy Code.

5.3.    Nonconsensual Confirmation.  If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majorities provided in ~~section~~Section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with ~~section 13.7~~Section 14.6 hereof or undertake to have the Bankruptcy Court confirm the Plan under ~~section~~Section 1129(b) of the Bankruptcy Code or both.  With respect to any impaired Classes of Claims that are deemed to reject the Plan, the Debtors ~~shall~~will request the Bankruptcy Court to confirm the Plan under ~~section~~Section 1129(b) of the Bankruptcy Code.

# ARTICLE VI

## PROVISIONS GOVERNING AUCTION

6.1.    Auction of Assets and Stalking Horse Bidder

(a)    After entry of the Confirmation Order in these cases, the Debtors ~~shall~~will conduct an ~~auction (the~~ "Auction ") of the ~~assets set forth in Section 6.2 below (collectively, the~~ "Assets") pursuant to the procedures set forth in Section 6.4 below.

(b)    ~~Ralph Roberts Realty~~ Group, ~~LLC ("Group")~~ has agreed to serve as the stalking horse bidder for Realty's assets, pursuant to the ~~asset purchase agreement (the~~ "Purchase Agreement")~~,~~, an executed copy of which is attached hereto as Exhibit A.[2]  Interested bidders will be required to bid against the signed Purchase Agreement at the Auction.  Although the Debtors have signed the Purchase Agreement, it is subject to this Court's approval, and Debtors are prepared to accept competing bids from any other qualified interested parties. The Bidding Procedures ~~described herein~~ are designed to strike a balance between inviting competing bids and enabling the Debtors to close a sale with the Winning Bidder (as defined below) within a reasonable timeframe.  The Bidding Procedures thus are fair, reasonable and necessary to promote the ~~highest and/or~~best ~~sale price~~offer, without imposing undue obstacles to the competitive bid process.

---

[2] Capitalized terms not defined herein ~~shall~~will have the meanings ascribed to them in the Purchase Agreement.

6.2.    Assets To Be Auctioned

(a)    The Debtors will sell the Assets to Group or another Qualified Bidder (as defined below), in whatever configuration provides the most benefit to the Debtors' estates pursuant to the bid procedures set forth below.  As described in the Purchase Agreement, the Assets consist of:

(1)    the assumption and assignment of ~~all contracts with investors, both informal and reduced to writing that exist as of December 1, 2012, regarding properties purchased by investors to which Realty is entitled to a share of the profits upon the sale of such property by such investor (the "Split Contracts"), a copy~~the Split Contracts, a list of which is attached as Exhibit B;

(2)    all equipment owned by Realty, including machinery, furniture, fixtures, furnishings, materials and supplies, data processing hardware, and other personal property~~, wherever situated a list of which is attached as Exhibit C~~ listed on Exhibit C, which includes the following: twelve computers, four office chairs and three desks;

~~(3)    all accounts receivable of Realty including "accounts" (as defined in the UCC) and all book debts, notes, drafts and other obligations or indebtedness owing to Realty arising from the sale, lease or exchange of goods or other property by it and/or the performance of services by Realty (the "Accounts");~~

(3)    the Accounts;

(4)    all of Realty's real estate listing agreements;[3]

~~(4)~~(5)    all of the right, title and interest of Realty, to the extent that it is assignable to a third party, to intellectual property owned by Realty, such as logos, trade names, signage and the like;[4]

~~(5)~~(6)    all of the right, title and interest of Realty in and to the lease for leased premises located at 12900 Hall Road, Suite 190, Sterling Heights, Michigan, 48313;

~~(6)~~(7)    all of the right, title and interest of Realty in and to the leases for Realty's leased office equipment;

---

[3] The Debtors believe that the real estate listing agreements are not transferrable to a buyer that is not associated with Mr. Roberts as the listing broker and will terminate automatically upon the sale to any buyer that is not Group.

[4] The Debtors believe that the trade name "Ralph Roberts Realty, LLC" ~~and/~~or other derivations of Mr. ~~Roberts~~Roberts' name cannot be used by a party that is not Mr. Roberts~~, as that is a violation of Michigan~~.

-16-

(7)(8)   all of the right, title and interest of Realty in and to Realty's property tracking database;

(8)(9)   all of the right, title and interest of Realty in and to all original Files and Records and books relating to Realty;

(9)(10) all of Realty's rights, claims, defenses, or causes of action against third parties with respect to the Acquired Assets arising out of transactions prior to the Closing; and

(10)(11)         all goodwill relating to Realty and the foregoing assetsAssets.

6.3.   Notice of Auction

(a)   Within 24 hours of entry of the Confirmation Order, the Debtors shallwill cause a notice of these Bidding Procedures (the "Auction Notice"), to be sent to (i) those persons who have contacted or have been contacted by the Debtors with respect to a potential purchase of the Assets, (ii) the Office of the United States Trustee, (iii) all parties on the Debtors' official matrix of creditors in these cases, and (iv) all other entities that the Debtors believe, in their business judgment, may have an interest in acquiring the Assets.  The Debtors will promptly file a certificate of service regarding the mailing of such notice.

(b)   The Debtors will further advertise the Auction by placing an ad in the Detroit Free Press, and the Detroit Legal News, which ad shallwill set forth the Auction Date and other pertinent information pertaining to the auctionAuction, the QualificationBid Deadline, and the Hearing Date, as well as a broad description of the Assets and contain contact information for how interested parties may obtain a full copy of the Bidding Procedures Order.

(c)   The Debtors will also advertise the Auction by posting notice of the Auction, and all pertinent Auction information on the internet at the dedicated and proprietary website www.————.trusteerealpropertysolutions.com.  This website will be updated if and when additional information regarding the Auction or the Assets becomes available.  The published Auction notice will also contain this information to enable all parties in interest access to the most current information regarding the Auction.

6.4.   Bidding Procedures

(a)   *Initial Requirements*. To be eligible to participate in the bidding process, a potential bidder ("Potential Bidder") must deliver to the Debtors, with a copy to Gold, Lange & Majoros, P.C. ("GLM"), 24901 Northwestern Hwy., Suite 444, Southfield, MI, 48075, attn:  Hannah Mufson McCollum, the following by the close of business one week after entry of the Confirmation Order:

(i)   an executed confidentiality agreement acceptable to the Debtors (the "Confidentiality Agreement"): and

-17-

(ii)     current audited and last unaudited financial statements of the Potential Bidder (or if a bidder is an entity formed for the purpose of acquiring the business, current audited financial statements of the equity holder(s) of the Potential Bidder, who ~~shall~~will guarantee the obligations of the Potential Bidder), or such other form of financial disclosure and credit quality support acceptable to the Debtors.

(b)     *Qualified Bidder*.  A "Qualified Bidder" is a Potential Bidder that delivers the documents described above and, in the Debtors' sole discretion, is determined to demonstrate the financial capability to consummate and reasonable likelihood of consummating the purchase of the Assets for which a Bid is to be submitted by such Potential Bidder.  After the Potential Bidder delivers all of the materials required above, the Debtors ~~shall~~will determine~~, and shall notify the Potential Bidder in writing,~~ whether the Potential Bidder is a Qualified Bidder (the "Qualifying Notice").  The Debtors will notify all Potential Bidders who are Qualified Bidders in writing that they are authorized to bid within 3 days of the submission deadline set forth in Section 6.4(a).

(c)     *Bid Requirement*.  A bid ("Bid") is a letter from a Qualified Bidder ~~stating~~ that:

(i)     States that the Qualified Bidder offers to purchase the Assets upon the terms and conditions set forth in the Purchase Agreement~~, which encloses~~;

~~(i)~~(ii)   Encloses a signed copy of the Purchase Agreement marked to show those amendments and modifications, including, but not limited to, price and the time of closing, which are proposed by the Qualified Bidder;

~~(ii)~~(iii)  States that the Qualified Bidder is prepared to enter into and consummate the transaction within not more than ~~fifteen (15)~~seven days after the ~~entry by~~ conclusion of the ~~Bankruptcy Court of an order approving the sale of the Assets, subject to receipt of any governmental or regulatory approvals,~~Auction; and

~~(iii)~~(iv)States that the Qualified Bidder's offer is irrevocable until ~~Closing (as described below).~~the closing of the sale of the Assets.

(d)     *Qualified Bid.*  A Bid will be a qualified bid (a "Qualified Bid") only if it:

(i)     is submitted by a Qualified Bidder;

(ii)     is an all-cash bid;

(iii)     equals or exceeds the value being paid by Group pursuant to the Purchase Agreement by at least $10,000.00;

(iv)     conforms to the terms and conditions of the Purchase Agreement;

-18-

(v)    is submitted with a $20,000.00 initial deposit (the "Initial Deposit") payable to the Debtors in the form of a certified or cashier's check or wire transfer of funds, which will be held by the Debtors in a non-interest bearing account;

(vi)    fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(vii)    does not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment;

(viii)    is submitted with written evidence of the Qualified Bidder's license to act as a servicer of loans and land contracts pursuant to the Michigan Mortgage Brokers, Lenders, and Servicers Licensing Act, Public Act 173 of 1987, as amended, (MCL 445.1651 *et seq.*) or written evidence that the Qualified Bidder has an agreement with such a licensed third party servicer;

(ix)    is submitted with written evidence of the Qualified Bidder's real estate broker's license pursuant to the Michigan Occupational Code, Public Act 299 of 1980, as amended (MCL 339.2501 *et seq.*) or written evidence of the Qualified Bidder's association with such licensed real estate broker;

(viii)(x)    is submitted with written evidence of a commitment for financing for the Qualified Bidder's maximum bid or other evidence of ability to consummate a transaction; and

(ix)(xi) is submitted not later than 4:00 p.m. Eastern Daylight Time on February 7, 201314 days after entry of the Confirmation Order  (the "Bid Deadline"), by delivering written copies of its bid to GLM, 24901 Northwestern Hwy., Suite 444, Southfield, MI, 48075, attn:  Hannah Mufson McCollum.

(e)    *Additional Requirements and Provisions.*

(i)    The Debtors shallwill determine, in their sole discretion, whether a Bid constitutes a Qualified Bid. The Initial Deposit shall be in the form of a certified or cashier's check or wire transfer of funds and shall be held by the Debtors in a non-interest bearing account.

(ii)    Initial Deposit(s) shallwill be forfeited upon a default of a Qualified Bidder's purchase agreement.

(i)(iii)  No bidBid or Qualified Bid may be subject to financing, due diligence, board approval, receipt of any nongovernmental or governmental consents or similar contingencies not provided for in the Purchase Agreement.

(iv)    After the Bid Deadline, eachGroup will be deemed to be a Qualified Bidder that submitswho has made a Qualified Bid will be providedand will have standing to be heard at any hearing that relates to the Auction or the sale of the Assets.

-19-

(v)    The Debtors may make reasonable alterations or additions to these Bidding Procedures as long as such alterations or additions are announced at the Auction and do not adversely affect Group's rights.

(vi)    No party that failed to submit a timely Qualified Bid or who failed to participate in the Auction may be heard in connection at any hearing that relates to the Auction or the sale of the Assets.

(ii)(vii) Any Qualified Bidders presenting Bids or Qualified Bids will bear their own expenses in connection with a copy of any other Qualified Bid(s).sale of the Assets and the Auction.

(iii)(viii)    The Debtors, in their sole discretion, may amend, waive or alter the above stated requirements with respect to establishing criteria for Qualified Bidders and Qualified Bids if it is in the best interest of the estates, provided that no amendment, waiver or alteration may adversely affect the rights of Group without its written consent.

(f)    *Acknowledgements by Qualified Bidder*

(iv)(i)  Each Qualified Bidder, as a consequence of submitting a bid, shallBid or a Qualified Bid, will be deemed to acknowledge:

(1)    that it understands and is bound by the Bidding Procedures and the other terms of this motionPlan and resulting orderthe Confirmation Order;

(2)    that it had an opportunity to inspect and examine the assets bid on and to review all pertinent documents and information with respect to such assets before making its offer and that each such bidder relied solely on that review and upon its own investigation and inspection in making its bid;

(3)(2) that it is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether express or implied, by operation of law or otherwise, made by any person or party including the Debtors, their respective agents or representatives, regarding the assets bid onAssets, these Bidding Procedures or completeness of any information provided in connection therewith; and

(4)(3) that it submits its bidBid or Qualified Bid on its own volition with full knowledge of the potential consequences.; and

(v)    Atthat the Sale Hearing, the Court may approve a sale of the Assets (such approved bid, the "Winning Bid" and such bidder, the "Winning Bidder") and enter a Sale Order.

(vi)    If a Qualified Bidder is not the Winning Bidder as determined by the Court at the Sale Hearing, the Deposit will be returned to the bidder within two (2) business days after the entry of the Sale Order or within two (2) business days of a final order denying a sale.  In the event the sale to the Winning Bidder is not consummated within the time established in the Winning Bidder's purchase agreement, the Debtors have the right to

-20-

accept the next Qualified Bid and consummate the sale with the maker of the next Qualified Bid, subject to the consent of that party.

(vii)(4) Other than as provided in the Purchase Agreement, the sale of assets shall be on an "AS IS, WHERE IS" basis without any representations or warranties of any kind, nature or description by the Debtors, including any warranties of merchantability or fitness for a particular purpose; moreover, the Sale Order shall provide that the Winning Bidder shall not be a successor in interest to the Debtors, and shall be deemed a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code.

(viii) The sale shall be closed at GLM's offices as soon as possible following the Sale Hearing, but in no instance later than February 28, 2013 (the "Closing").

6.5. Auction.

(a) If the Debtors do not receive any Qualified Bids by the Bid Deadline, then the Debtors will close the sale with Group.

(a)(b) If more than one Qualified Bid is received by the Bid Deadline, at leastthen three business days prior toafter the Auction Date (defined below), no later than 12:00 p.m. (Michigan time),Bid Deadline, the Debtors shallwill deliver to all Qualified Bidders a copy of the highest and best Qualified Bid received, as determined in the Debtors' business judgment, consistent with the Bidding Procedures.

(b)(c) If more than one Qualified Bid is received by the Bid Deadline, the Auction will be conducted at GLM's offices on February 14 (the "Auction Date") at 10:30 a.m. (Michigan time). If, however, no Qualified Bid other than Group is received by the Bid Deadline, then the Auction will not be held.21 days after entry of the Confirmation Order at 10:30 a.m.

(d) Only Qualified Bidders (and their counsel and financial advisors) that have submitted Qualified Bids shallwill be entitled to participate in the Auction. At the Auction,, and only Group and Qualified Bidders who have submitted a Qualified Bid will be permitted to increase their bids.

(e) The minimum overbid at the Auction shall require minimum overbids ofis $10,000.00.

(f) Bidding at the Auction will continue until such time as the highest and best Qualified Bid is determined.

(e)(g) Each Qualified Bidder must appear in person at the Auction or through a duly authorized representative, unless alternative arrangements are made in advance with the Debtors.

(d)(h) Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors

-21-

determine is relevant, the Debtors, in their discretion, may conduct the Auction in the manner ~~it~~they determines will achieve the maximum value for the Assets and that is in the best interests of their estates.

~~(e)~~(i)    ~~As soon as practicable after~~After the conclusion of the Auction, the Debtors ~~shall~~will (i) review each Qualified Bid made at the Auction on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the ~~Sale~~sale and (ii) identify the highest or otherwise best offer or offers for the ~~Purchased~~ Assets as the ~~Winning Bid.~~ winning bid.

~~(f)    At the Sale Hearing, the Debtors will present the Winning Bid as the highest and best offer and will request Bankruptcy Court approval thereof and authority to sell the Assets to the Winning Bidder.  Notwithstanding the foregoing, if no Qualified Bid is received, no auction will occur and the Debtors shall present Group as the Winning Bidder at the Sale Hearing.~~

~~(g)    Group shall be deemed to be a Qualified Bidder who has made a Qualified Bid and shall have standing to be heard at the Sale Hearing and any other hearing that relates to the transactions contemplated herein. The Debtors may make reasonable alterations or additions to the bidding procedures as long as such alterations or additions are announced at the Auction and do not adversely affect Group's rights.  No bidder who failed to submit a timely Qualified Bid or who failed to participate in the Auction may be heard at the Sale Hearing.~~

~~(h)    Any bidders presenting bids shall bear their own expenses in connection with the proposed sale, whether or not such sale is ultimately approved, in accordance with the terms of the Purchase Agreement.~~

(j)    The Debtors will notify the Qualified Bidder that has submitted the highest or otherwise best offer as that such Qualified Bidder is the "Winning Bidder" in writing no later than 24 hours after the conclusion of the Auction.

(k)    If a Qualified Bidder is not the Winning Bidder at the Auction, the Initial Deposit will be returned to the Qualified Bidder no later than ten days after the Auction. In the event the sale to the Winning Bidder is not closed within seven days of the Auction, Debtors have the right to accept the next Qualified Bid and consummate the sale with the maker of the next Qualified Bid, subject to the consent of that party.

(l)    The sale will be closed at GLM's offices no later than seven days after the Bid Deadline if no Qualified Bids other than that submitted by Group are received and, in the event that the Debtors receive one or more Qualified Bids and hold the Auction, no later than seven days after the Auction.

(m)    If an Auction occurs, the Debtors will file a notice with the Bankruptcy Court that notifies parties in interest of the Winning Bidder and the price received for the Assets at the Auction.

6.6.    Sale Authority

(a)     The Confirmation Order shall act as authority for the Debtors to close the sale of the Assets with Group or the Winning Bidder at the Auction.

(b)     After the Auction, the Debtors – in their sole discretion, without further court order and without notice to parties in interest, Group or the Winning Bidder (if the Auction occurred); and without Group's permission or the Winning Bidder's permission (if the Auction occurred) – may close a sale with the next highest bidder from the Auction (if the Auction occurred), or, if the next highest bidder is unwilling to close, or if the Auction did not occur, then with the best offer for the Assets then available.

(c)     All liens, claims, and encumbrances against the Assets, whether consensual or statutory, will be extinguished with respect to the Assets.

(d)     The Confirmation Order will serve as evidence that the Debtors are authorized to close a sale of the Assets to Group, to the Winning Bidder, or with the best offer available, whoever the buyer might be, based solely on the Debtors' representations as to who the proper buyer of the Assets is.

(e)     The Confirmation Order will provide that Group, the Winning Bidder, or the best offer available, whoever the buyer might be, is a good faith purchaser under 11 U.S.C. §363(m).

6.6.6.7.     Proceeds of Auction

(a)     Upon completion of the Auction, all proceeds received from the Auction shallwill be placed into a trust account maintained by GLMRealty.

(b)     Once Allowed Administrative Expense Claims and Allowed Professional Expense and Reimbursement Claims have been paid, the remainder of the proceeds of the Auction shallwill be deemed to be the Unsecured Distribution and shallwill be distributed in accordance with the terms of this Plan.

## ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

7.1.     Distributions for Claims Allowed as of the Effective Date.  Except as otherwise provided in this Article VI, distributions of Cash to be made on the Effective Date to holders of Allowed Claims shallwill be deemed made on the Effective Date if made on the Effective Date or as soon thereafter as practicablepractical, but in any event no later than: (i) thirty (30) days after the Effective Date; or (ii) with respect to any particular Claim, such later date when the applicable conditions of sections 8Sections 9.3 and 89.4 (regarding Cure payments for executory contracts and unexpired leases being assumed) or section 6.4(c)Section 7.3 (regarding undeliverable distributions), as applicable, are satisfied.  Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to sectionSection 7.4 of the Plan.

-23-

7.2.    **Prepayment Right.**  The Debtors retain the right to prepay any Allowed Claim in their business judgment.

7.3.    <u>Disbursements, Generally</u>.  All distributions under the Plan ~~shall~~will be made by the Debtors or such other Person designated by them.  All distributions under the Plan ~~shall~~will be made in accordance with the priorities established by the Plan.  Any Cash payment to be made pursuant to the Plan may be made by check or wire transfer.

Distributions to the holders of Allowed Claims will be made as follows: (i) at the respective addresses set forth in the Schedules unless superseded by the address set forth on the proofs of claim filed by holders of Claims, or (ii) at the address set forth in any written notice of address change delivered to the Debtors after the date of filing of any proof of claim.

Returned or otherwise undeliverable Distributions will remain in the possession of the Debtors until such time as a distribution becomes deliverable.  The Debtors may, but ~~shall~~will not be required to, take reasonable steps to attempt to deliver the distribution to the holder of the Allowed Claim.  Any holder of an Allowed Claim that does not advise the Debtors that it has not received its, his or her distribution within one hundred and twenty (120) days after the date of attempted distribution will have its, his or her Claim for such undeliverable distribution discharged and will be forever barred from asserting any such Claim against the Debtors or their property.  In such cases, undeliverable distributions will become the Debtors' property, free of any restrictions thereon_._

~~(a)~~7.4.  <u>Timing of Distributions</u>.  In the event any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably ~~practicable~~practical after the next succeeding Business Day, but ~~shall~~will be deemed to have been completed as of the required date.

~~7.4.~~7.5.<u>Setoffs</u>.  The Debtors may, but ~~shall~~will not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim in respect of which distribution ~~shall~~will be made), any claims of any nature whatsoever that they may have against the holder of such Claim.


**ARTICLE VIII**

<u>PROCEDURES FOR RESOLVING AND TREATING DISPUTED ADMINISTRATIVE EXPENSE CLAIMS AND CLAIMS</u>

8.1.    <u>Objections to and Resolution of Administrative Expense Claims and Claims</u>..  Except as to applications for allowance of compensation and reimbursement of expenses under ~~sections~~Sections 330, 331 and 503 of the Bankruptcy Code, the Debtors ~~shall~~will, on and after the Effective Date, have the exclusive right to make and file objections to Administrative Expense Claims and Claims and ~~shall~~will have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and

Claims and compromise, settle or otherwise resolve Disputed Administrative Expense Claims and Disputed Claims without approval of the Bankruptcy Court.

Unless otherwise ordered by the Bankruptcy Court, the Debtors ~~shall~~will file all objections to Administrative Expense Claims and Claims that are the subject of proofs of claim or requests for payment filed with the Bankruptcy Court (other than applications for allowances of compensation and reimbursement of expenses), and serve such objections upon the holder of the Administrative Expense Claim or Claim as to which the objection is made ~~as soon as is practicable, but in no event~~no later than one hundred and twenty (120) days after the Effective Date, or such later date as may be approved by the Bankruptcy Court.

8.2.    No Distribution Pending Allowance.  ~~Notwithstanding any other provision of the Plan, no Cash shall be distributed~~The Debtors will not make any distribution under the Plan on account of any Disputed Claim unless and until such Claim is deemed Allowed.

8.3.    Estimation.  The Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or Disputed Claim pursuant to ~~section~~Section 502(c) of the Bankruptcy Code regardless of whether they have previously objected to such Claim.  In the event the Bankruptcy Court estimates any contingent or Disputed Claim, the estimated amount may constitute a maximum limitation on such Claim, as determined by the Bankruptcy Court.  Notwithstanding this, the Debtors may elect to pursue any supplemental proceedings to object to the allowance and payment of such Claim.  All of the aforementioned Claims objection and estimation procedures are cumulative and not exclusive of one another.

# ARTICLE IX

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1.    Assumption and Assignment of Executory Contracts and Unexpired Leases.  All executory contracts and unexpired leases that exist between the Debtors and any Person or Entity ~~shall~~will be deemed assumed by ~~them~~the Debtors on the Confirmation Date and assigned to the Winning Bidder of the Auction effective as of the Closing, except for any executory contract or unexpired lease (i) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date, (ii) as to which a motion for approval of the rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date or (iii) listed on Exhibit G hereto.

9.2.    Rejection of Certain Contracts  Each contract and lease listed on Exhibit G to the Plan, ~~including~~in addition to all of the listing agreements between Realty and its clients, which Realty believes are not assignable, will be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. The Debtors reserve the right, at any time on or prior to the Effective Date, to amend Exhibit G to ~~the Plan to~~add or delete any contract or lease.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejection of any executory contract or unexpired lease listed on Exhibit ~~I~~G to the Plan, provided that the Effective Date occurs.  Any Allowed Claims for rejection damages ~~shall~~will be included in Class 9 – Realty Unsecured Claims.

If the rejection by a Debtor, pursuant to this Plan or otherwise, of an executory contract or unexpired lease results in a Claim, then such Claim ~~shall~~will be forever barred and ~~shall~~will not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them unless a Proof of Claim is Filed with the Bankruptcy Court and served upon counsel to the Debtors within thirty (30) days after the later of (a) the Effective Date or (b) notice that the executory contract or unexpired lease has been rejected, unless otherwise ordered by the Bankruptcy Court. Any Proofs of Claim arising from the rejection of the Debtors' executory contracts or unexpired leases that are not timely ~~Filed shall~~filed will be disallowed automatically, forever barred from assertion, and ~~shall~~will not be enforceable against the Reorganized Debtors ~~or~~without the need for further notice to or action, order, or approval of the Bankruptcy Court or other Person, and any Claim arising out of the rejection of the executory contract or unexpired lease ~~shall~~will be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

9.3. <u>Approval of Assumption and Assignment of Executory Contracts and Unexpired Leases</u>. Entry of the Confirmation Order ~~shall~~will, subject to and conditioned upon the occurrence of the Effective Date, constitute the approval, pursuant to ~~sections~~Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption and assignment to the Winning Bidder of the executory contracts and unexpired leases assumed pursuant to ~~section 8~~Section 9.1 hereof, effective as of the ~~Effective Date~~closing on the sale of the Assets.

9.4. <u>Cure of Defaults</u>. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of performance (within the meaning of ~~section~~Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to the assumption, the Cure ~~shall~~will occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, if there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, the Reorganized Debtors ~~shall~~will have the right to reject the contract or lease for a period of five (5) days after entry of a Final Order establishing a Cure amount in excess of that provided by the Debtors or Reorganized Debtors.

Except as may otherwise be agreed to by the Debtors and the non-Debtor party to a particular contract or lease, any and all undisputed defaults under any executory contract or unexpired lease assumed by them ~~shall~~will be satisfied by Cure, in accordance with ~~section~~Section 365(b)(1) of the Bankruptcy Code.

The Debtors believe that there are no defaults with respect to any executory contracts and unexpired leases.

<div align="center">

**ARTICLE X**

**<u>MEANS FOR IMPLEMENTATION OF THE PLAN</u>**

</div>

10.1. <u>Funding of the Plan</u>. Cash payments required under the Plan will be funded from (1) existing Cash balances as of the Effective Date, (2) proceeds of the Auction, and (3) Mr. Roberts' payments under the terms of this Plan.

10.2.    Roberts' Payments Under the Plan.  Mr. Roberts will devote his disposable monthly income over the five-year period of the Plan, as set forth in the budget and projections included in the Disclosure Statement, and such disposable monthly income will be included in the funds available for the Unsecured Distribution. for the five-year period of the Plan.  Mr. Roberts may, at any time, pre-pay the entirety of his remaining monthly payments under the terms of the Plan at the discount rate of 4.5%.

10.3.    Direction to Parties.  From and after the Effective Date, the Debtors may apply to the Bankruptcy Court for an order directing any necessary party to execute or deliver, or to join in the execution or delivery of, any instrument required to effect a transfer of property dealt with by the Plan, and to perform any other act, including the recording of any release or notice of satisfaction of any Lien, that is necessary for the consummation of the Plan, pursuant to sectionSection 1142(b) of the Bankruptcy Code.

## ARTICLE XI

## EFFECT OF CONFIRMATION OF PLAN

11.1.    Term of Bankruptcy Injunction or Stays.  Unless otherwise provided in the Confirmation Order, all injunctions or stays provided for in this casethese cases under sectionsSections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shallwill remain in full force and effect until the Effective Date.

11.2.    Causes of Action Reserved and Preserved.  As of the Effective Date, any and all Causes of Action, including, without limitation, avoidance actions accruing to the Debtors under Chapter 5 of the Bankruptcy Code, actions against former investors for turnover of unpaid accounts receivable, actions against former investors for an accounting of amounts paid, claims against former employees for wrongful appropriation of confidential business information and interference with the Debtors' business, and potential claims for wrongful prosecution, which are listed on Exhibits D, E and EH to the Plan, if not sold to the Winning Bidder at the Auction, shallwill be reserved and preserved by, and for the benefit of, the Debtors.  To the extent that these Causes of Action are not sold to the Winning Bidder at the Auction, and the Debtors recover any amounts with respect to these actions, the net amount recovered after the costs of prosecution shallwill be added to the Unsecured Distribution and distributed in accordance with the terms of this Plan.

11.3.    Discharge of Debtors.  Except as may otherwise be provided in the Plan or Confirmation Order, the rights afforded and the payments and Distributions to be made and the treatment under the Plan will be in complete exchange for, and in full and unconditional settlement, satisfaction, discharge, and release of any and all existing debts and Claims of any kind, nature or description whatsoever against the Debtors and their assets, their property or their estates, and will effect a full and complete release, discharge, and termination of all Liens, security interests, or other claims, interests, or encumbrances upon all of the Debtors' assets and property.  Further, all Personspersons and entities are precluded from asserting, against any property of the Debtors, or any Propertyproperty that is to be distributed under the terms of the Plan, any Claims, obligations, rights, causes of action, or liabilities based upon any act, omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, other

-27-

than as expressly provided for in the Plan or Confirmation Order, whether or not the holder of a Claim based upon such debt has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

Mr. Roberts ~~shall~~will receive a discharge upon the completion of the earlier of (1) all of his required payments under the terms of this Plan over the five year Plan period, or (2) the lump sum payment of the net present value of all of his required payments under the terms of this Plan. Upon the occurrence of either of the above, Mr. Roberts ~~shall~~will file a motion for entry of his discharge.  The Debtors may also, pursuant to 11 U.S.C. 1141(5)(A) or (B), move to seek a discharge for Mr. Roberts prior to completion of the Plan.

        11.4.   <u>Injunction</u>. Except as may otherwise be provided in the Plan or Confirmation Order, all ~~Persons~~persons and entities who have held, hold or may hold Claims against the Debtors are, with respect to any such Claims, permanently enjoined from and after the Confirmation Date from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan): (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors or any of their property; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors or any of their property; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or any of their property; or (d) prosecuting or otherwise asserting any right, claim or cause of action released pursuant to the Plan.

Except as otherwise specifically provided in the Plan, nothing in the Plan will be deemed to waive, limit, or restrict in any way the discharge granted to the Debtors upon Confirmation of the Plan by Section 1141 of the Bankruptcy Code and the terms of this Plan.

        11.5.   <u>Comprehensive Settlement of Claims and Controversies</u>.  Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies, and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of the Debtors, their estate and the holders of Claims and are fair, equitable and reasonable.

        11.6.   <u>Binding Effect</u>.  Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the Plan ~~shall~~will be binding upon and inure to the benefit of the Debtors and the holders of Claims and their respective successors and assigns, whether or not the Claim of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

# ARTICLE XII

## EFFECTIVENESS OF THE PLAN

12.1.   Conditions Precedent to Confirmation.  The following are conditions precedent to the entry of the Confirmation Order, unless such conditions, or any of them, have been satisfied or ~~duly~~ waived ~~pursuant to section 11.5 of~~in writing by the ~~Plan~~Debtors:

(a)   The Confirmation Order is in form and substance reasonably satisfactory to the Debtors.

(b)   The Plan ~~shall~~will not have been materially amended, altered or modified from the Plan ~~as~~filed on ~~November 26~~December 5, 2012, unless such material amendment, alteration or modification has been made in accordance with ~~section 13.7 of the Plan~~Section 14.6.

(c)   All Exhibits to the Plan are in form and substance reasonably satisfactory to the Debtors.

12.2.   Conditions Precedent to Occurrence of Effective Date.  The following are conditions precedent to the occurrence of the Effective Date for the Plan, unless such conditions, or any of them, have been satisfied or ~~duly~~ waived ~~pursuant to section 11.5 of~~in writing by the ~~Plan~~Debtors:

(a)   The Bankruptcy Court ~~shall~~will have entered the Confirmation Order.

(b)   The Bankruptcy Court ~~shall~~will have entered an order (contemplated to be part of the Confirmation Order) approving and authorizing the Debtors to take all actions necessary or appropriate to implement the Plan, and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

(c)   The Bankruptcy Court will have entered an order (contemplated to be part of the Confirmation Order) approving and authorizing the Debtors to sell the Assets in accordance with the bidding and sale procedures set forth in the Plan.

~~(c)~~(d)   No stay of the Confirmation Order ~~shall~~will then be in effect.

~~(d)~~(e)   The Plan and all Exhibits to the Plan ~~shall~~will not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order.

12.3.   Waiver of Conditions.  The conditions precedent to the entry of the Confirmation Order and to the occurrence of the Effective Date may be waived, in whole or in part, at any time by the written agreement of the Debtors without an order of the Bankruptcy Court.

-29-

**ARTICLE XIII**

**RETENTION OF JURISDICTION**

13.1.   Jurisdiction of Bankruptcy Court.  The Bankruptcy Court shallwill retain jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sectionsSections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)   To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, if any are pending, and the allowance of any Claims resulting therefrom;

(b)   To hear and determine any and all adversary proceedings, applications and contested matters, even if filed after confirmation of the Plan;

(c)   To hear and determine any objections to Administrative Expense Claims or Claims;

(d)   To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(e)   To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by sectionSection 1142 of the Bankruptcy Code;

(f)   To consider any amendments to or modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)   To hear and determine all applications for compensation and reimbursement of expenses of professionals under sectionsSections 330, 331 and 503(b) of the Bankruptcy Code;

(h)   To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(i)   To recover all of the Debtors' assets and property of their estates, wherever located;

(j)   To hear and determine matters concerning state, local and federal taxes in accordance with sectionsSections 346, 505 and 1146 of the Bankruptcy Code;

(k)   To hear and determine any requests by the Debtors to sell any asset pursuant to sectionSection 363 of the Bankruptcy Code;

(l)   To hear any other matter not inconsistent with the Bankruptcy Code;

(m)     To hear and determine all actions pursuant to ~~sections~~Sections 105, 502, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, any collection matters related thereto, and settlements thereof;

(n)     To hear and determine any disputes concerning quarterly fees owing or claimed to be owing to the office of the U.S. Trustee under 28 U.S.C. § 1930; and

(o)     To enter a final decree closing this cases.

## ARTICLE XIV

## <u>MISCELLANEOUS PROVISIONS</u>

14.1.     <u>Effectuating Documents and Further Transactions</u>. The Debtors are each authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the transactions set forth in, and the terms and conditions of, the Plan.

14.2.     <u>Committee</u>.  On the Effective Date, ~~any official committee and/or unofficial or ad hoc committees shall~~the Committee will be dissolved and its members released and discharged of any further duties and responsibilities and the retention or employment of the ~~such committee or committees'~~Committee's professionals ~~shall~~will also terminate, except that ~~such committee or committees~~the Committee and ~~their respective~~its  professionals may prepare, file and seek approval of ~~their respective~~ applications for final allowances of compensation and reimbursement of expenses.

14.3.     <u>Post Effective Date Fees and Expenses</u>.  From and after the Effective Date, the Reorganized Debtors may, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons ~~incurred~~employed by the Debtors in connection with the implementation and consummation of the Plan, the reconciliation of Claims, the prosecution of Causes of Action, or any other matters as to which such professionals are employed.

14.4.     <u>Payment of Statutory Fees</u>.  All fees payable pursuant to ~~section~~Section 1930 of title 28 of the United States Code ~~shall~~will be paid on the Effective Date and the Debtors ~~shall~~will prepare and submit such post-confirmation reports as may be required. The Debtors ~~shall~~will continue to remit to the office of the United States Trustee all appropriate post confirmation monthly reports/affidavits for all relevant time periods and ~~shall~~will continue to remit quarterly fee payments in full based on all disbursements for the relevant period(s) until ~~the case is~~these cases are closed by order of the ~~court~~Bankruptcy Court.  To the extent any monthly reports/affidavits are not timely provided or fees are not paid in full, this case may be re-opened by the office of the United States Trustee to file such Motions or take such action as appropriate to be provided with such reports and to be paid any fees owed or due.

14.5.     <u>Effect of Conversion</u>.  In the event this case is converted to a chapter 7 case, all property of the Debtors ~~shall~~will re-vest in the converted ~~estate~~estates.

14.6.    Amendment or Modification of the Plan.  Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of ~~sections~~Sections 1122 and 1123 of the Bankruptcy Code, and the Debtors ~~shall~~will have complied with ~~section~~Section 1125 of the Bankruptcy Code.  The Plan may be altered, amended or modified by the Debtors at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of ~~sections~~Sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under ~~section~~Section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications.  A holder of a Claim that has accepted the Plan ~~shall~~will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan or the Disclosure Statement without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims.

14.7.    Severability.  In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision ~~shall~~will be invalid, void or unenforceable with respect to the holder or holders of such Claims as to which the provision is determined to be invalid, void or unenforceable.  The invalidity, voidness or unenforceability of any such provision ~~shall~~will in no way limit or affect the enforceability and operative effect of any other provision of the Plan and ~~shall~~will not require the re-solicitation of any acceptance or rejection of the Plan unless otherwise ordered by the Bankruptcy Court.

14.8.    Revocation or Withdrawal of the Plan.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan ~~shall~~will be deemed null and void.  In such event, nothing contained herein ~~shall~~will constitute or be deemed a waiver or release of any claims by or against the Debtors or any other Person or Entity or to prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors.

14.9.    Notices.  All notices, requests and demands to or upon the Debtors to be effective ~~shall~~will be in writing and, unless otherwise expressly provided herein, ~~shall~~will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

*If to the Debtors:*

Ralph Roberts Realty, LLC and Ralph R. Roberts
18299 Tara Drive
Clinton Twp., MI  48036

-32-

~~Attn:  Ralph Roberts Realty, LLC and Ralph R. Roberts~~Telephone: 586-751-0000                                                     Facsimile: 586-620-6449

*with a copy to:*

Hannah Mufson McCollum
Gold, Lange & Majoros, P.C.
24901 Northwestern Hwy., Suite 444
Southfield, MI 48075
~~Facsimile: 248-350-0519~~
Telephone:  248-350-8220
Facsimile: 248-350-0519

14.10.  <u>Governing Law</u>.  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent any exhibit to the Plan provides otherwise, the rights and obligations arising under the Plan ~~shall~~will be governed by, and construed and enforced in accordance with, the laws of the State of Michigan~~, without giving effect to the principles of conflicts of law of such jurisdiction~~.

14.11.  <u>Withholding and Reporting Requirements</u>.  In connection with the consummation of the Plan, the Debtors ~~shall~~will comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder ~~shall~~will be subject to any such withholding and reporting requirements.

14.12.  <u>Headings</u>.  Headings are used in the Plan for convenience and reference only, and ~~shall~~are not ~~constitute~~ a part of the Plan for any other purpose.

14.13.  <u>Exhibits</u>.  All exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

14.14.  <u>Filing of Additional Documents</u>.  On or before confirmation of the Plan, the Debtors ~~shall~~will file with the Bankruptcy Court such agreements and other documents, if any, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

14.15.  <u>Plan Controls</u>.  To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan ~~shall~~will be controlling.

14.16.  <u>Section 1125(e) of the Bankruptcy Code</u>.  The Debtors have, and upon confirmation of the Plan ~~shall~~will be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

-33-

14.17.  <u>Return of Security Deposits</u>.  Unless the Debtors have agreed otherwise in a written agreement or stipulation approved by the Bankruptcy Court, all security deposits provided by the Debtors to any Person or Entity at any time after the Commencement Date ~~shall~~will be returned to the Debtors within twenty (20) days after the Effective Date, without deduction or offset of any kind.

14.18.  <u>Bar Date for Administrative Expense Claims</u>.  The Confirmation Order will establish a bar date for Administrative Expense Claims other than for Administrative Expense Claims for professional compensation and reimbursement of expenses of professionals.  Holders of Allowed Administrative Expense Claims not paid prior to the Effective Date ~~shall~~will submit proofs of claim on or before such bar date or be forever barred from doing so.  The notice of confirmation delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth such date and constitute notice of the bar date for Administrative Expense Claims.  The Debtors ~~shall~~will have thirty (30) days or such longer period as may be allowed by order of the Bankruptcy Court to review and object to such Administrative Expense Claims before a hearing for determination and allowance of such Administrative Expense Claims.  This paragraph does not apply to any amounts that may be owed to the Office of the United States Trustee.

14.19.  <u>Tax Liability</u>.  The Debtors are hereby authorized to request an expedited determination under ~~section~~Section 505(b) of the Bankruptcy Code of any tax liability for all taxable periods ending after the ~~Commencement~~Petition Date through and including the Effective Date.

14.20.  <u>Time</u>.  In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 ~~shall~~will apply.

Dated: ~~November 26~~December 5, 2012

 

 

RALPH ROBERTS REALTY, LLC
BY:  Ralph R. Roberts
ITS:  President

-and-

 

Ralph R. Roberts

**IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

In re:                                              )        Chapter 11
                                                    )
RALPH ROBERTS REALTY, LLC, *et al.*[1]              )        Case No. 12-53023
                                                    )        (Jointly Administered)
                                                    )
           Debtors.                                 )        Judge Thomas J. Tucker
                                                    )

~~FOURTH~~

**FIFTH AMENDED DISCLOSURE STATEMENT OF
RALPH ROBERTS REALTY, LLC AND RALPH R. ROBERTS UNDER CHAPTER 11
OF THE BANKRUPTCY CODE**

---

[1] This case is jointly administered with the case of Ralph R. Roberts, Case No. 12-53024.

# Table of Contents

Page

I.  INTRODUCTION ................................................................................................2

    A.  General ..............................................................................................2

II. BACKGROUND AND OPERATIONS OF THE DEBTORS ...........................2

    A.  Background of the Debtors .................................................................2

    B.  Compensation/Income and Post-Confirmation Income ....................6

    C.  Nature of Case and Events Leading to Chapter 11 Filing .................6

III. SIGNIFICANT POST-PETITION ACTIONS ...................................................7

    A.  First Day Motions and Cash Collateral Use .....................................7

    B.  Retention of Professionals .................................................................7

    C.  Case Administration...........................................................................7

        1.  Bar Date ..................................................................................8

    D.  Post Petition Transfers Outside of the Ordinary Course...................8

    E.  Post-Petition Litigation .....................................................................8

    F.  Other Assets and Income ...................................................................9

    G.  General Liabilities............................................................................10

    H.  Plan Auction.....................................................................................10

IV. ASSETS AND LIABILITIES..........................................................................11

    A.  Liquidation Analysis........................................................................11

    B.  Long-Term Debt Obligations...........................................................13

    C.  Guaranteed Debt ..............................................................................13

    D.  Priority Debt.....................................................................................13

    E.  Unsecured Debt.................................................................................13

    F.  Section 503(b)(9) Administrative Expense Claims ..................13

G.  Causes of Action .............................................................................13

    1.  Chapter 5 Claims...................................................................14

    H.  Pending Litigation as of the Petition Date .................................14

V.  IMPLEMENTATION OF THE PLAN .............................................................15

A.     Prepetition Financial Information ............................................................15

B.     Post-Petition Financial Information ........................................................15

C.     Plan Projections .....................................................................................15

D.     Ordinary Course Business Operations ....................................................16

E.     Tax Ramifications ..................................................................................16

     1.     U.S. Federal Income Tax Consequences to the Debtors ...........17

          a.     Cancellation of Debt Income .......................................17

     2.     U.S. Federal Income Tax Consequences to Holders of Certain Claims ....17

          a.     Distributions in Discharge of Accrued But Unpaid Interest ..........18

     3.     Importance of Obtaining Professional Tax Advice ...................18

VI.     LEGAL REQUIREMENTS.......................................................................18

     A.     Required Information...............................................................18

          1.     Voting Procedures............................................................18
          2.     Acceptance.......................................................................19
          3.     Confirmation....................................................................19
          4.     Modification.....................................................................19
          5.     Effect of confirmation......................................................19
          7.     Waivers of Defects, Irregularities, Etc............................21
          8.     Withdrawal of Ballots; Revocation..................................21
          9.     Further Information; Additional Copies ...........................21

VII.     CONFIRMATION OF THE PLAN.........................................................22

     A.     Acceptance..............................................................................22

     B.     Best Interests Test ...................................................................22

     C.     Nonconsensual Confirmation...................................................23

     D.     Feasibility...............................................................................24

VIII.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...........................................................................................24

     A.     Liquidation Under Chapter 7 ...................................................25

     B.     Alternative Plan of Reorganization...........................................25

IX.     CERTAIN FACTORS TO BE CONSIDERED ...................................25

     A.     Risks of Bankruptcy................................................................25

|  |  | 1. | Objection to Classifications | 25 |
|  |  | 2. | Risk of Non-Confirmation of the Plan | 25 |
|  | B. | Risks Associated with the Reorganization | | 26 |
|  | C. | Risks Relating to Cash for Plan Distributions | | 26 |
| X. | CONCLUSION | | | 26 |

**DISCLOSURE STATEMENT**

I.      INTRODUCTION

        A.  General

The purpose of this ~~fourth~~fifth amended disclosure statement (the "Disclosure Statement") is to provide holders of all Claims against the Debtors with adequate information, within the meaning of Section 1125(a) and 1126 of the Bankruptcy Code, of a kind, and in sufficient detail, to make an informed judgment about the ~~fourth~~fifth amended joint chapter 11 plan of reorganization submitted to the Bankruptcy Court on ~~November 26~~December 5, 2012 (the "Plan") by Ralph Roberts Realty, LLC ("Realty") and Ralph R. Roberts (each individually referred to as a "Debtor" and collectively, as the "Debtors"). ~~A copy of the Plan is attached hereto as Exhibit A.~~ Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.

The Debtors are debtors and debtors-in-possession in this case under Chapter 11 of the Bankruptcy Code. The Debtors are reorganizing pursuant to Sections 1107 and 1108 of the Bankruptcy Code and are soliciting votes to accept or reject the Plan. The Debtors believe that acceptance of the Plan is in the best interests of all holders of Claims against them.

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN, TOGETHER WITH THE EXHIBITS, IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

II.     BACKGROUND AND OPERATIONS OF THE DEBTORS

        A.  Background of the Debtors

Realty is a Michigan Limited Liability Company, which was organized in March of 2005. Mr. Roberts is an individual debtor under Chapter 11. Realty is owned 20% by Mr. Roberts and 80% by Rowland Family, LLC, which itself is owned 32.5% by Mr. Roberts, 47.5% by Kathleen Roberts, Mr. Roberts' wife, 10% by Mr. Roberts' two ~~minor~~ children and 10% by Lois Maljack and Jeffrey Roberts. Further, Mr. Roberts is owed approximately $1,350,000 by Realty on account of past unpaid commissions and loans made to Realty, and also has the right to make future claims against Realty on account of future ~~commission~~commissions.

Mr. Roberts has been selling real estate since the late 1970s. Mr. Roberts started working at Fox Brothers Real Estate in Centerline, Michigan. During the next several years, Mr. Roberts worked at various real estate companies and listed and sold hundreds of properties. Mr. Roberts then started working for Earl Keim in Warren in 1985. In 1986, Mr. Roberts went to Earl Keim in Madison Heights, and then in late 1986, joined Re/MaxProperties in Warren. After several successful years at Re/Max, the owners stopped paying payroll taxes, which caused all of the accounts to be frozen and made it impossible for its agents, including Mr. Roberts, to be paid. As a result, Mr. Roberts himself paid the past due taxes for the company and a short time afterwards, purchased the company.

After several years, Mr. Roberts left the Re/Max franchise and opened Ralph R. Roberts Real Estate, Inc. ("Real Estate") in 1991. Over several years, Mr. Roberts added a title company and

a mortgage company to Real Estate's affiliate companies. Mr. Roberts also implemented a business model wherein Real Estate would use funds lent by private investors (the "~~Private Investors~~2007 Creditors") at high interest rates to purchase property. Once the purchased property was either re-sold, sold on land contract, or renovated, Real Estate would then repay the ~~Private Investors~~2007 Creditors using the proceeds of Real Estate's secured credit facility, which was syndicated among several banks. This greatly reduced the interest rate that Real Estate was paying, while still allowing the bank syndicate to retain the properties as collateral. Over the course of the life of this business model, which Real Estate used from approximately 1991 to 2001, the ~~Private Investors~~2007 Creditors were paid millions of dollars as a result of the real estate boom that occurred during that time.

However, in 2001, Real Estate began to experience financial and political problems, which began when one of Real Estate's agents informed Mr. Roberts that her brother had been wrongly convicted of rape, and ~~asking~~asked Mr. Roberts if there was anything he could do. Mr. Roberts met with Mr. Paul Pash, the former police chief of Warren, and Mr. Carl Marlinga, the former prosecutor for the City of Warren, and Mr. Marlinga agreed to re-open the case. However, Mr. Marlinga was in the midst of a run for a Michigan senate seat, and his opponent, Ms. Candace Miller, as a campaign tactic, accused Mr. Roberts of giving money to Mr. Marlinga to reopen the rape case. These allegations were reported by the Detroit Free Press in 2002. In February of 2003, the FBI raided Mr. Roberts' office and his personal residence and Mr. Roberts was formally indicted in June of 2004. The indictment caused Real Estate's investors, including a number of banks, to become skittish about future investments and begin demanding immediate repayment of current investments.

The entire incident was manufactured for the political gain of Mr. Marlinga's opponents. Mr. Roberts' case was dismissed in June of 2005 at the request of the government and Mr. Marlinga was found not guilty by a jury. Further, after a 2003 retrial, Mr. Jeffery Moldowan was acquitted, after the sole eyewitness recanted her testimony and the expert witness was found not to be credible.[2] Unfortunately, although the charges were dropped and Mr. Roberts was completely exonerated, the damage done was substantial. While the charges against Mr. Roberts were pending, Real Estate's syndicate of bank investors required forced place life insurance from Mr. Roberts at a staggering cost, and also replaced Mr. Roberts with a temporary manager for Real Estate. The temporary manager reported directly to the syndicate banks, and all of Real Estate's employees reported to the temporary manager. This caused tremendous stress to Real Estate's employees, business disruptions and loss of investor and client confidences. The banks, interested only in reducing their exposure, simply exacerbated the problem.

After all charges against Mr. Roberts were dropped, he once again took control of Real Estate, but Real Estate was cash-flow negative, had lost most of its investors and client base, and was facing increasingly strident demands for repayment from ~~private investors.~~the 2007 Creditors.

Just as Mr. Roberts was beginning to recover from the needless trauma of his indictment, Mr. Roberts suffered a crushing blow when his daughter died in May, 2006 at the age of 18. Mr.

---

[2] Mr. Moldowan was also awarded a $2.8 million judgment for wrongful prosecution.

Roberts was unable, for a period of time, to carry on the business, and Realty generated almost no income during that period. At the same time as this tragedy, ~~Real Estate's former private investors (~~the "2007 Creditors~~")~~ began a targeted, persistent and harassing drive to force Mr. Roberts, Real Estate or Realty to pay them the full amount they alleged to be owed to them.

In September, 2007, Mr. Roberts reached a settlement agreement with Real Estate's syndicate bank investors. Mr. Roberts agreed to formally shut down Real Estate as well as its associated companies and repay the syndicate banks over time. Mr. Roberts then began operating Realty, which he had founded in 2005, in order to give investors and clients distance from Real Estate's financial distress and increased confidence in Realty's new business model.

Also, as a condition of ~~this~~the settlement with the bank syndicate, Mr. Roberts entered into a settlement agreement with the 2007 Creditors. This agreement was based on assumptions that the real estate market, which had been growing exponentially for several years, would continue on its growth trajectory.

However, in 2008, the real estate market in Michigan, more so than in the rest of the country, suffered a sudden and devastating collapse. Rather than appreciating, most real estate lost 50% or more of its value, and real estate sales tumbled to record lows. As a result, Realty had virtually no sales and no income. Neither Realty nor Mr. Roberts had the cash flow to fund all required payments and all required conditions of the settlement agreement with the 2007 Creditors. Further, Mr. Roberts, who owned a house on Lake St. Clair, defaulted on its mortgage, as a result of his poor cash flow.

In 2009, Mr. Roberts developed a new business model based on the underbidding by banks at foreclosure sales. This underbidding, which was frequently tens of thousands of dollars below both the amount owed on the foreclosed properties, as well as the fair market value of the properties themselves, allowed Mr. Roberts and Realty to begin to return to profitability through the sale of real estate during the redemption period. However, this was insufficient to return Realty to full profitability, and it continued to report negative net income - $135,000 in negative income in 2009, $188,000 in negative net income in 2010 and $398,000 of negative net income in 2011.[3]

Throughout this period, Mr. Roberts continued to attempt to negotiate with the 2007 Creditors to work out a viable repayment plan based on Mr. Roberts' new business model. The 2007 Creditors, however, apparently more motivated by personal grudges, accused Mr. Roberts of selling his Lake St. Clair house at a profit (despite proof that the lender accepted a short sale and forgave a significant deficiency~~)~~), of spending too much money on his daughter's funeral, of hiding and dissipating assets, and of other unspecified and unsubstantiated "bad acts". This refusal to rationally negotiate culminated in the filing of a complaint against Mr. Roberts in February of 2011.

---

[3] This negative net income reflects commissions earned, but not paid to, Mr. Roberts in the approximate amount of $500,000. If these are removed, Realty shows a modest profit of approximately $105,000.

After the complaint was filed, Mr. Roberts continued his attempts to negotiate a rational repayment plan, all of which were rejected by the 2007 Creditors. After a series of increasingly invasive and irrelevant discovery requests and more than $90,000 in legal fees, Mr. Roberts and Realty filed for bankruptcy protection on May 25, 2012 in order to rationally deal with the problematic legacy debt represented by the 2007 Creditors.

The Debtors also filed their Combined Chapter 11 Plan of Reorganization and Disclosure Statement on the Petition Date.

On June 20, 2012, the Committee was formed. The Committee is comprised of four of the 2007 creditors (Mary Ferris, Tony Ferris, Charles Ferarolis and Mr. Richard Whitmore), and two other creditors, Mr. David Wilson and Mr. Michael Smith.

This Court granted preliminary approval of the Plan on July 5, 2012.

After a motion by the Committee to adjourn the hearing to consider confirmation of the Plan and for authority to conduct discovery, on August 22, 2012, the Court entered an order adjourning the hearing to consider confirmation of the Plan until October 17, 2012. The Committee and the Debtors engaged in discovery during the ~~plan~~ adjournment of the confirmation hearing, with the Debtors providing responses to the Committee's discovery requests, and producing Mrs. Kathleen Roberts, Mr. Gerald VanGoethem (Maplelane Homes, Inc.'s former accountant), Mr. Joseph Sirianni and Mr. Roberts for 2004 examinations. Discovery on the Plan is now closed.

On October 9, 2012, the Committee and the 2007 Creditors filed objections to confirmation of the Plan (the "Objections"). The Objections asserted that the disclosure statement did not contain sufficient information to enable creditors to vote, that Plan solicitation was "piecemeal" as a result of the Debtors' multiple plan supplements, that the Plan was not feasible because the projections were overly inflated, and that the Plan violated the absolute priority rule because it proposed a contested cramdown without an accompanying auction of the Debtors' equity. The Debtors filed a response to the Objections, asserting that they had provided sufficient information in the disclosure statement to enable creditors to vote, that the projections contained in the plan were conservative and achievable, and that Plan satisfied the absolute priority rule.

On October 17, 2012, this Court held an initial hearing to consider confirmation of the Plan. After preliminary argument, in which the Committee asserted that the absolute priority rule was a barrier to even proceeding with an evidentiary hearing on the rest of the Committee's objections, the Court took the issue of the absolute priority rule under advisement. On October 19, 2012, this Court issued an opinion denying confirmation of the Plan because the Plan did not provide for competitive bidding for equity in Realty.

After the issuance of the Court's opinion, the Debtors, the Committee and the 2007 Creditors agreed to mediate the Committee's and the 2007 Creditors' objections to the Debtors' Plan. This Court, by stipulated order, appointed Mr. Howard Sher as the mediator. Despite Mr. Sher's herculean efforts, after 12 hours, the parties were unable to settle at mediation.

After mediation and the opinion denying confirmation, Realty suffered a catastrophic decline in revenue for October as a result of lack of confidence by Realty's employees and investors. In addition, after October 17, a number of Realty's employees abruptly quit, formed a competing

company, and stole a copy of the Debtors' confidential property tracking database. Since that time, these former employees have attempted to contact the Debtors' current investors in order to entice them away from the Debtors. The Debtors also laid off a number of employees in order to manage the cash flow difficulties that arose as a result of the revenue disruption.

As a result of the failed mediation, the employee mutiny and the drop off in revenue, the Debtors determined that they could not propose a consensual plan, as they did not believe that ~~the projections~~ their projected income, especially as it had declined significantly from that originally projected, supported the payout the Committee demanded. The Debtors further determined that the likely expense of attempting to seek confirmation of a contested cramdown plan was prohibitive and would be detrimental to the estates and the creditors. Accordingly, the Debtors determined that the least expensive and most efficient means of proceeding in these cases was to liquidate Realty's assets for the benefit of all of the Debtors' creditors, and propose a liquidating plan.

### B. Compensation/Income and Post-Confirmation Income

The Debtors intend to liquidate Realty's assets and pay the net sale proceeds to unsecured creditors after the payment of all allowed administrative expenses, the majority of which will be the fees of the professionals in these cases. As well as the anticipated proceeds from the Auction of Realty's assets, Mr. Roberts will devote all of his projected monthly disposable income during the five-year period of the Plan to the repayment of creditors through the Plan.

Pre-petition, Mr. Roberts was paid $117,400 in salary in 2011. Mr. Roberts, although entitled to one-half of the commissions on properties sold by Realty, has not been paid these commissions since 2007. The total accrued but unpaid amounts equal approximately $1.35 million. Mr. Roberts received no other fringe benefits, such as car or insurance allowances pre-petition.

Post-petition, Mr. Roberts has been paid a salary of $125,000 for 2012 to date, and is not entitled to any commissions, car allowances, insurance allowances, or any other "fringe benefits" that are customary for executives of companies. Mr. Roberts is entitled to participate in Realty's 401(k) plan, which provides a 3% match. Mr. Roberts pays for his own medical insurance, at the cost of approximately $20,000 per year.

Post-confirmation, to the extent that Group is the Winning Bidder, Mr. Roberts' compensation will be determined by Group's profitability. However, Mr. Roberts has projected that he anticipates being able to earn a salary of $90,000 for the first year of the Plan, $95,000 for the second year, $100,000 for the third year and $105,000 for the fourth and fifth years of the Plan, and will pay creditors ~~his monthly~~ $30,242, which represents Mr. Roberts' disposable monthly income ~~of $30,242~~ over the five-year life of the Plan.

### C. Nature of Case and Events Leading to Chapter 11 Filing

Prior to the Petition Date, as described above, the Debtors attempted to settle with the 2007 Creditors. These settlement attempts were ultimately unsuccessful, and forced the Debtors to file for bankruptcy to propose a rational repayment plan.

As further discussed above, the Debtors attempted to settle with the 2007 Creditors and the Committee after the Petition Date, and engaged in a 12-hour mediation in an attempt to do so. This mediation was ultimately unsuccessful, and led the Debtors to propose this auction plan, which was explicitly called for by the Committee and the 2007 Creditors in the Objections.

III.     SIGNIFICANT POST-PETITION ACTIONS

The Debtors filed this chapter 11 case on May 25, 2012, and the following significant actions have taken place between that date and the date of filing this amended Plan:

A.     First Day Motions and Cash Collateral Use

The Debtors filed the Plan and this Disclosure Statement on the Petition Date.  Concurrently, the Debtors also filed a motion to set a chapter 11 status conference to establish dates and deadlines with respect to voting on the Plan and the setting of a confirmation hearing.  The Debtors did not file a first day motion to use cash collateral or seek approval for debtor-in-possession financing. First, as the Debtors have no secured creditor with a lien on all assets and therefore did not require permission to use cash collateral.  Second.Further the Debtors believe that they will havethe Auction proposed in the Plan provides sufficient cash flowfunds to makepay all post-petition payments to administrative creditors as well as payments required under the proposed Planexpenses, and therefore the Debtors did not request court approval for debtor-in-possession financing.  Therefore, there are no cash collateral, post-petition financing, or adequate protection orders entered in these Chapter 11 Cases.

After the July 5, 2012 order granting preliminary approval of the Disclosure Statement, as discussed above, the Debtors, the 2007 Creditors and the Committee engaged in plan discovery, which led to the production of significant amounts of documents, and four 2004 examinations. Both the Committee and the 2007 Creditors objected to the Third Amended Plan, and this Court held a hearing on those Objections on October 17, 2012, and issued an opinion and order denying confirmation of the Third Amended Plan on October 19, 2012.  That opinion and order, as well as the Objections, led to the proposal of this plan, which proposes an auction of all of Realty's assets to Group, an entity formed and owned by Mr. Roberts, or such other bidder as submits the highest and/or otherwise best bid.

B.     Retention of Professionals

To represent them in this chapter 11 case, the Debtors retained Gold, Lange & Majoros, P.C. as bankruptcy counsel, and the Bankruptcy Court entered an order approving that retention on June 20, 2012 [Docket No. 45].  Similarly, the Debtors have also retained Sirianni & Company PLLC as accountants, and the Bankruptcy Court entered an order approving that retention on June 29, 2012 [Docket No. 64].  The Debtors retained Robert A. Novak PLLC as litigation counsel, and the Bankruptcy Court entered an order approving that retention on July 20, 2012 [Docket No. 78].  The Committee retained Carson Fischer, PLLC as bankruptcy counsel and the Bankruptcy Court entered an order approving that retention on July 31, 2012 [Docket No. 89].

C.     Case Administration

### 1. **Bar Date**

The Clerk of the Court established September 24, 2012 as the deadline for all non-governmental creditors, including holders of claims under Section 503(b)(9) of the Bankruptcy Code, to file a proof of claim against the Debtors' ~~estate~~estates.

The Debtors received ~~40~~45 filed claims (some of which are duplicative), which asserted general unsecured claims in the amount of $13,110,162.26. The Debtors received no filed priority claims.

### D. Post Petition Transfers Outside of the Ordinary Course

The Debtors have made no post-petition transfers outside of the ordinary course.

### E. Post-Petition Litigation

The Debtors have brought no post-petition litigation. However, the Debtors are involved with ~~two~~several pieces of post-petition litigation.

First, on September 7, 2012, the Debtors filed a notice of removal of a currently pending state court case, captioned Ralph Roberts Realty, LLC v Manaia Capital Management, Inc. to the Bankruptcy Court. Manaia Capital Management, Inc. did not object, and this matter is currently subject to an adversary scheduling order and is pending. Realty seeks a determination that no redemption of property occurred, and thus the property in question remains the property of its investor, entitling Realty to a split when that investor sells the property.

Second, in December, 2011, Bryan Legree filed a state-court complaint against Jerone Turner, Marchie Turner, Chris Kayne, and Ralph Roberts Realty, Macomb County Circuit Court Case No. 11-4713. Mr. Legree, a debtor in bankruptcy, sued Mr. & Mrs. Turner, the buyers of his house, Mr. Kayne, an agent of Realty, and Realty itself. Mr. Legree alleged that the Turners, Mr. Kayne and Realty constructively evicted him from his home. On December 8, 2011, Realty filed a notice of removal of this state court litigation, which was given adversary proceeding no. 11-07001, alleging that the matter was not properly in front of the state court as it concerned a professional appointed in Mr. Legree's bankruptcy case and employed by Mr. Legree's bankruptcy trustee, and involved a bankruptcy-court authorized sale of the property at issue, which was not Mr. Legree's residence. On June 28, 2012, Judge Rhodes issued an order allowing the case to be removed to bankruptcy court. This adversary proceeding was stayed by the filing of the Debtors' bankruptcy cases. However, Judge Rhodes issued an order setting a status conference in the case for November 19, 2012. Prior to that status conference, Realty and Mr. Legree agreed to dismiss Realty and Mr. Kayne from the adversary proceeding and remand the remaining issues back to state court. Judge Rhodes entered a dismissal and remand order on November 19, 2012.

Third, on September 18, 2012, in an adversary proceeding captioned Brian Legree ~~filed an adversary complaint against Realty, alleging that his~~v Jerone Turner, Marchie Turner, Chris Kayne and Ralph Roberts Realty, Adv. No. 12-05688, Brian Legree filed a complaint substantially identical to the state court complaint described above, but this time filed it in Realty's bankruptcy case. This complaint alleged that Mr. Legree's claim against Realty was not

dischargeable. ~~This claim~~ in Realty's bankruptcy.  Mr. Legree's non-dischargeability action was filed after the deadlines set forth in Bankruptcy Rules 4004 and 4007, ~~and the Debtors~~asserted non-dischargeability claims against non-debtors and contained other defects, and Realty filed a motion to dismiss on October 18, 2012.  ~~This matter was resolved by stipulated order entered~~ After a hearing on November ~~19~~14, 2012, ~~which dismissed Realty and its agent, Mr. Chris Kayne and remanded~~ the ~~remaining matters back~~Bankruptcy Court entered an order granting Realty's motion to ~~state court~~dismiss.

~~Third~~Fourth, the 2007 Creditors have, in the past, alleged that Mr. Roberts made, and Mrs. Roberts received, fraudulent transfers of various interests in corporations and/or money and property.  After extensive investigation by the 2007 Creditors and the Committee, both the 2007 Creditors and the Committee admitted that Mrs. Roberts received only the transfer of property that was entireties property, which transfers are not fraudulent under Michigan law.  Therefore, the Debtors have definitively determined that they do not have a cause of action against Mrs. Roberts for return of fraudulent transfers.

~~Fourth~~Fifth, the Debtors have claims and causes of action against former employees, including Ms. Grace Marji-Warren, Ms. Lanette Louwers, Ms. Bunni Monti, and Ms. Sherry Drouillard, for theft of corporate assets, theft of confidential business information and ~~tortuous~~tortious interference in business relationships with Realty's investors.   The Debtors continue to investigate these matters.

~~Finally~~Sixth, the Debtors also have claims and causes of action against former investors for failure to pay Realty its share of the profits from sold houses.  The Debtors believe that the amount of money owed is approximately $250,000, and is owed by a number of different investors, ~~although only~~including, but not limited to, Jon Savoy, Arnold Hassig a/k/a Butch Hassig and Dennis Stevens ~~owe the Debtors significant amounts.~~.  If these accounts receivable are not sold to the Winning Bidder at the Auction, ~~The~~the Debtors plan to file adversary proceedings to collect these accounts receivable ~~within 45 days of.~~

Finally, the ~~date hereof.  The~~ Debtors also have a potential cause of action against Charles Ferarolis, *et al.*, the current plaintiffs in the Macomb County litigation brought by the 2007 Creditors, for failure to provide an accounting of amounts paid and amounts applied to interest and principal, potential misapplication of payments, and wrongful refusal to apply appropriate setoffs against principal.  The Debtors continue to investigate this cause of action.

    F.   Other Assets and Income

As discussed above, the Debtors have very few assets.  The Debtors' significant assets are their ability to generate cash from business operations as a result of Mr. Roberts' talents as a real estate broker and professional.  As noted above, Realty ~~owns~~is owed approximately $300,000 in past-due accounts receivable from various investors that have defaulted on their obligations to pay Realty a percentage of the net profit upon the sale of investor-owned properties, approximately $60,000 in current accounts receivable from investors, office fixtures, furniture, electronics and other office equipment, including a leased copier and postage machine, and a minimal amount of cash.  Mr. Roberts owns a 2012 Yukon subject to a security agreement, retirement accounts with an approximate aggregate value of $350,000, the right to receive

royalties on books that he has written, interests in several non-operating businesses and holding companies, and a right of setoff against claims held by the ~~Private Investors~~2007 Creditors in a no-longer-operating prior business.  Mr. Roberts does not believe that he will be entitled to a tax refund.

Realty also owns the right to the splits generated as a result of investors' sales of real estate. Realty estimates that there are approximately 300 properties with respect to which it is entitled to splits.  Approximately 150 of those properties are subject to written contracts with the respective investor owners; the remainder are the subject of oral contracts with no written counterpart.  The oral contracts contain no timeframe within which an investor must sell its property and pay Realty the split income.  The written contracts contain sale deadlines of between 5 and 8 years. Realty believes that the net present value of these contracts is zero, as they depend on the services of Mr. Roberts for continued monitoring of the value of the properties, rental management services, and other services for which Realty and Mr. Roberts are uniquely qualified.  Notwithstanding this belief, the Debtors have determined that the best and most efficient way of obtaining a recovery for creditors is to auction the assets of Realty, including these contracts, to the highest bidder at the Auction.

Realty also holds net operating loss carryforwards as a result of ongoing losses.

The Debtors own no other significant assets, and anticipate that their ability to fund payments called for under the Plan will derive from cash proceeds from the sale of assets, Mr. Roberts' payments into the Plan, and the payment of administrative expenses by the Winning Bidder.

G. General Liabilities

Mr. Roberts is obligated to JPMorgan Chase Bank, N.A. with respect to a second mortgage on property located at 18299 Tara Drive, Clinton Township, Michigan, 48036.  Mr. Roberts does not own the Tara Drive property, and is not obligated with respect to the first mortgage on that property.  As set forth in the attached projections, Mr. Roberts will make payments on the second mortgage, as the non-debtor owner of the property intends to retain it, and it is where Mr. Roberts resides, as well as contributing to the payment of taxes and upkeep. Mr. Roberts is also obligated with respect to a financing agreement with Ally Financial on his vehicle, a 2012 GMC Yukon.  Finally, Mr. Roberts has a total of approximately $~~200~~890,000 ~~of~~in unsecured debt ~~relating to credit cards and legal fees, and approximately $10 million dollars of unsecured debt related to obligations of Realty and other business entities that Mr. Roberts personally guaranteed.  As well (~~as ~~general unsecured~~reflected by filed claims~~)~~.  Mr. Roberts' schedules disclose that he is also obligated as a guarantor of the debts of Realty to the 2007 Creditors, in the approximate amount (as asserted b the 2007 Creditors) of $~~200,000 with respect to prepetition legal fees,~~10 million dollars.  Realty ~~is~~has a total of approximately $12,219,000 in unsecured debt (as reflected by filed claims), of which the majority relates to claims asserted by the 2007 Creditors.  Realty is also obligated to current investors in the approximate amount of $50,000, and Realty is also obligated in the approximate amount of $2,900.00 per month to its landlord for office space, as well as for general ordinary course business expenses.

H.  Plan Auction

After the denial of confirmation of the Third Amended Combined Plan of Reorganization and Disclosure Statement and mediation, the Debtors determined, as discussed above, that the expense and delay of a contested cramdown plan would not be beneficial to creditors. Accordingly, the Debtors proposed the current Plan, which provides for an auction of substantially all of the assets of Realty to the highest bidder at a public auction.

Ralph Roberts Realty Group, LLC ("Group"), an entity formed by Mr. Roberts and owned solely by him, will serve as the stalking horse bidder for the sale. Group has entered into an asset purchase agreement with Realty, a copy of which is attached as Exhibit A. Group has agreed to purchase the Assets listed in the asset purchase agreement for $50,000 plus the payment of all unpaid Allowed Administrative Expense Claims of the Debtors. Group has also agreed to assume the lease with Realty's landlord, assume the leases for Realty's currently leased business equipment, and assume all contracts, whether written or not, with Realty's current investors. This assumption includes, as is required, the performance of all of Realty's duties under such contracts, including, but not limited to, rental management, land contract servicing, assistance, including legal, with investors' landlord/tenant issues, recording and transfer of deeds with respect to purchased properties, creation of acquisition entities and appraisal and sale of properties for investors (all at the investors' request). Group has also agreed to assume Realty's existing real estate listing agreements, but Realty believes that any Winning Bidder that is not Group would not be able to assume such listing agreements, as they are not transferable between brokers under Michigan Law and would, upon the sale to a Winning Bidder not associated with Mr. Roberts as a broker, be automatically terminated.

After entry of the Confirmation Order, interested potential bidders have seven days to submit a signed confidentiality agreement and financial information to the Debtors. After submission of this information, such potential bidder will be deemed to be a "Qualified Bidder." Qualified Bidders then have seven days to submit a "Qualified Bid", which is, in general and as more particularly described in the Plan, a cash offer for the Assets of at least $60,000 plus the payment of all unpaid Allowed Administrative Expense Claims, with a $20,000 initial deposit upon terms and conditions substantially similar to those in the asset purchase agreement between Group and Realty. Any Qualified Bid must also contain proof of the Qualified Bidder's broker's and servicer's licenses (or its association with a third party or parties that has such a license) and of the Qualified Bidder's financial bona fides and ability to close a transaction. The Debtors have sole discretion to determine whether a bid is a Qualified Bid.

If the Debtors receive one or more Qualified Bids, then they will conduct an auction seven days after the bid deadline. If the Debtors do not receive any Qualified Bids, then they will close the sale of the Assets with Group. The Confirmation Order shall authorize such sale and no further sale order will be required. If the Winning Bidder is not Group, Group will operate a business that will be in competition with the Winning Bidder.

IV.    ASSETS AND LIABILITIES

    A.  Liquidation Analysis.

The Debtors have prepared the following liquidation analysis. The liquidation analysis assumes that the full fair market value of all assets will be obtained, the proceeds will be pooled, and the

costs of liquidation will be subtracted from the pool. Costs of liquidation include payment of the past-due real estate taxes, brokers' commissions, transfer taxes and other sale fees, and an estimate of the applicable legal fees.

### B. Long-Term Debt Obligations

As of the Petition Date, Realty was generally obligated to pay debts generated in the ordinary course of its business. ~~-~~ As discussed above in III.G and in IV.C, Realty was also obligated with respect to unsecured debts arising primarily out of settlement agreements and legal fees in the approximate amount of $12 million, based on filed claims. ~~Mr.~~ Also, as discussed above in III.G and in IV.C, Mr. Roberts, as of the Petition Date, was obligated to the 2007 Creditors, the settling banks, and other settling parties, as well as on account of guaranteed debt, ~~as discussed below in (C)~~ in the approximate amount of $~~800~~890,000, based on filed claims. Mr. Roberts is also obligated to Ally Financial in the approximate amount of $55,000 with respect to a 2012 GMC Yukon, which claim is secured.

### C. Guaranteed Debt

As noted above, Mr. Roberts has personally guaranteed the settlement debts arising from the operation of Real Estate. Mr. Roberts has also guaranteed the debt of Maplelane Homes, Inc., in the approximate amount of $1.3 million. Realty is not obligated with respect to that debt. The Debtors are original obligors on the debts listed on their respective schedules.

### D. Priority Debt

The Debtors are not aware of any outstanding priority debt.

### E. Unsecured Debt

As described above, Mr. Roberts estimates, based on filed claims, that he has approximately $~~10 million~~890,000 in general unsecured debt, including trade debt. Realty estimates, based on filed claims, that it has approximately $~~9~~12 million in unsecured debt. These claims may be subject to disallowance or reduction.

### F. Section 503(b)(9) Administrative Expense Claims

Under Section 503(b)(9) of the Bankruptcy Code, a claim for payment for goods shipped to a debtor in the twenty days *before* the commencement of a bankruptcy case may be entitled to priority status as an administrative expense claim. The Debtors are unaware of any potential Section 503(b)(9) claims in ~~this case~~these cases.

### G. Causes of Action

Section ~~10~~11.2 of the Plan provides that, as of the Effective Date, any and all Causes of Action, including, without limitation, avoidance actions accruing to the Debtors under Chapter 5 of the Bankruptcy Code and all actions listed ~~in~~on Exhibit ~~IV~~H to the Plan, ~~shall~~will be reserved and preserved by, and for the benefit of, the Debtors and the proceeds of such Causes of Action ~~shall~~will be retained by the Debtors.

1.  <u>Chapter 5 Claims</u>

In the 90 days before the Petition Date, Realty made $55,348.30 in potentially preferential payments.  In the 90 days before bankruptcy, Mr. Roberts made $0.00 in potentially preferential payments.  These payments may be subject to statutory and other defenses.

In the one year immediately preceding the bankruptcy filing, Realty made $60,380.00 in payments to "insiders" (as defined in Section 101(31) of the Bankruptcy Code).  In the one year immediately preceding the bankruptcy filing, Mr. Roberts made no payments to "insiders".  The payments made by Realty may be subject to statutory and other defenses.

Additionally, as set forth in more detail on <u>Exhibit H</u>, the Debtors possess causes of action for turnover of unpaid accounts receivable against a number of ~~former investors~~<u>investors that defaulted on their obligations to pay Realty a percentage of the net proceeds resulting from the sale of investor-owned property</u>, which the Debtors reserve the right to pursue.

H.  <u>Pending Litigation <u>as of the Petition Date</u></u>

There are several piece of litigation ~~currently~~<u>that either were</u> pending against the Debtors<u> as of the Petition Date or were commenced thereafter, although some of these causes of action have been resolved</u>.  The first arises out of the 2007 Creditors' February, 2011 lawsuit, filed in Macomb County Circuit Court, captioned Charles Ferarolis, *et al.* v. Ralph R. Roberts *et al.*, case no. 2011-0782-CK.  The events leading to this litigation are described in detail above.

The second ~~piece~~<u>and third pieces</u> of litigation ~~is captioned~~<u>are connected.  In December, 2011,</u> Bryan Legree ~~v.~~<u>filed a state-court complaint against</u> Jerone Turner, Marchie Turner, Chris Kayne, and Ralph Roberts Realty, <u>Macomb County Circuit Court </u>Case No. 11-4713~~, currently pending in removal proceedings in front of the Bankruptcy Court in adversary case no. 11-07001~~.  Mr. Legree, a debtor in bankruptcy, sued Mr. & Mrs. Turner, the buyers of his house, Mr. Kayne, an agent of Realty, and Realty itself.  Mr. Legree alleged that the Turners, Mr. Kayne and Realty constructively evicted him from his home.  <u>On December 8, 2011, </u>Realty filed a notice of removal of ~~the~~<u>this state court</u> litigation, <u>which was given adversary proceeding no. 11-07001,</u> alleging that the matter was not properly in front of the state court as it concerned a professional appointed ~~by the~~<u>in Mr. Legree's</u> bankruptcy ~~court~~<u>case</u> and employed by Mr. Legree's bankruptcy trustee, and involved a bankruptcy-court authorized sale of the property<u> at issue</u>, which was not ~~his~~<u>Mr. Legree's</u> residence.  On June 28, 2012, ~~the bankruptcy court~~<u>Judge Rhodes</u> issued an order allowing the case to be removed to bankruptcy court.  This ~~matter was resolved by stipulated~~<u>adversary proceeding was stayed by the filing of the Debtors' bankruptcy cases.  However, Judge Rhodes issued an</u> order ~~entered on~~<u>setting a status conference in the case for</u> November 19, 2012~~, which dismissed~~.  <u>Prior to that status conference,</u> Realty and ~~its agent, Mr. Chris Kayne and remanded~~<u>Mr. Legree agreed to dismiss Realty and Mr. Kayne from the adversary proceeding and remand</u> the remaining ~~matters~~<u>issues</u> back to state court.  <u>Judge Rhodes entered a dismissal and remand order on November 19, 2012.</u>

<u>In the third piece of litigation, captioned Brian Legree v Jerone Turner, Marchie Turner, Chris Kayne and Ralph Roberts Realty, Adv. No. 12-05688, on September 18, 2012, Brian Legree filed a complaint substantially identical to the state court complaint described above, but this</u>

time filed it in Realty's bankruptcy case. This complaint alleged that Mr. Legree's claim against Realty was not dischargeable in Realty's bankruptcy. Mr. Legree's non-dischargeability action was filed after the deadlines set forth in Bankruptcy Rules 4004 and 4007, asserted non-dischargeability claims against non-debtors and contained other defects, and Realty filed a motion to dismiss on October 18, 2012. After a hearing on November 14, 2012, the Bankruptcy Court entered an order granting Realty's motion to dismiss.

The ~~third~~fourth piece of litigation is captioned LeVasseur Dyer & Associates, P.C. v Ralph Roberts, Case No. 12-0164, currently pending in the 45th District Court for the State of Michigan (Berkley) and is a civil action against Mr. Roberts for the collection of approximately $7,800 in legal fees. As of the Petition Date, this action was pending. After receiving notice that the Debtors' bankruptcy cases stayed the pending action, LeVasseur Dyer & Associates, P.C. has filed a number of actions against property not owed by Realty but with respect to which Realty is entitled to a share of the profit when such property is sold by the investor currently holding it. ~~The Debtors believe that these actions are in violation of the automatic stay, and intend to seek their removal to the Bankruptcy Court for adjudication, including requests for sanctions and legal fees.~~

Finally, Realty is currently the plaintiff in a number of eviction and land contract forefeiture actions in Macomb County District Court and Oakland County District Court on behalf of current investors for which it acts as a property manager. Any funds or properties recovered are not the property of Realty or Mr. Roberts and will be turned over to the respective property owner. These actions are disclosed in Realty's schedules and the Plan exhibits out of an abundance of caution.


V.     IMPLEMENTATION OF THE PLAN

     A.  Prepetition Financial Information

Tax returns for 2009, 2010 and 2011, which detail the Debtors' income and expenses for those taxable years, are attached as Exhibit I.

     B.  Post-Petition Financial Information

The Debtors have attached copies of all post-petition monthly operating reports as Exhibit J.

     C.  Plan Projections

The Debtors intend to make the Unsecured Distribution out of (1) the net proceeds of the Auction after the payment of Allowed Administrative Expense Claims and (2) Mr. Roberts' disposable monthly income during the five-year period of the Plan, which is set forth in the following projections.

D.  Ordinary Course Business Operations

In the ordinary course of their business, the Debtors, on behalf of their investors, form corporate entities for which the Debtors act as the resident agent or notice agent.  The Debtors have never been owners of these formed corporate entities, nor are they voting members.  The Debtors form these entities on behalf of their investors, who use them to acquire investment property.  Post-confirmation until the closing after the Auction, the Debtors will continue to form these corporate entities on behalf of their investors, and will continue to act as notice and/or resident agents for these entities as a courtesy to their investors.

E.  Tax Ramifications

The following is a summary of certain U.S. federal income tax consequences to the Debtors and to certain holders of Claims that are expected to result from implementation of the Plan.  This discussion is based on the Internal Revenue Code (the "IRC,"), as amended, Treasury Regulations in effect on the date of this Disclosure Statement, and administrative and judicial interpretations thereof available on or before such date.  All of the foregoing are subject to change, which change could apply retroactively and could affect the federal income tax consequences described below.  There can be no assurance that the IRSInternal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below.  No ruling has been applied for or received from the IRS with respect to any of the tax aspects of the Plan and no opinion of counsel has been requested or received by the Debtors with respect thereto.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder.  The tax consequences to holders may vary based upon the individual circumstances of each holder.  In addition, this discussion does not address any aspect of local, state or foreign taxation, or any estate or gift tax consequences of the Plan.

The following assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out.  This discussion further assumes that the various debt and other arrangements to which either of the Debtors are parties and any Distributions and allocations provided for under the Plan will be respected for federal income tax purposes in accordance with their respective forms or as described below.

THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND SUBJECT TO SIGNIFICANT UNCERTAINTIES.  THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED.  THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  EACH HOLDER OF A CLAIM IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

1. U.S. Federal Income Tax Consequences to the Debtors

The Debtors expect that they will have consolidated net operating loss ("NOL") carryforwards to the year ended December 31, 2011 and, to the extent not used or eliminated in that year, to subsequent years. The amount of such NOLs and NOL carryforwards remains subject to review and adjustment by the IRS and to limitations imposed by Sections 108 and 382 of the ~~Internal Revenue Code ("IRC"),~~IRC, as discussed below.

### a. **Cancellation of Debt Income**

The Debtors will realize cancellation of debt income ("CODI") as a result of the reduction of certain debts and the discharge of Allowed Claims under the Plan. However, CODI is not taxable to a debtor if the debt discharge occurs in a title 11 bankruptcy case. Rather, under Section 108 of the IRC, such CODI instead may reduce certain of the Debtors' tax attributes, generally in the following order: (a) ~~net operating losses~~NOLs and ~~net operating loss~~NOL carryforwards ~~("NOLs");~~; (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of depreciable and nondepreciable assets (but not below the amount of their liabilities immediately after the discharge); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards. A debtor may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets (and, possibly, the depreciable assets of its subsidiaries) and then to reduce NOLs and certain other tax attributes. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income that accrues between the date of discharge and the end of the' taxable year). Any excess CODI over the amount of available tax attributes is not subject to United States federal income tax and has no other United States federal income tax impact.

2. U.S. Federal Income Tax Consequences to Holders of Certain Claims

The U.S. federal income tax consequences of the transactions contemplated by the Plan to holders of Claims arising from distributions to be made under the Plan may vary depending upon, among other things, the type of consideration received by the holder in exchange for the indebtedness it holds, the nature of the indebtedness owing to it, whether the holder is a corporation, whether the holder has previously claimed a bad debt or worthless security deduction in respect of its Claim, whether such Claim constitutes a "security" for purposes of reorganization provisions or other provisions of the IRC, whether the holder is a resident of the United States for tax purposes, whether the holder reports income on an accrual or cash basis, and whether the holder receives ~~Distributions~~distributions under the Plan in more than one taxable year. This discussion assumes that the holder has not taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or any prior year and that such Claim did not become completely or partially worthless in a prior taxable year. Moreover, the Debtors intend to claim deductions to the extent they are permitted to deduct any amounts they pay in cash, stock or other property pursuant to the Plan.

### a. **Distributions in Discharge of Accrued But Unpaid Interest**

In general, to the extent that money or property received by a holder of an unsecured claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, such a holder will recognize a deductible loss to the extent that any accrued interest claimed was previously included in gross income and is not paid in full. Holders of Claims for or including accrued interest should consult their own tax advisors.

### 3. Importance of Obtaining Professional Tax Advice

IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that: (i) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the IRC, (ii) such discussion is written in connection with the promotion or marketing of the transactions or matters discussed herein, and (iii) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.

## VI. LEGAL REQUIREMENTS

### A. Required Information

The following language in this Part VI.A is required by the Bankruptcy Court. Voting procedures and standards are described in greater detail in VI.A.3: Confirmation of the Plan.

### 1. **Voting Procedures**

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims or equity interests that are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan. Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Bankruptcy Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtors' Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Bankruptcy Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Bankruptcy Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Bankruptcy Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and disclosure statement, each holder of such a claim or interest

should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the Debtors' attorney by the deadline previously established by the ~~court~~Bankruptcy Court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted. A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtors' attorney.

## 2. **Acceptance**

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

## 3. **Confirmation**

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process. Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:

(1)     Each class of impaired creditors and interest must accept the plan, as described in paragraph VI.A.2, above.

(2)     Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

## 4. **Modification**

The Debtors reserve the right to modify or withdraw the plan at any time before confirmation.

## 5. **Effect of confirmation**

If the plan is confirmed by the Bankruptcy Court:

(1)     Its terms are binding on the Debtors, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.

(2)     Except as provided in the plan:

(a)     In the case of a corporation that is reorganizing and continuing business:

<div style="margin-left: 3em;">

      i)        All claims and interests will be discharged.

      ii)      Creditors and shareholders will be prohibited from asserting their claims against or interest in the debtor or its assets.

(b)      In the case of a corporation that is liquidating and not continuing its business:

      i)        Claims and interests will not be discharged.

      ii)      Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

(c)      In the case of an individual or husband and wife:

      i)        Claims will be discharged, except as provided in 11 U.S.C. §§ 523 and 1141(d).

      ii)      Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 1141(d).

</div>

Paragraphs VI.A.5.(2)(b) and VI.A.5.(2)(c) apply in these Chapter 11 Cases.

### 6. *Additional Information*

Under the Plan, the impaired Classes are Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 and ~~12~~13.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED PROPERLY AS DESCRIBED IN THIS DISCLOSURE STATEMENT AND IN ACCORDANCE WITH THE BALLOT AND THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED BY THE DEBTORS' ATTORNEY NO LATER THAN THE VOTING DEADLINE.

By signing and returning the Ballot, each holder of a Claim entitled to vote will also be confirming that (i) such holder and/or agents acting on its behalf have had the opportunity to ask questions of and receive answers from the Debtors concerning the terms of the Plan and other related matters; (ii) the Debtors have made available to such holder or its agents all documents and information relating to the Plan and related matters reasonably requested by or on behalf of such holder; and (iii) except for information provided by the Debtors or their agents in writing, such holder has not relied on any statements made or other information received from any person with respect to the Plan.

Voting on the Plan by each holder of a Claim or interest in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of such a Claim or interest

should vote on the enclosed ballot either to accept or to reject the Plan, and then return the ballot by mail to the Debtors by the deadline previously established by the Bankruptcy Court.

### 7. Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility, acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, which determination will be final and binding. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of Ballots must be delivered to the Debtors prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in their opinion or that of their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors or the Bankruptcy Court determines. Neither of the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to delivery of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.

### 8. Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to counsel for the Debtors at any time before the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the Ballot sought to be withdrawn, and (iv) be received by counsel for the Debtors in a timely manner at the address set forth below.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of a Ballot that is not received in a timely manner by counsel for the Debtors will not be effective to withdraw a previously cast Ballot.

### 9. Further Information; Additional Copies

IF A BALLOT IS DAMAGED, LOST OR MISSING, A REPLACEMENT BALLOT MAY BE OBTAINED BY SENDING A WRITTEN REQUEST TO COUNSEL FOR THE DEBTORS. IF YOU HAVE ANY QUESTIONS ABOUT THE PROCEDURE FOR VOTING YOUR CLAIM OR WITH RESPECT TO THE PACKET OF MATERIALS THAT YOU HAVE RECEIVED, OR IF YOU WISH TO OBTAIN AN ADDITIONAL COPY OF THE PLAN, THIS DISCLOSURE STATEMENT OR ANY APPENDICES OR EXHIBITS TO SUCH DOCUMENTS, PLEASE CONTACT HANNAH MUFSON MCCOLLUM, 24901 NORTHWESTERN HWY., SUITE 444, SOUTHFIELD, MICHIGAN, 48075, OR BY TELEPHONE AT (248) 350-8220.

## VII.    CONFIRMATION OF THE PLAN

### A.  Acceptance

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that: (i) the Plan classifies Claims and Equity Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Debtors complied with applicable provisions of the Bankruptcy Code; (iv) the Plan has been accepted by the requisite votes of holders of Claims (except to the extent that confirmation is available under section 1129(b) of the Bankruptcy Code); (v) the Plan has been proposed in good faith and not by any means forbidden by law; (vi) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vii) the Plan is feasible and confirmation will likely not be followed by the liquidation or the need for further financial reorganization of the Debtors, unless such liquidation or reorganization is proposed in the Plan; (viii) the Plan is in the "best interests" of all holders of Claims in an impaired Class by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan; (ix) all fees and expenses payable under 28 U.S.C. § 1930 (fees owing to the bankruptcy clerk and the United States Trustee) have been paid or the Plan provides for their payment on the Effective Date; and (x) if applicable, the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined under section 1114 of the Bankruptcy Code, at the level established prior to confirmation for the duration of the period that the Debtor has obligated itself to provide such benefits.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that Class, but for that purpose counts only those who actually vote to accept or reject the plan.  Thus, a class will have voted to accept the Plan if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### B.  Best Interests Test

Notwithstanding acceptance of the Plan by the requisite majorities of the holders of Claims in Classes entitled to vote, in order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all Classes impaired by the Plan.  In order to Confirm the Plan, the Bankruptcy Court must find that the Plan provides to each ~~Entity~~entity that rejects the Plan a recovery which has a value at least equal to the value of the distribution that each such Entity would receive if all of the Debtors' assets which are property of their estate were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate what creditors would recover in a Chapter 7 liquidation, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' remaining assets if the Chapter 11 Cases were converted to Chapter 7 and the assets were liquidated by a

trustee in bankruptcy.  Upon liquidation, the potential distribution available to creditors may be reduced (a) by the costs of liquidation under Chapter 7, which costs would include the compensation of a trustee, disposition expenses, including possible transfer taxes which may not be payable under Chapter 11, all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation of professionals), litigation costs (if any), and Claims arising during the pendency of the Chapter 11 Cases and the Chapter 7 liquidation proceedings, and (b) to the extent of the value of the Collateral securing the Claims of secured creditors.  There may be included Chapter 11 Administrative Expense Claims for the failure of the Debtors to fulfill post-petition contracts, if any.  These Claims would have to be paid in full out of the liquidation proceeds before the balance, if any, would be made available to pay unsecured creditors.

The Debtors have prepared a Liquidation Analysis to show the anticipated distribution to creditors in a Chapter 7 liquidation of the Debtors.  As demonstrated in the Liquidation Analysis, it is anticipated that creditors would receive far less in a Chapter 7 liquidation than they would under the Plan, and, ~~therefore, this requirement will easily be satisfied.~~ in addition, it is likely that the Debtors' chapter 11 administrative creditors would not be paid in full.  Therefore, the Debtors believe that they have satisfied this requirement.

## C.  Nonconsensual Confirmation

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has voted to accept the plan.  These "cramdown" provisions are set forth in Section 1129(b) of the Bankruptcy Code.

The Plan may be confirmed pursuant to the cramdown provisions if, in addition to satisfying other requirements of section 1129 of the Bankruptcy Code, the Plan: (i) "does not discriminate unfairly" and (ii) "is fair and equitable with respect to each Class of claims or equity interests that is impaired under, and has not accepted, the Plan." As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have meanings unique to bankruptcy law.

The requirement that a plan "not discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of a similar value under a plan.  A plan may provide for different treatment for different classes if the claims or interests in such classes have different priorities or characteristics.

By establishing separate Classes for the holders of each type of Claim and Equity Interest and by treating each holder of a Claim and Equity Interest in each Class the same, the Debtors submit that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests.  The Plan separately classifies the Debtors' ~~ongoing~~ secured obligations and ~~their remaining~~ unsecured obligations ~~separately~~.  Should the Debtors seek to cramdown the Plan because an impaired Class has voted to reject the Plan, they believe the Plan is fair and equitable, because each secured creditor will receive the approximate value of its collateral through the Plan.  Further, to the extent that unsecured creditors are in a separate class, this classification is

appropriate because the Claims in these Classes have entirely different characteristics and may be treated differently.

The "fair and equitable" standard, also known as the "absolute priority rule," has different meanings with respect to secured and unsecured claims. With respect to secured claims, for a plan to be fair and equitable, the plan may provide, among other things, that the holder of such claims retain the liens securing those claims to the extent of the allowed amount of such claims, and that such holder receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. Alternatively, a plan may provide for the realization by the holders of secured claims of the indubitable equivalent of such claims.

With respect to a class of unsecured creditors, a plan may be fair and equitable if it provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of the claim, or if it provides that the holder of a claim or interest that is junior to the claims of such class will not receive or retain distributions or interests under the plan on account of such junior claim or interest any property.

Here, with respect to Realty, the Plan satisfies the absolute priority rule because it calls for an auction sale of Realty's assets, and Mr. Roberts is not retaining his interest in Realty. Finally, as to Mr. Roberts himself, because he is an individual debtor, the absolute priority rule does not apply. As a result, the Debtors have satisfied the absolute priority rule. Mr. Roberts further believes that he has satisfied the "fair and equitable" standard by committing his disposable monthly income for the next five years to creditor payments under the Plan. The Debtors reserve the right to amend the Plan or to seek confirmation under Section 1129(b) of the Bankruptcy Code in the event any impaired Class votes to reject the Plan. ~~However, the Debtors anticipate that all impaired Classes of Claims will vote to accept the Plan.~~

D. Feasibility

The Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization unless such liquidation or reorganization is proposed in the Plan. The Debtors ~~have prepared financial projections and~~ believe that the liquidation provided for by the Plan will provide sufficient income to pay all administrative expenses and that therefore the feasibility requirement under the Bankruptcy Code will be met.

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include (i) liquidation under Chapter 7 of the Bankruptcy Code, and (ii) the preparation and presentation of an alternative plan of reorganization.

A.  Liquidation Under Chapter 7

If no Chapter 11 plan can be confirmed, this case may be converted to a case under Chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the Debtors' assets, subject to their claims of exemption and their right to reaffirm debts.  A discussion of the anticipated effect that a Chapter 7 liquidation would have on the recoveries of holders of Claims is set forth above in Section VII.B.  The Debtors believe that liquidation under Chapter 7 would result in, among other things, lower distributions being made to creditors than those provided in the Plan, and that no or few assets would be available to distribute to general creditors.

B.  Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or any other party in interest once the Debtors' exclusivity period has expired) could attempt to formulate a different plan of reorganization. The Debtors believe that this Plan is the best result for all interested parties.  The Plan, in the Debtors' opinion, represents the best alternative to protect the interests of creditors and parties in interest.

IX.    CERTAIN FACTORS TO BE CONSIDERED

A.  Risks of Bankruptcy

1.  **Objection to Classifications**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

The Plan separately classifies Claims into six13 Classes.  The claims in these Classes have different characteristics and it is therefore appropriate for such claims to be separately classified.

2.  **Risk of Non-Confirmation of the Plan**

Even if all Classes entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court.  As discussed above, Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the Debtors' non-exempt assets were liquidated under Chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies all the requirements for Confirmation of a plan of reorganization under the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court will conclude that the requirements for Confirmation of the Plan have been satisfied.

B. <u>Risks Associated with the Reorganization</u>

Factors that could negatively impact the Debtors include, without limitation: loss of employment, a further drop in the value of real estate, a further slow-down of the economy, a further reduction in jobs and/or income in the region, and/or rising energy costs.  Any one or more these factors, if occurring, may adversely affect projected operating results and financial condition.

C. <u>Risks Relating to Cash for Plan Distributions</u>

The Debtors' ability to fund Cash distributions under the Plan, and therefore consummate the Plan in its present form, is dependent on their income from their employment.

X.    CONCLUSION

RALPH ROBERTS REALTY, LLC AND RALPH R. ROBERTS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THEM AND <u>STRONGLY RECOMMEND</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.

Dated: ~~November 26~~December 5, 2012

_____
RALPH ROBERTS REALTY, LLC
BY:  Ralph R. Roberts
ITS:  President

-and-

_____
Ralph R. Roberts

**TABLE OF EXHIBITS**

Exhibit A                      Asset Purchase Agreement with Exhibits

Exhibit B                      List of Investor Contracts

Exhibit C                      Equipment List

Exhibit D                     Potential Preference Actions – Non-Insider

Exhibit E                      Potential Preference Actions – Insider

Exhibit F                      Threatened and Pending Litigation

Exhibit G                     Executory Contracts and Leases to Be Rejected

Exhibit H                     Reserved Causes of Action

Exhibit I                       2009, 2010 and 2011 Financial Information

Exhibit J                       Post-Petition Financial Information

# EXHIBIT A

# ASSET PURCHASE AGREEMENT

## ASSET PURCHASE AGREEMENT


## BASIC TERMS


**Seller:** RALPH ROBERTS REALTY, LLC ("**Realty**" or "**Seller**")


**Purchaser:** RALPH ROBERTS REALTY GROUP, LLC., a Michigan corporation ("**Group**" or "**Purchaser**")


**Assets:** Certain assets of Ralph Roberts Realty, LLC and its business operated at 12900 Hall Rd., Suite 190, Sterling Heights, MI, 48313, such assets as specifically described in Section 1 of the Asset Purchase Agreement (collectively hereinafter referred to as the "**Assets**").


**Purchase Price:** $50,000 (the "**Purchase Price**") plus payment of certain administrative expenses as set forth in Section 5 of the Asset Purchase Agreement.


The Purchase Price shall be payable subject to the terms and conditions as referred to in this Asset Purchase Agreement entered into by and between Seller and Purchaser.


**Closing Date:** Within ~~fifteen (15)~~seven business days after Seller obtains approval of this transaction from the United States Bankruptcy Court (the "**Closing Date**").

**ASSET PURCHASE AGREEMENT**

      This **ASSET PURCHASE AGREEMENT** (the "**Agreement**") is entered by and between Ralph Roberts Realty, LLC ("**Realty**" or "**Seller**") and Ralph Roberts Realty Group, LLC, a Michigan corporation ("**Group**" or "**Purchaser**"), and is made effective as of ~~November 26~~December 5, 2012 (the "**Effective Date**").

**RECITALS**

      WHEREAS, Ralph Roberts Realty, LLC, a Michigan corporation, operates a specialty real estate business, specializing in real estate transactions and the identification of real estate opportunities for investors (the "**Business**"), located at 12900 Hall Rd., Suite 190, Sterling Heights, MI 48313 (the "**Premises**");

      WHEREAS, Realty and its principal, Mr. Ralph Roberts, filed for bankruptcy protection on or around May 25, 2012 (the "**Filing Date**"), seeking relief under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Proceedings**");

      WHEREAS, under the United States Bankruptcy Code, Realty, as a debtor-in-possession, is currently the legal owner of all the assets of Realty and is vested with the powers to liquidate all the assets of Realty for the benefit of Realty's creditors as listed in the bankruptcy schedules filed by Realty in the Bankruptcy Proceedings;

      WHEREAS; Realty, in furtherance of this Asset Purchase Agreement, desires to sell and/or assign to Purchaser all of Realty's right, title and interest in and to certain assets of Realty and the Business (as specifically described in Section 1 below, collectively hereinafter referred to as the "**Assets**");

      WHEREAS, Purchaser desires to purchase, acquire and, where applicable, assume all of Realty's rights, title and interest in the Assets in accordance with the terms and conditions set forth in this Asset Purchase Agreement.

**AGREEMENT**

      NOW, THEREFORE, for and in consideration of the mutual agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

      **1.**       **Purchase, Sale, Assumption and Assignment of Assets.** Subject to the terms and conditions described herein, Seller agrees to sell assign, transfer, convey and deliver to Purchaser free and clear of all encumbrances, and Purchaser agrees to purchase (as is and where is), accept, and receive free and clear of all encumbrances, all of Seller's right, title and interest in and to all of the

Assets (other than those specifically excluded and identified in Section 1(k) of this Agreement, as the "**Excluded Assets**") including without limitation the following (hereinafter referred to as the "**Assets**"):

a.      the assumption and assignment of all contracts with investors, both informal and reduced to writing that exist as of the Closing Date (as defined below), regarding properties purchased by investors to which Realty is entitled to a share of the profits upon the sale of such property by such investor (the "Split Contracts"), a copy of which is attached as <u>Exhibit B</u>;

b.      all equipment owned by Realty, including machinery, furniture, fixtures, furnishings, materials and supplies, data processing hardware, and other personal property, wherever situated a list of which is attached as <u>Exhibit C</u>;

c.      all accounts receivable of Realty including "accounts" (as defined in the UCC) and all book debts, notes, drafts and other obligations or indebtedness owing to Realty arising from the sale, lease or exchange of goods or other property by it and/or the performance of services by Realty (the "Accounts");

d.      All of Realty's real estate listing agreements;[1]

d.e.    all of the right, title and interest of Realty, to the extent that it is assignable to a third party, to intellectual property owned by Realty, such as logos, trade names, signage and the like;[2]

e.f.    the assumption and assignment of the lease for leased premises located at 12900 Hall Road, Suite 190, Sterling Heights, Michigan, 48313;

f.g.    the assumption and assignment of the leases for Realty's leased office equipment;

g.h.    all of the right, title and interest of Realty in and to Realty's property tracking database;

h.i.    all of the right, title and interest of Realty in and to all original Files and Records and books relating to Realty;

---

[1] Seller believes that the real estate listing agreements are not transferrable to any buyer that is not associated with Mr. Roberts as a real estate broker, and that such agreements would automatically terminate upon the sale to any such buyer.

[2] Seller believes that the trade name "Ralph Roberts Realty, LLC" and/or other derivations of Mr. Roberts name cannot be used by a party that is not Mr. Roberts.

i.j.      all of Realty's rights, claims, defenses, or causes of action against third parties with respect to the Assets arising out of transactions prior to the Closing Date including the cost of litigating such actions; and

j.k.      all goodwill relating to Realty and foregoing assets.

k.l.      EXCLUDED ASSETS:   Excluded Assets shall include the following: (i) Seller shall not be assigning or otherwise transferring any bankruptcy Chapter 5 causes of action or any other causes of action that Realty may have against any insiders; (ii) Seller is not assigning or otherwise transferring any causes of action that may be brought by the Estate against any party for violation of Michigan Fraudulent Transfer Act or for conversion; and (iv) Seller shall not be assigning or otherwise transferring any cash in Seller's bank accounts as of the Closing Date (defined below).

Unless otherwise specifically set forth herein, Seller's interest in the Assets to be assigned to Purchaser under this Agreement shall be absolute ownership, free and clear of any and all liens, debts and encumbrances of any kind.   Except for the aforementioned Excluded Assets, the Assets and Seller's interest in all other items used for the operation of the Business and located on the Premises on or after the Filling Date / Closing Date shall be conveyed to Purchaser through this Asset Purchase Agreement by Bill of Sale or appropriate conveyance instrument at the Closing, whether Seller's interest is joint or several, corporate or individual, proprietary or leased (to the extent assignable).

It is agreed and acknowledged by the parties that the Seller is not assuming any outstanding personal property tax liability (if any) associated with the Assets, which shall be an obligation of the Purchaser. Purchaser shall provide evidence that these obligations are current at the time of Closing.

**2.      Purchase Price; Payment of Purchase Price.**

a.      **Purchase Price**. In consideration of the sale, assignment, transfer and delivery of the Assets to Purchaser by Seller, Purchaser agrees to pay to the Seller a total purchase price of Fifty Thousand United States Dollars ($50,000.00) (hereinafter referred to as the "**Purchase Price**").

b.      **Payment of Purchase Price**.   The Purchase Price shall be paid to Seller (or Seller's agent) by Purchaser in cash in full on the hereinafter defined Closing Date.

**3.      Closing**.   The closing (the "**Closing**") of the transactions contemplated herein shall be consummated on the "**Closing Date**", which shall be within fifteen (15) businessno later than seven days after Realty obtains approvalthe Auction called for by Realty's Fifth Amended Combined Plan of this transaction from the United States Bankruptcy CourtReorganization and Disclosure Statement.   On or before 2:00 p.m. EST on the Closing Date, the parties shall deliver to each other, as applicable, (the forms of which, where applicable, being subject to the reasonable approval of Sellers and Purchaser) the following:

a. **By Seller**. The Seller shall deliver to Purchaser the following:

i. a Bill of Sale for the Assets substantially in the form of Exhibit "B", attached hereto and made a part hereof; and

ii. an assignment and assumption of contracts between investors and Realty as of the Closing Date, substantially in the form attached as Exhibit "C".

b. **By Purchaser**. the Purchaser shall deliver to Seller the following:

i. a cashier's check for the Purchase Price; and

ii. an assignment and assumption of investor contracts as of the Closing Date, substantially in the form attached as Exhibit "C".

4. **Representations and Warranties of Seller**. Seller hereby represents and warrants the following to the Purchaser:

a. **Authority**. This Agreement and all agreements, instruments and documents herein provided to be executed or to be caused to be executed by Seller are duly authorized, executed and delivered by and are binding upon Seller. Seller has obtained all consents and permissions related to the transactions herein contemplated and required under any covenant, agreement, encumbrance, or laws (including but not limited to, before Closing, any required permission under United States Bankruptcy Code and bankruptcy court rules from the bankruptcy court having jurisdiction over the Bankruptcy Proceeding).

b. **Ownership of Assets; Free and Clear Title**. Seller acknowledges that, under United States Bankruptcy laws, Realty is the rightful owner of the Assets and Realty has not has not assigned, pledged or otherwise encumbered the Assets. Realty further represents and acknowledges that the Assets are being transferred to Purchaser with free and clear title without any liens, claims or encumbrances of any party. Notwithstanding the foregoing, Purchaser shall assume all personal property tax liability associated with the Assets, which may be currently outstanding or may accrue in the future.

5. **Representations and Warranties of Purchaser**. Purchaser represents and warrants the following to Sellers, and their successors and assigns:

a. **Authority**. This Agreement and all agreements, instruments and documents herein provided to be executed or to be caused to be executed by Purchaser are duly authorized, executed and delivered by and are binding upon Purchaser. Purchaser has obtained all consents and permissions related to the transactions herein contemplated and required under any covenant,

agreement, encumbrance, or laws. Purchaser has full power and capacity to perform the obligations under this Agreement.

b. **Licenses**. Purchaser represents and warrants that Purchaser's principal, Roberts, is a licensed real estate broker in the State of Michigan, and said license is in good standing.

c. **No Litigation and Investigations**.  To the best of Purchaser's knowledge, other than the Bankruptcy Proceedings, there are no actions, suits, legal or administrative proceedings or governmental investigations currently pending or threatened against or affecting Purchaser, nor are there any judgments, decrees, orders, rulings, writs or injunctions specifically referring to Purchaser, which may adversely affect Purchaser,  or Purchaser's ability to fully perform all the terms and conditions of the transactions contemplated under this Agreement; and that, prior to Closing, all tax obligations (both federal and state) will have been paid in full and shall be current and all required tax returns shall be filed.

d. **Independent Verification**. Purchaser acknowledges that Purchaser is acquiring the Assets "**AS IS**" and "**WHERE IS**" subject to all faults, in their condition on the Closing Date (except as otherwise provided in this Agreement), based upon Purchaser's own due diligence, analysis and physical and financial examination.  Purchaser acknowledges, represents and warrants that other than as set forth herein, Seller has not made and shall not make any verbal or written representations, warranties or certifications of any nature or kind whatsoever to Purchaser, whether express or implied, with respect to the Assets, and, in particular, no representations or warranties have been made or shall be made with respect to the economic value of the Assets.  Purchaser declares and acknowledges that this express disclaimer shall be considered a material and integral part of this sale and is reflected in consideration payable by Purchaser hereunder and, as an inducement for Seller to proceed with this transaction.

e. **Administrative Obligations.**  Purchaser represents and warrants that all post-petition obligations associated with the Assets and operation of the Business to the extent that the proceeds of the sale of the Assets are not sufficient to fully pay them will be paid by Purchaser and/or shall be the liability of the Purchaser.  By way of clarification, post-petition obligations refer to Realty's obligations arising after the Filing Date associated with the Assets, including professional fees, expenses for goods and services incurred by Realty in operations of the Business after the Filing Date, or other liabilities incurred by Realty associated with the Business accruing after the Filing Date.  During the period between the Filing Date and the Closing Date, Seller and Purchaser acknowledge and agree that Realty may use Cash Assets to pay for post-petition obligations of the Business.  After the Closing Date, Realty shall submit to the Purchaser, and Purchaser shall promptly pay, such post-petition obligations.

**6.** **Conditions Precedent to Closing**. In addition to the conditions provided in other provisions of this Agreement,  each party's obligation to perform their respective undertakings provided in this Agreement (including their respective obligations to close on the transactions contemplated by this Agreement) are conditioned on the due performance by each other party of their each and every

undertaking and agreement to be performed by each other party hereunder in all material respects, and the truth of each representation and warranty made by each other party in this Agreement in all material respects at the time as of which the same is made and as of the Closing Date as if made on and as of the Closing Date. As also a condition precedent to closing, each party shall obtain the requisite bankruptcy court / trustee approvals (as the case may be) to consummate the sale and purchase of Assets under this Agreement.

       **7.**     **Indemnifications**. Purchaser ("**Indemnifying Party**"), shall indemnify, defend and hold harmless Seller and its respective agents (each such indemnified party referred to as "**Indemnitee**"), against and with respect to damages arising out of or in any manner, incident, relating or attributable to: (i) any inaccuracy in any representation or warranty of the Indemnifying Party contained in this Agreement or in any certificate, instrument, document or agreement executed by such Indemnifying Party in connection with this Agreement or otherwise made or given in connection with this Agreement, (ii) any failure by Indemnifying Party to perform or observe, or have performed or observed, in full any covenant, agreement or condition to be performed or observed by such Indemnifying Party under this Agreement or under any certificate or other document or agreement executed by Indemnifying Party in connection with this Agreement, and (iii) claims relating to Indemnifying Party's enforcement of rights under this Agreement.

       **8.**     **Notices**. Any notice, request or other communication to be given by any party hereunder, shall be in writing and shall be sufficient if sent by registered or certified mail, postage prepaid, addressed (until another address is supplied to the other parties by the addressee) as follows:

         **To Seller:**       Ralph R. Roberts ~~Realty, LLC~~

                                  Ralph Roberts Realty, LLC

                                    12900 Hall Rd., Suite 190

                                  Sterling Heights, MI_ 48313

                                  ~~Office: (586) 751-0000~~

                                  ~~Fax: (586) 620-6449~~

                                  Office (586) 751-0000

                                  Fax (586) 620 6449

                                  Email: ralphroberts25@gmail.com

         **With a copy to:**     Hannah Mufson McCollum, Esq.

                                  Gold, Lange & Majoros, P.C.

                                  24901 Northwestern Hwy., Suite 444

                                  Southfield, MI 48075

                                  Telephone: 248-350-8220

                                  Facsimile: 248-350-0519

                                  Email: hmccollum@glmpc.com

To Purchaser:    Ralph R. Roberts ~~Realty Group, LLC~~

_____

_____

_____    ~~Telephone:~~

_____    ~~Facsimile:~~

_____    ~~Email:~~

_____    Ralph Roberts Realty Group, LLC

_____    18299 Tara Drive

_____    Clinton Township, MI  48036

_____    Office: (586) 751-0000

_____    Fax:  (586) 620-6449

_____    Email:  ralphroberts25@gmail.com

_____

9.    **Further Instruments.**  Each party will, whenever and as often as it shall be requested so to do by the other, cause to be executed, acknowledged or delivered any and all such further instruments and documents as may be necessary or proper, in the reasonable opinion of the requesting party, in order to carry out the intent and purpose of this Agreement.

10.    **Survival**. Unless otherwise expressly provided for in this Agreement, all agreements, representations, warranties, indemnification obligations and covenants of the parties set forth in this Agreement shall survive the consummation of the transactions contemplated by this Agreement.

11.    **Captions**. The captions appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit or describe the scope or intent of this Agreement or any provision thereof.

12.    **Severability.**  If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

13.    **Governing Law/Forum**. This Agreement shall be governed by and constituted and enforced in accordance with the United States Bankruptcy Code and the bankruptcy rules, and with internal laws of the State of Michigan, and shall be binding upon the parties hereto in the United States and worldwide.  Where there is a conflict between the United States Bankruptcy code or rules and internal laws of the State of Michigan, the United States Bankruptcy code or rules (as the case maybe) will prevail.  Failure to enforce any provision of this Agreement shall not constitute a waiver of any other term hereof.

14. **Third Party Beneficiaries.**  Except as otherwise expressly provided in this Agreement, the parties to this Agreement do not intend by any provision of this Agreement to confer any right, remedy or benefit upon any third party (express or implied).

15. **Amendments.**  This Agreement may be amended by written agreement of amendment executed by all parties, but not otherwise.

16. **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which, when taken together, shall constitute one and the same instrument, with the same effect as if all of the parties to this Agreement had executed the same counterpart.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date first written above.

**SELLER:**

RALPH ROBERTS REALTY, LLC

_____

By: Ralph R. Roberts

Its: President

**PURCHASER:**

RALPH ROBERTS REALTY GROUP, LLC

_____

By: Ralph R. Roberts

Its: President

<u>**EXHIBIT A**</u>

List of Assets

1. 12 Computers
2. 4 Chairs
3. 3 Desks
4. All accounts receivable
5. Property tracking database
6. All physical files and records

**Excluded Assets**

1. Cash
2. Chapter 5 Causes of Action
3. Fraudulent Transfer Actions
4. Personal property of Realty employees (ex: personal pictures, personal furniture), landlord-owned property (partitions, office furniture and file cabinets), leased equipment otherwise not acquired by Purchaser (to the extent not assumed: copier, phone system, printers)

**EXHIBIT B**

**BILL OF SALE**

KNOW ALL MEN BY THESE PRESENTS, THAT RALPH ROBERTS REALTY, LLC ("**Realty**" or "**Seller**"), for good and valuable consideration, in hand paid at and before the sealing and delivery of these presents, the receipt and adequacy of which is hereby acknowledged, does hereby sell, set over, transfer, assign and convey unto RALPH ROBERTS REALTY GROUP, LLC, a Michigan corporation ("**Purchaser**") and any successors or assigns, all Seller's right, title and interest in and to all of the Assets (as defined in the attached Asset Purchase Agreement) subject to the terms and conditions, warranties and covenants described in the Asset Purchase Agreement and all exhibits attached thereto, whether such interest is joint or several, individual or corporate.

Other than the representations and warranties of the Seller as made in the Asset Purchase Agreement, Purchaser is acquiring the Assets "AS IS" and "WHERE IS" without any representations and warranties.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Bill of Sale on ~~November 26~~December 5, 2012, (the "Effective Date").

**SELLER:**                                                    **PURCHASER:**
RALPH ROBERTS REALY, LLC                    RALPH ROBERTS REALTY GROUP, LLC


_____          _____
By: Ralph R. Roberts                                  By: Ralph R. Roberts
Its: President                                              Its: President

**EXHIBIT C**

**ASSIGNMENT AND ASSUMPTION OF INVESTOR CONTRACTS**

FOR VALUE RECEIVED, RALPH ROBERTS REALTY, LLC ("Realty" or "Assignor"), hereby assigns, conveys, transfers and sets over to RALPH ROBERTS REALTY GROUP, LLC, a Michigan corporation ("Group" or "Assignee") and any successors or assigns, all Assignor's right, title and interest, in, to and under certain written and verbal agreements by and between Realty and certain of its investors (the "Investors") as listed on <u>Addendum I</u> to this Assignment (collectively referred to as the "Contracts"), subject to the terms and conditions, warranties and covenants described in the Contracts, the Asset Purchase Agreement and all exhibits attached thereto, whether such interest is joint or several, individual or corporate.

Assignee hereby accepts the foregoing assignment and assumes all of the obligations of Assignor under the Contracts, for the benefit of Assignor, its successors and assigns, and for the benefit of the Investors, their successors and assigns, to pay, perform, discharge when due and otherwise satisfy in due course all of such obligations and liabilities of Realty under and in accordance with the provisions of the Contracts.

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Assignment and Assumption of the Contracts, on ~~November 26~~<u>December 5</u>, 2012, (the "<u>Effective Date</u>").

**Assignor:**                                                    **Assignee:**
RALPH ROBERTS REALY, LLC                      RALPH ROBERTS REALTY GROUP, LLC

_____          _____
By: Ralph R. Roberts                              By: Ralph R. Roberts
Its: President                                          Its: President

**Addendum I to Exhibit C**

**List of Investors Contracts to be Assigned and Assumed**