UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN THE MATTER OF,                    Case No. 12-53023
                                     Detroit, Michigan
RALPH ROBERTS REALTY                 January 23, 2013
_____/     11:33 a.m.

IN RE: CONTINUED CONFIRMATION HEARING AND DEBTOR'S MOTION TO
DISQUALIFY MADDIN, HAUSER, WARTELL, ROTH & HELLER, P.C. AS
COUNSEL FOR DEFENDANTS JON SAVOY, ET AL
BEFORE THE HONORABLE THOMAS J. TUCKER
TRANSCRIPT ORDERED BY: IAN BOLTON, ESQ.

APPEARANCES:

For the Debtor:                  HANNAH MUFSON MCCOLLUM, ESQ.
                                 (67171)
                                 Gold, Lange & Majoros
                                 24901 Northwestern Highway
                                 Suite 444
                                 Southfield, MI 48075
                                 248-350-8220

For the Unsecured Creditors      ROBERT WEISBERG, ESQ. (P26698)
Committee:                       Carson, Fischer
                                 4111 Andover Road
                                 West-Second Floor
                                 Bloomfield Hills, MI 48302-1924
                                 248-644-4840

For the 2007 Creditors:          MARC E. THOMAS, ESQ. (P25628)
                                 Bendure & Thomas
                                 30700 Telegraph Road
                                 Suite 3475
                                 Bingham Farms, MI 48025
                                 248-646-4527

For Maddin, Hauser, Wartell,     IAN BOLTON, ESQ. (P68872)
Roth & Heller:                   Maddin, Hauser, Wartell, Roth
                                 & Heller
                                 28400 Northwestern Highway
                                 3rd Floor
                                 Southfield, MI 48034
                                 248-354-4030

1  Court Recorder:              Jamie Laskaska

2  Transcriber:                 Deborah L. Kremlick

3

4

   Proceedings recorded by electronic sound recording, transcript
5  produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Court in Session)

2         THE CLERK:  Ralph Roberts Realty, 12-53023.

3         MS. MCCOLLUM:  Good morning, Your Honor.  Hannah

4    McCollum on behalf of Ralph Roberts and Ralph Roberts Realty.

5         MR. WEISBERG:  Good morning, Your Honor.  Robert

6    Weisberg on behalf of the Unsecured Creditors' Committee.

7         MR. THOMAS:  Marc Thomas on behalf of the 2007

8    creditors.

9         MR. BOLTON:  Good morning, Your Honor.  Ian Bolton

10   on behalf of Maddin, Hauser.

11        THE COURT:  All right.  Good morning to everyone.

12   We have two matters today for hearing.  One is the

13   continuation of the confirmation hearing that we began and

14   held last Wednesday.  And the other is a hearing on the

15   debtor's motion to disqualify the Maddin, Hauser firm.

16       Ms. McCollum, I don't care which we talk about first.  Do

17   you have a preference?

18        MS. MCCOLLUM:  Your Honor, I think I'd like to talk

19   about the confirmation issues first.

20        THE COURT:  All right, then we'll do that.

21        MS. MCCOLLUM:  Okay.  Thank you.  Since last week I

22   circulated a proposed confirmation order to the committee and

23   to the U.S. Trustee.

24       The first thing the U.S. Trustee has indicated to me that

25   she has no objection to the order that was attached to the

1  notice of presentment that I filed yesterday.  So the U.S.

2  Trustee office has signed off on the proposed confirmation

3  order.

4      I circulated that order to the committee and they came

5  back as you probably saw on the notice of presentment with a

6  number of issues with the order that I characterized not as

7  issues with the order, but as sort of material points that

8  differed from the settlement agreement that we put on the

9  record.

10      It's my understanding based on some communications I

11  received from them today, that they may have withdrawn all or

12  part of these additional issues that they had.  But at this

13  point, Your Honor, I -- I am faced with two alternatives and

14  that is to request that your order -- that Your Honor simply

15  enforce the settlement that we entered on the record last

16  week.

17      We have -- on the debtor's side we have complied with our

18  duties.  We have secured the agreement of all of the claimants

19  who agreed to have their claims waived.  We have -- those

20  claimants have indicated to us that they do not oppose those

21  -- the waivers of claims.

22      And we have -- Mr. Roberts and Realty have moved forward

23  to obtain financing for the $250,000 initial down stroke

24  payment.  So, Your Honor, we can either move forward with that

25  compromise, or we can take it entirely off the table and I can

1  request confirmation of the plan.

2      Your Honor, the debtors believe that the settlement is in

3  the best interest of the creditors and that it will return

4  more money to them than the proposed plan, but if the --

5          THE COURT:  Well, let me -- let me just stop and you

6  said the committee may have withdrawn all or some of the

7  issues that they had with your proposed confirmation order.

8  Mr. Weisberg -- why don't I have Mr. Weisberg tell me if

9  that's so and -- or not.  Mr. Weisberg, is there an agreed

10 settlement here, or isn't there?

11         MR. WEISBERG:  I don't -- I don't think there is,

12 Your Honor.  But I'm not eliminating that from the realm of

13 possibility.  And if I might just elaborate for a moment.

14     The first point is this.  I'm a little confused by --

15 well, I shouldn't say a little.  I'm a lot confused by Ms.

16 McCollum's comments.  And what I mean by that is simply this.

17     Is that I believe that the record was very clear when we

18 were here last week.  That one, that the terms that had been

19 tentatively agreed to between the debtor's representatives and

20 a representative of the committee where one, general --

21 general economic terms that needed to be incorporated into an

22 acceptable confirmation order.  And number two, was expressly

23 subject to the consent of the committee as a whole.

24     The discussions and negotiations if you will, or lack

25 thereof, that took place after Ms. McCollum circulated her

1  proposed order, certainly indicated to Ms. McCollum that at

2  least with respect to the latter point that the committee had

3  not accepted at least her version of what she believed to be

4  the deal reached by the parties at the -- at the hearing last

5  week.

6      So I'm not sure why we're having discussion about a

7  proposed compromise or a submission of an order because there

8  was no agreement with the committee that was reached and

9  therefore there is no order to be presented on any level.  So

10 I'm not sure how that occurred and why that is occurring, what

11 the point of that occurring is.

12     Having said that, however, in response to the order that

13 was circulated even prior to the presentment of that order,

14 there was a proposal made to the debtors.  That proposal was

15 rejected by the debtors.  It was after that rejection that the

16 debtors submitted the order for -- by way of presentment.

17     And subsequent to that rejection, there was last evening

18 another proposal submitted to the debtors which I think

19 addressed some but perhaps not all of the debtor's concerns or

20 issues.  To the extent that -- that's still a possibility

21 meaning that it did in fact address all of the debtor's

22 concerns or issues, then we might very well have an agreement

23 with the committee.

24     If it did not in its entirety address all the debtor's

25 concerns or issues, or if the debtor isn't willing to waive

1  off on those issues that were not sufficiently addressed, then

2  we do not have an agreement. And the only alternative that I

3  think that at that point that the Court would have would be to

4  proceed with the confirmation hearing and to -- to strike the

5  -- the notice of presentment because there's no basis to

6  present any order to the Court.

7          THE COURT: All right. Well, let me -- let me

8  interrupt at this point. Ms. McCollum, I have in my notes and

9  I -- I recall this at the hearing last week when you were

10 describing the settlement, putting it on the record toward the

11 latter part of the hearing last Wednesday afternoon, that you

12 said -- you did note that the settlement was subject to the

13 approval of the committee.

14     And that as of that time only the chair of the committee

15 had agreed to the settlement terms. You did say that you -- I

16 guess you believed, or the parties believed that they will get

17 the full -- they would get full committee approval of these

18 terms that you -- that you were stating, but you did say that

19 it -- it was subject to the full committee approval. And Mr.

20 Weisberg is saying the full committee did not approve it. Now

21 is -- is any of that inaccurate in your view?

22          MS. MCCOLLUM: Your statement is correct,

23 technically. Ms. Mary Ferris was in the courtroom. She is

24 the chairperson of the committee. And she did consent in her

25 capacity as chairperson, but not in her capacity as, you know,

1 | speaking for the entire committee.

2 | However, I would point out to Your Honor that Ms. Ferris

3 | is also the co-trustee for the group of creditors known as the

4 | 2007 Creditors. Four of those creditors sit on the committee,

5 | therefore they are a majority.

6 | I believe that Ms. Ferris was also speaking in her

7 | capacity as trustee for the -- or co-trustee for the 2007

8 | Creditors, that she would consent to the settlement agreement.

9 | She's -- has -- has been said many times in this case,

10 | multiple people are wearing multiple hats and so I believe

11 | that she had the power to carry the vote of that for the

12 | majority of the committee. If the committee is telling me

13 | that they do not consent to this settlement agreement, I'm

14 | perfectly happy to go forward with confirmation.

15 | THE COURT: Well, all right. At this point then, I

16 | will make this ruling.

17 | The -- the settlement that was described, the terms of

18 | which were placed on the record during the hearing last week,

19 | was in fact subject to full committee approval and at that

20 | point had only been approved by the chair of the committee.

21 | And from what the parties have described since that time, the

22 | full committee has not approved the settlement that was

23 | described at -- the terms of which were described at the last

24 | week's hearing.

25 | And instead has, according to Mr. Weisberg, has -- has

1   proposed as of last evening some -- something different or at

2   least something that the debtor -- debtors and their counsel

3   view as -- as different than what was proposed last week.

4       So at this moment in my view there is not an enforceable

5   settlement between the debtors on the one hand, and the

6   creditors' committee on the other hand regarding the subject

7   of confirmation of debtor's proposed plan.

8       Now, at least -- it sounds to me that at least that does

9   not mean that the parties might not be able to reach such a

10  settlement, but it -- it hasn't happened yet.  Now Ms.

11  McCollum, the alternative to a settlement of course is that we

12  finish the confirmation hearing.  You, when we left off last

13  week, I believe was you were -- you were -- stood up and were

14  getting ready to give your reply argument.

15          MS. MCCOLLUM:  That's correct.

16          THE COURT:  Regarding the arguments that had been

17  made during the hearing and the committee's objections to

18  confirmation and so forth.  You didn't do that because at that

19  point at your suggestion the parties took a break and went out

20  in the hall and talked and came back with this -- this

21  settlement that was discussed.

22      So I guess my question is, you know, we -- we can finish

23  the confirmation hearing today and it -- if there's no

24  settlement today, I certainly want to do that.  But, you know,

25  again I'm wondering whether it's time again for the parties to

1 go out in the hall.

2      MS. MCCOLLUM:  Your Honor, can I have one minute to

3 confer with my client?

4      THE COURT:  Sure, yeah.

5      MR. THOMAS:  Your Honor, while Ms. McCollum is

6 conferring --

7      THE COURT:  No, no.  Not -- not while she's talking.

8 I want her to hear what you say.

9      MS. MCCOLLUM:  Mr. Roberts has indicated that he

10 does believe that a break would be profitable and that we

11 could go and see if we can reach a further settlement.  So,

12 Your Honor, I would like to request that we take a recess.

13      THE COURT:  All right.  Mr. Thomas, did you want to

14 say something before we -- before I send you all back out in

15 the hall?

16      MR. THOMAS:  Yes, Your Honor.  Just for the record.

17 Ms. Mary Ferris is not a trustee.  Ms. McCollum represented

18 that she was a trustee of this trust that was formed in 2007

19 as part of the settlement agreement at that time, but she is

20 not.  The only two trustees remain, Mr. Ferarolis and Joe

21 Sirianni.

22      THE COURT:  Well, in any case you -- you can say

23 that for the record, obviously that doesn't matter for

24 anything the Court needs to do at this point.  But I -- I will

25 ask the parties to reconvene your settlement discussions out

1  -- out in one of the conference rooms, or two of the

2  conference rooms and -- and we'll recall the case after you've

3  had a chance to do that.

4      Now, Mr. Bolton, you're here for a different motion.

5          MR. BOLTON:  That's correct, Your Honor.  And if --

6  if at all possible, I'd like the motion heard so I don't have

7  to sit here all day.

8          THE COURT:  No, we're going to -- we're going to

9  wait.  We're going to wait, so stick around.  And we'll recall

10 this case when the parties are ready, but we -- we are going

11 to finish these hearings today if there's no settlement.

12 Thank you.

13         MS. MCCOLLUM:  Thank you, Your Honor.

14         MR. WEISBERG:  Thank you, Your Honor.

15     (Court in Recess at 11:46 a.m.; Resume at 12:33 p.m.)

16         THE CLERK:  Recalling the matter of Ralph Roberts

17 Realty, 12-53023.

18         MS. MCCOLLUM:  Good afternoon, Your Honor.  Hannah

19 McCollum on behalf of Ralph Roberts and Ralph Roberts Realty.

20         THE COURT:  All right.  You don't all need to

21 re-enter your appearances.  One second.

22     Okay.  All right.  Thank you.  Ms. -- Ms. McCollum, where

23 are we?

24         MS. MCCOLLUM:  Your Honor, I'm pleased to report

25 that the discussions were productive and we have reached a

1  settlement.  And I will put those terms on the record and then

2  ask Mr. Weisberg and Mr. Thomas to confirm that my statements

3  are correct.

4      I believe that and I will also ask Mr. Weisberg to

5  confirm this, that the settlement that we have reached is

6  reached with full committee authority so we don't have the

7  same problem that we had today.

8          THE COURT:  Well, let me -- let me -- I'm happy to

9  have you put the terms on the record and -- and to go through

10  that process.  But have you had a chance to work on a revised

11  confirmation order that reflects the settlement?

12          MS. MCCOLLUM:  We have not.  My anticipation would

13  be to go back to my office and provide that within --

14  certainly before the close of business today, but hopefully by

15  mid-afternoon to Mr. Weisberg and Mr. Thomas with the hope

16  that they could provide me comments and changes by no later

17  than tomorrow so that we could get it entered as soon as

18  possible.

19          THE COURT:  Well, I'm wondering if the changes are

20  not so extensive from what you proposed that you can just work

21  on that and -- and get it done while you're all here this

22  afternoon and present it to me.  Is that -- do you think

23  that's feasible?

24          MR. THOMAS:  Yeah, that's feasible.

25          MR. WEISBERG:  It may be, Your Honor with one -- one

1 small caveat.  One of the things that I wanted to make sure

2 about before this order was submitted and -- and entered was

3 to make sure that the debtors and the committee were on the

4 same page with respect to what I'll say is the remaining

5 population of potential claims to be included and to share in

6 the unsecured component of this -- of this -- of this plan.

7     Because there's a -- an agreement with respect to removal

8 of insiders and removal of certain people who have

9 unquantified claims and Ms. McCollum stated earlier that

10 certain consents have been garnered.

11     So if we can get that today then I think your suggestion

12 is great and we can probably do that.  If we can't, that may

13 be one open item that still needs to be resolved before we

14 submit the order.

15         THE COURT:  All right.  Well, let's -- let's do

16 this.  Ms. McCollum, would you as you had intended to do,

17 would you state the terms of the settlement on the record?

18 And then Mr. Weisberg can respond on behalf of the committee.

19         MS. MCCOLLUM:  Certainly, Your Honor.  We have

20 agreed, and this is substantially similar with some -- some

21 slight modifications to the deal that we reached last week.

22     We have agreed that there will be an initial down stroke

23 payment of up to $250,000 for administrative claims.  The

24 claim of Carson, Fischer as allowed by further application of

25 this Court will be paid in full, whatever that claim is.

1      If the administrative claims are more than $250,000, the

2   remaining claimants will either agree to reduce their claims,

3   or the debtors or Mr. Roberts will pay those claims.  In other

4   words, the second $250,000 that we are proposing to pay to the

5   unsecured creditors over 48 months in equal monthly

6   installments, that amount is in violate.  It will not be

7   reduced by any admin claims filed against the estate or paid.

8           THE COURT:  Well, hold on one second.  All right.

9   Thank you.  Go ahead.

10          MS. MCCOLLUM:  I think we are in agreement but again

11  I will ask Mr. Weisberg to confirm this, that the initial

12  payments that are being made to the admins will include -- or

13  basically be given credit for the $30,000 that Mr. Roberts had

14  proposed to pay through his plan and that upon that

15  contribution of 30,000, Mr. Roberts will be entitled to a

16  discharge.  The -- yes, we were going to pay 250,000 over 48

17  months.

18          THE COURT:  In other words does the initial $250,000

19  include 30,000 from Mr. Roberts then?

20          MS. MCCOLLUM:  Yes, yes, that is correct.

21          THE COURT:  So essentially it's two twenty from

22  Ralph Roberts Realty, that debtor, and thirty from Ralph

23  Roberts.

24          MS. MCCOLLUM:  Correct.

25          THE COURT:  Okay.  Thanks.  Go ahead.

1        MS. MCCOLLUM:  The -- the terms that we discussed

2    last week wherein we would grant the unsecured creditors a

3    second position lien in realties, assets, and Realty would be

4    the obligor on the 250,000 remain the same.  However, the

5    committee has proposed and we have agreed that Ms. Mary Ferris

6    serve as the nominee for the unsecured creditors to be the

7    lien holder.  Because otherwise it's a little complicated as

8    to how that would happen.

9        So Ms. Ferris is going to be the nominee for the

10    unsecured creditors and hold the second position lien which

11    will be valid essentially until all the last -- all the plan

12    payments are made and then that lien will be released unless

13    the company defaults on its obligation in which case Ms.

14    Ferris as the nominee can take whatever action she needs to

15    take to enforce that lien.

16        Going towards that of the 250,000 that's going to go to

17    unsecureds, the debtors and the committee have agreed that

18    10,000 of that two fifty will be held in escrow by Mr. Marc

19    Thomas so that if in the event any enforcement action is

20    needed, that there will be a fund out of which that

21    enforcement action can be funded.  If at the end of the 48

22    months there has been no default and there was no need for

23    enforcement action, that 10,000 will be released, I believe,

24    pro rata to all the unsecured claimants entitled to the

25    distribution.

1        MR. THOMAS:  Correct.

2        MS. MCCOLLUM:  So we had put in this order that we

3   noticed out for presentment certain default provisions.  We

4   anticipate granting the nominee essentially default

5   provisions.

6        I don't know whether the ones we have drafted are

7   acceptable or they need to be tweaked, but there are certainly

8   provisions that if Realty fails to make any unsecured

9   payments, the nominee can move to enforce their security

10  agreement -- or security interest and take whatever other

11  actions are necessary in the Bankruptcy Court to enforce that

12  lien and to compel payment or such other such actions.

13       THE COURT:  This is a second lien though?

14       MS. MCCOLLUM:  Yes, that is correct.

15       THE COURT:  The first lien being held by remind me,

16  who?

17       MS. MCCOLLUM:  The first lien is going to be held by

18  either Mr. Roberts' IRA or -- or potentially Mrs. Roberts'

19  IRA, whoever loans the money to fund the initial payment.

20  They're going to require a first lien so that that loan can be

21  repaid.

22       THE COURT:  All right.  Thanks.  Go ahead.

23       MS. MCCOLLUM:  We also agree, continue to agree that

24  the general unsecured claims of Kathleen Roberts, Maplelane

25  Homes, Dorotha Roberts, Joseph Sirianni, Nancy Sirianni,

1  Sirianni and Company, PLLC, Joseph Sirianni, CPA, Sally --

2          MR. WEISBERG:  Paczkowski.

3          MS. MCCOLLUM:  Paczkowski, and Wallace Paczkowski,

4  David Griem, and Griem and Griem, P.C. will be disallowed in

5  their entirety and not paid any portion of the two fifty.

6      In addition the debtors have agreed to object to the

7  claim of Staybridge.  Mr. Roberts serves as a guarantor of the

8  Staybridge debt which is not otherwise a debt of the debtors.

9  And the underlying loan is not -- the debtors are not an

10 obligor on it and it is not in default.  So we agree to object

11 to that claim and --

12          THE COURT:  So the debtor Ralph Roberts Realty will

13 object to the claim.

14          MS. MCCOLLUM:  Yes.

15          THE COURT:  Not Ralph Roberts individually.

16          MS. MCCOLLUM:  Correct.

17          THE COURT:  He's going to get a discharge.

18          MS. MCCOLLUM:  Correct.

19          THE COURT:  Under this.  All right.  Go ahead.  Go

20 ahead.

21          MS. MCCOLLUM:  And we have agreed that the committee

22 potentially acting through Ms. Ferris as the nominee, I'm not

23 sure how we were going to do that, but certainly the debtors

24 were going to -- have agreed to object to that claim and

25 provide the committee with the ability to review and consent

1  to any settlement that we reach with Staybridge.

2      The concern is that Staybridge at this point has filed a

3  1.3 million dollar claim and that substantially dilutes the

4  distribution and the committee is concerned and I certainly

5  can see where their concern is coming from that the debtors

6  would simply roll over and say we don't really particularly

7  care what that claim is, so we're going to compromise it.  So

8  we've agreed to allow the committee to weigh in on any

9  potential compromise.

10      At this point we, the debtors, believe that Staybridge

11  would be willing to simply waive their claim so that it would

12  not share in this pool.  But we've agreed to -- to allow them

13  to weigh in on that.

14      And I think that's -- we've also agreed that Mr. Marc

15  Thomas is entitled to share in the unsecured distribution pool

16  on account of his contribution to the -- assisting the

17  unsecured creditors in these cases.  And we've agreed that we

18  will notice out -- we will put these terms in a proposed order

19  confirming the plan and do it out on a notice of presentment

20  so that creditors will have seven days plus three for mailing

21  to object to these terms.  And if no objections be filed, then

22  confirmation will be effective as of January 16th.

23          THE COURT:  Did Mr. Thomas file a -- any sort of

24  proof of claim?

25          MS. MCCOLLUM:  He did not.

1          THE COURT:  Well, what I'm wondering about is --

2   well, what is he going to receive?  And on what -- how is it

3   calculated?

4          MS. MCCOLLUM:  Your Honor, I believe that Mr. Thomas

5   has been employed as the attorney for the 2007 Creditors on a

6   contingency basis and I think is entitled to, and I'll let him

7   answer this if I'm incorrect, but I believe he's entitled to a

8   third of what they would otherwise be entitled to receive in

9   the -- if they were to have won the State Court lawsuit that

10  was pending when we filed this case.

11      So he's certainly entitled to a one-third share of

12  anything that the 2007 Creditors receive.  We have simply

13  agreed that he is -- he is entitled to share whatever his

14  claim is he can assert it against the full unsecured

15  distribution rather than just against the portion that the

16  2007 Creditors receive.

17         THE COURT:  That doesn't clearly tell me what the

18  parties have agreed of what -- what Mr. Thomas -- how much he

19  will receive.  You're saying the one-third -- he's going to

20  receive a one-third contingency fee based on the distribution

21  to all unsecured creditors, or just based on the amount

22  distributed to the 2007 Creditors?

23         MS. MCCOLLUM:  All unsecured creditors.

24         THE COURT:  One-third of whatever that --

25         MS. MCCOLLUM:  One-third of the two fifty.

1           THE COURT:  Well -- of the two fifty.  So you're

2   saying you can quantify that right now.

3           MS. MCCOLLUM:  Yes.

4           THE COURT:  It's one-third of 250,000.

5           MS. MCCOLLUM:  Correct.

6           THE COURT:  To the extent the two fifty is actually

7   paid over time.

8           MS. MCCOLLUM:  Correct.  That is correct.

9           THE COURT:  All right.  Anything else about the

10  agreed settlement terms?

11          MS. MCCOLLUM:  I don't think so.  I put certain

12  protections in the order such as after the last payment the

13  committee -- or the nominee in this case I guess would agree

14  to file a lien release, but I think that's sort of technical

15  stuff that we can agree to when I circulate the order.  But if

16  -- if Mr. Weisberg or Mr. Thomas have any particular concerns

17  about that sort of thing, I'd just ask them to let me know.

18          THE COURT:  Now all of these creditors who you

19  listed as parties whose claims will be disallowed in their

20  entirety, have all of those creditors already agreed to that?

21          MS. MCCOLLUM:  Yes, they have.  And further the --

22          THE COURT:  So did you plan to file some sort of

23  stipulation to reflect that, or to have them sign off on any

24  proposed orders confirming the plan, or what?

25          MS. MCCOLLUM:  I was going to simply circulate the

1 order -- the proposed order confirming the plan which I did --

2 I circulated the initial one to them and I received consents

3 from them.  And I -- I would certainly be happy to circulate

4 this one as well, although I don't anticipate it's going to be

5 significantly different.

6     The other thing is that was raised on the record last

7 week, is that we proposed that Mr. Roberts be the sole owner

8 of Realty going forward, and that required the consent of an

9 entity called Rowland Family.  And we have obtained the

10 consent of Rowland Family to that change in ownership.

11         THE COURT:  They're currently a partial member.

12         MS. MCCOLLUM:  They are currently a partial owner,

13 correct.

14         THE COURT:  Yeah.  All right.  Anything else then

15 before we hear from Mr. Weisberg?

16         MS. MCCOLLUM:  No, Your Honor.

17         THE COURT:  Mr. Weisberg.

18         MR. WEISBERG:  Thank you, Your Honor.  I believe

19 that Ms. McCollum has substantially stated the -- the

20 resolution.  I'd like to just add a -- a few words of

21 clarification.

22     The first one being that the plan I think currently

23 provides that the committee is no longer as of -- as of

24 confirmation.  And in fact what's going to happen here is the

25 committee will survive in certain capacities.

1    The capacity number one is, is that counsel for the

2  committee will be able to both obviously pursue its fee

3  application and to defend any objections in connection with

4  the fee application as well as to pursue any objections to

5  debtor's counsel's fee applications if -- if that becomes

6  necessary.

7    And that as Ms. McCollum stated, with respect to this 1.2

8  or 1.3 million dollar claim, the committee will have the

9  ability to sign off on any resolution of that.  And that all

10  of those activities on -- on the part of the committee to the

11  extent that they become part of an admin -- allowed

12  administrative expense claim, those claims -- or those amounts

13  will be paid in full upon allowance and that if that -- if as

14  a result of that when added to other administrative expense

15  claims of debtor's professionals, the pool exceeds $250,000,

16  then the other professionals aside from the committee admin

17  expenses, will either waive their fees, or -- or the debtors

18  will pay those fees.

19    Number two is that small -- that for -- and just for the

20  record, the -- the nominee to hold the lien on behalf of the

21  unsecured creditors will be Dr. Mary Ferris, not -- not Ms.

22  Mary Ferris.  And that as Ms. McCollum stated, Mr. Thomas will

23  reserve in his trust account $10,000 to fund any enforcement

24  mechanism that is necessary down the road to be distributed at

25  the end of the case -- or the end of the distributions.

1       And with respect to Mr. Thomas' fees, of course best laid

2   plans of mice and men here.  Mr. Thomas did have another

3   hearing that he needed to attend to.  I thought it was okay

4   for him to -- to exit at this point because I thought we had a

5   resolution which I think we do.  However, I don't know the

6   exact nuances of Mr. Thomas' fee arrangement.  I don't want to

7   misrepresent it to the Court.

8       I believe it to be a standard one-third contingency with

9   expenses to be absorbed and whatever.  And having said that, I

10  want to make a clarification to the Court with respect to the

11  thinking behind the committee here.

12      The committee believes that Mr. Thomas has number one,

13  made a substantial contribution to the estate.  And number

14  two, that the 2007 Creditors probably at the end of the day

15  will be about 80% of the unsecured creditor pool which means

16  that effectively the -- the 20% of the non-2007 unsecured

17  creditors will absorb 20% of Mr. Thomas' fee, whatever that

18  may be.

19      So that just by way of clarification and trying to give

20  the Court some perspective as to how that -- how that plays

21  out.  And then -- and then --

22          THE COURT:  Which -- which you view as permissible

23  because it is, among other reasons, because it is not an

24  unfair amount for them to contribute for -- in exchange for

25  Mr. Thomas' substantial contribution to the estate as you view

1  it.

2       MR. WEISBERG:  Correct, correct, correct.

3       THE COURT:  All right.  Go ahead.

4       MR. WEISBERG:  And then -- and then lastly, Your

5  Honor, as I said earlier, we want to make sure that the

6  committee and the debtors are on the same page with respect to

7  this remaining pool if you will because as I think the Court

8  will appreciate, the committee is not reserving any claim

9  objection except for administrative claims power after this

10 plan is confirmed.  And so the committee is going to have to

11 live with the -- the claims pool as currently constituted

12 unless the debtor objects to a claim or claims which the

13 debtor has the right to do, including claims of the committee

14 -- committee members.

15      But we need to make sure that if the debtor chooses not

16 to object to certain claims that -- that the committee is

17 comfortable to allow those claims as being allowed and we

18 think that the committee is, but we just want to make sure

19 we're on the same page as to what is comprised of that pool of

20 known -- known claimants.

21      And one further clarification which maybe Ms. McCollum

22 could -- can comment on -- on that point.  It was -- it was --

23 it was -- came to my attention in -- in sort of reviewing some

24 of the past activities over the last week, that the -- the

25 claims register that currently exists, may be inaccurate in

1    some respects.

2        And what I mean by that is, is that it looks to me like

3    that the 2007 Creditors who had claims against both Mr.

4    Roberts and against Ralph Roberts Realty, and in fact filed

5    claims that would appear to be against both of those entities.

6    Yet, I -- I noticed when Ms. McCollum one, made reference to

7    her tally of votes which I know is not the same as the claims

8    register, that -- that she did not reflect any votes in

9    connection with Mr. Roberts' side of the equation.

10       Now to try to reconcile those two -- two concepts, it --

11   it's not clear to me how the debtors anticipate the -- the

12   sharing in the -- the pot.  My -- my recollection was there

13   were sort of de minimis creditors of Mr. Roberts personally

14   other than the bank claim that we mentioned earlier.  And the

15   committee is okay with that if they're all going to share in

16   the pot.

17       But -- but I was just curious as to how the plan is

18   supposed to work on that point because I think there's some

19   mis -- misstatement relative to who's in the Ralph Roberts pot

20   and who's in the -- the -- the non-Ralph Roberts pot.

21            MS. MCCOLLUM:  There's only one pot.

22            MR. WEISBERG:  There's only one pot.

23            MS. MCCOLLUM:  Right.

24            MR. WEISBERG:  Everybody shares in it.

25            MS. MCCOLLUM:  Correct.

1    MR. WEISBERG: Okay.

2    MS. MCCOLLUM: So my -- my anticipation would be

3 that in connection with this, the -- the 2007 Creditors would

4 agree they get one claim against the pot.

5    MR. WEISBERG: Yes, right, right. And that's fine.

6 I just wanted to make -- get some clarification of that. I

7 think that will work out when you see the totality of the

8 claims pool that we're working with.

9    THE COURT: So to the extent any of the 2007

10 Creditors filed a claim in each of the cases.

11    MR. WEISBERG: Yeah. One claim.

12    THE COURT: It's going to be one claim --

13    MR. WEISBERG: Yeah, absolutely. I just wanted to

14 make sure we -- there was no disconnect there and I don't

15 think there is.

16    THE COURT: Excuse me. It's going to be on claim in

17 the amount, assume they -- assume they filed a claim in the

18 same amount in each case, it's going to be that single amount

19 one time.

20    MR. WEISBERG: Correct, correct.

21    THE COURT: In terms of what's the allowed claim.

22    MR. WEISBERG: And I wasn't suggesting anything

23 differently. I just wanted to make sure I understood how the

24 debtors were viewing the -- the various claims pools and who

25 was in them and who was sharing.

1          THE COURT:  Well, shouldn't -- shouldn't we put that

2     in the order confirming plan so that it's clear there?

3          MR. WEISBERG:  Yes, that's fine.

4          THE COURT:  You'll put that in that?

5          MR. WEISBERG:  We can do that.

6          THE COURT:  So Mr. Weisberg, a couple of loose ends

7     then it sounds like possibly here from what you've said.  And

8     one is, Mr. Thomas left and you're not sure what his exact fee

9     arrangement is.

10          MR. WEISBERG:  I -- I --

11          THE COURT:  So you're not sure what -- what the deal

12     is, or it's supposed to be in terms of how much Mr. Thomas, or

13     what his fee claim is -- is deemed to be for purposes of the

14     pro rata distribution in the unsecured creditor claim pool?

15          MR. WEISBERG:  I've been working under an assumption

16     of a one-third contingency.  But there may be some expense

17     component to it.  I -- I -- let me just make the following

18     suggestion.  I can try to get a hold of Mr. Thomas and get

19     some clarification on that before we leave today.

20          THE COURT:  And the idea is whatever that fee is,

21     that fee amount is, it will be treated as if it were an

22     allowed claim and he gets a pro rata distribution along with

23     the other creditors in that -- the unsecured creditors, is

24     that it?

25          MR. WEISBERG:  No.  It's treat -- not -- not

1  exactly. It's treated effectively as if -- the 2007 Creditors

2  are already obliged to comply with that fee arrangement for

3  whatever they get. That's sort of an outside of the

4  bankruptcy component of it.

5      And they would be required to -- to -- to pay 100% of

6  that amount, whatever that amount is that the 2007 Creditors

7  achieve. What's going to happen now -- so for example if --

8  if -- if the 2007 Creditors got $200,000, Mr. Thomas would get

9  say $66,000 from the 2007 Creditors.

10     Today if -- we're going to stick with that same number,

11 the $66,000 which is the fee arrangement. However that --

12 that number will be spread over not just the 2007 Creditors,

13 but over 100% of the unsecured creditor pool.

14         THE COURT: So in effect it will come off the top of

15 the pool that is -- will otherwise be available for

16 distribution to the unsecured creditors.

17         MR. WEISBERG: Correct. But -- but what I'm saying

18 to the Court is, is that --

19         THE COURT: And what's left is what is distributed

20 to that group of creditors on a pro rata basis.

21         MR. WEISBERG: That is also correct.

22         THE COURT: Is that it?

23         MR. WEISBERG: Yes.

24         THE COURT: Do you agree with that, Ms. McCollum?

25         MS. MCCOLLUM: Yes.

1          THE COURT:  All right.  Go ahead.

2          MR. WEISBERG:  Yeah.  And just -- and just by way of

3 further clarification, so it's clear to the Court.

4     Mr. Thomas' fee is not getting increased.  In other words

5 he's living with the amount -- his fee calculation is based on

6 what the 2007 Creditors are going to get, but it will be

7 spread over a larger population.

8          THE COURT:  And what they're going to get for

9 purposes of calculating Mr. Thomas' fee, contingency fee, I

10 assume is, the two hundred and fifty -- the second 250,000

11 that's going to be paid over time plus if anything is left

12 from the first 250,000 after payment of the administrative

13 expenses that are required to be paid.

14          MR. WEISBERG:  Correct.

15          THE COURT:  Those two numbers added together.

16          MR. WEISBERG:  Correct.

17          THE COURT:  Right?

18          MR. WEISBERG:  Yes.

19          THE COURT:  Okay.  The other question I had, or I

20 wasn't sure about from what you've said is, you said -- you

21 made this statement you need -- something to the effect you

22 need to make sure the committee is comfortable with the pool

23 of known claimants.

24          MR. WEISBERG:  What I meant by that is, we talked in

25 general terms about elimination of insiders.  Excuse me,

1   elimination of claimants who filed unquantified claims.

2       And so I just -- I've never gone through with Ms.

3   McCollum that entire population, compared that to the claims

4   pool and made sure that we are saying the same thing. We're

5   referring to the same groups of people who are being

6   eliminated. And that's --

7           THE COURT: Well, you heard her list all the ones

8   whose claims were going to be disallowed. I assume that was

9   intended to be all of the insiders.

10          MR. WEISBERG: I presume that it is. But what I

11  don't know because I haven't compared that list to the total

12  claims as scheduled and total claims as filed. I don't know

13  if there are others that should be in that list that are not.

14          THE COURT: So when are you going to know this?

15          MR. WEISBERG: Well, I'd like to get Ms. McCollum's

16  view of -- I need to look at the claims pool. And she said

17  she has a list of what she views as the total claims pool.

18  And if I can look at that and see what that is, I'll be able

19  to make that decision fairly quickly.

20          THE COURT: The idea is you need to do this before

21  you can sign off on the order.

22          MR. WEISBERG: That's -- that's correct.

23          THE COURT: All right. Anything else, Mr. Weisberg?

24          MR. WEISBERG: Then the last point, Your Honor, and

25  I think Ms. McCollum did make it clear. The concept is, is

1  that the order would be set around on negative notice so that

2  if anybody did think that for some reason their rights were

3  being abrogated they could certainly file some objection to

4  the -- the order upon circulation.  And assuming no -- no --

5  no objection, it would be final at the expiration of the --

6  the notice period.

7          THE COURT:  Well, that sort of raises another

8  question.  I think she said it's going to be a seven day

9  notice.

10          MR. WEISBERG:  Seven days, fine.

11          THE COURT:  Well, I'm wondering if we need more.  If

12  we need 28.

13          MR. WEISBERG:  I'm willing to live -- I personally

14  am willing to live with whatever the Court and -- and the

15  debtors are willing to live with.

16          THE COURT:  The only reason I ask that is, normally

17  of course the time creditors must be given to object to

18  confirmation of a plan is 28 days.

19          MR. WEISBERG:  Uh-huh.

20          THE COURT:  Now the Court can shorten that.  It's

21  not one of those notice length -- notices that the Court

22  cannot shorten for cause.

23      So there's no magic necessarily to the 28 days under

24  these circumstances.  The parties have agreed on seven and you

25  think that's enough.

1          MR. WEISBERG:  I do, Your Honor.  Under the

2  circumstances, I do.

3          THE COURT:  Ms. McCollum -- so essentially you want

4  me to shorten the time --

5          MR. WEISBERG:  Yes.

6          THE COURT:  -- perhaps to seven.

7          MS. MCCOLLUM:  Your Honor, yes.

8          THE COURT:  All right.

9          MS. MCCOLLUM:  Because we believe that everybody has

10  gotten notice.

11          THE COURT:  Well, except some of the terms of the

12  settlement which are new today.

13          MS. MCCOLLUM:  Yes, Your Honor.  But I would not --

14  I would submit that that's more of a 9019 notice period than a

15  confirmation order notice period essentially.

16          THE COURT:  Which is 21 days, but I can shorten that

17  too.

18          MS. MCCOLLUM:  Right.  And -- and we would request

19  that you shorten it to seven days.

20          THE COURT:  All right.  I'll do that.  All right.

21  So anything else, Mr. Weisberg?

22          MR. WEISBERG:  Nothing else, Your Honor.

23          THE COURT:  Ms. McCollum, anything further about

24  confirmation?

25          MS. MCCOLLUM:  I'm sorry to keep doing this, I just

1  wanted to make two further clarifications.  I agree with

2  everything that Mr. Weisberg said.

3     The additional terms that I think we forgot to put on the

4  record was that the State Court lawsuit, another -- another

5  component of this is that the State Court lawsuit currently

6  being pursued by the 2007 Creditors will be dismissed.

7     And that the second lien --

8          THE COURT:  I think that's one of the terms you

9  stated last week.  You're just continuing that forward, yeah.

10         MS. MCCOLLUM:  Correct, yes.  I did -- I did not put

11  it on the record earlier.

12     And that the -- and we don't believe that this is -- I

13  mean that we think that this is sort of black letter law but

14  we're putting it on the record anyway.  That the -- that the

15  second lien held by the committee has the rights of a second

16  lien holder.  They can't surpass the first lien unless they

17  pay it off.  I think that's pretty clear under Michigan law,

18  but we just want to make sure that there's no -- that the

19  committee doesn't -- is understanding that they are a second

20  lien holder, they're not a first lien holder and that position

21  is probably not going to change.  But other than that, I have

22  no clarifications and that is the settlement that we have

23  entered into.

24         THE COURT:  All right.  Mr. Weisberg, back to you on

25  what she just said.

1          MR. WEISBERG:  Agreed.  I just -- again, just for

2   purposes of the second lien position which is yes, it is a

3   second lien position, but -- but it cannot be worsened by the

4   first lien holder.

5      So that if the first lien holder loans $250,000 or

6   whatever it's going to loan to fund this plan, then she is

7   correct, we're in a second lien position, we're not a first

8   lien, we'd have to pay off the balance.  But the first lien

9   holder can't then loan another $500,000 and -- and push us

10  back further.

11         THE COURT:  Well, the first lien -- the first lien

12  is only to secure the -- any loans made to fund the initial

13  $220,000 payment.

14         MR. WEISBERG:  Correct.

15         THE COURT:  By Ralph Roberts Realty, right?

16         MR. WEISBERG:  Correct.  That is correct.

17         MS. MCCOLLUM:  Yeah.  We agree -- Your Honor, we

18  agree with that.  The first lien holder has agreed to waive

19  payments for the 48 months of the plan.  So in other words

20  that the debtors can -- that Realty can have sufficient cash

21  flow to pay this so that the two fifty will grow by the

22  accrued interest, but it wouldn't grow by exactly what Mr.

23  Weisberg said.  That we would not go out and take another

24  500,000 or a $1,000,000 loan.  So that's -- that's agreed.

25  Okay.

1          THE COURT:  The two fifty you said.

2          MS. MCCOLLUM:  Yes.

3          THE COURT:  I thought it was going to be two twenty.

4          MS. MCCOLLUM:  Your Honor, Mr. --

5          THE COURT:  Or is the -- is this first lien holder

6    also to fund Ralph Roberts' individual payment of 30,000?

7          MS. MCCOLLUM:  Yes, yes.

8          THE COURT:  So it's two fifty.

9          MS. MCCOLLUM:  Yes.

10          THE COURT:  All right.  Anything else?

11          MS. MCCOLLUM:  No.

12          THE COURT:  Mr. Weisberg, back to you.

13          MR. WEISBERG:  We're good, Your Honor.

14          THE COURT:  Do you agree with what she just said?

15          MR. WEISBERG:  Yeah.

16          THE COURT:  Okay.  So -- so from what's been said,

17    then I guess unless the parties one, make the effort to try to

18    get -- hammer out a confirming order of confirmation today in

19    the hall and come back, or even at your offices and come back

20    today which I'm -- I'm willing to let you do that and recall

21    the case.  We can do it on the basis of what we -- what we

22    were hoping to do after last week.

23          MR. WEISBERG:  Let's -- let's do it that way, Your

24    Honor.  I think that --

25          THE COURT:  Which way?

1          MR. WEISBERG:  The way -- let us go back to our

2   offices and exchange drafts and get -- get an order that --

3   that is acceptable for submission to the Court.

4          THE COURT:  All right.  So we'll hope for a

5   stipulation and proposed order to be filed and submitted

6   within the next what, couple of days?

7          MR. WEISBERG:  Couple days.

8          MS. MCCOLLUM:  Forty-eight hours.

9          THE COURT:  All right.  Now, just in case there's a

10  problem, we'll adjourn the confirmation hearing for further

11  hearing for one week again to January 30 at 11:00 a.m.  But

12  that obviously is not an invitation to actually -- for you all

13  to actually have to come back obviously.

14         MR. WEISBERG:  We're not treating it as such, Your

15  Honor.

16         THE COURT:  Yeah.  All right.  So is there anything

17  else we need to talk about today regarding confirmation?

18         MS. MCCOLLUM:  Your Honor, I just have one question.

19  So we have agreed that we were going to submit this order on

20  essentially a notice of presentment, but that you would like

21  to see a stipulation between the debtors, the committee, and

22  the office of the United States Trustee that the order that we

23  are submitting on negative notice is acceptable.

24         THE COURT:  Yes.

25         MS. MCCOLLUM:  Okay.

1          THE COURT:  And indicating the consent of the

2     creditors whose claims are being disallowed who have agreed to

3     that.

4          MS. MCCOLLUM:  Okay.

5          THE COURT:  And I -- I just, you know, I have to

6     remember not by -- if I'm fine with the order not to enter it

7     right away but to wait.

8          MS. MCCOLLUM:  Your Honor, I will not submit it to

9     your electronic cue so you won't have anything you would be

10    able to enter.

11         THE COURT:  Well, that's okay.  That's probably

12    good.  Wait for the seven days to run.  You will -- just file

13    the stipulation and the order will be attached to the

14    stipulation.  I can look at it that way if I need to.

15         MS. MCCOLLUM:  Correct.  And if -- and if Your Honor

16    has changes or -- or wants to make any corrections, I'm

17    perfectly happy to if your chambers contacts me, to send you a

18    -- a separate Word document.  But I agree, I think it's -- it

19    may be dangerous to put it in your order submission box.

20         THE COURT:  Well, I can wait -- I can wait for that

21    to -- when you do submit it.  You know, assuming that the

22    objection time runs, you're able to file a certificate of no

23    response and at that point you submit the order.  You know, I

24    can do it then if I need to.  And I won't make any substantive

25    changes to your order as you've agreed on without a further

1 | hearing to talk about that.

2 | MS. MCCOLLUM: Thank you, Your Honor.

3 | THE COURT: Anything else about confirmation then

4 | today?

5 | MS. MCCOLLUM: No.

6 | THE COURT: All right. Thank you all on that.

7 | MR. WEISBERG: Thank you, Your Honor.

8 | THE COURT: All right. Thanks.

9 | Now we need to call -- or hear the -- the motion to

10 | disqualify Maddin, Hauser brought by the debtor -- debtors.

11 | MR. WEISBERG: Your Honor, with the Court's

12 | permission we're going to absent ourselves from this

13 | proceeding. I don't think we have an interest in this -- in

14 | this matter.

15 | THE COURT: That's fine, it's up to you. All right.

16 | Mr. Bolton, thank you for your patience in waiting around.

17 | MR. BOLTON: No problem, Your Honor.

18 | THE COURT: For us to get to your -- this motion

19 | involving your firm. Ms. McCollum, go ahead. What would you

20 | like to say about this motion?

21 | MS. MCCOLLUM: Your Honor, the motion is pretty

22 | clear. Essentially we believe that Mr. Roberts is at the very

23 | least a former client of Maddin, Hauser and probably is a

24 | current client. I have with me an email newsletter that the

25 | debtor -- that Mr. Roberts received from Maddin, Hauser on

1  January 21st which was two days ago.

2      They clearly consider him to be at least some -- some

3  relation.  He has sued --

4          THE COURT:  Well, what do you mean.  What does this

5  newsletter say that's not in the record yet?

6          MS. MCCOLLUM:  It's -- it's -- Your Honor, I can --

7  I can hand it up if you'd like to see it.

8          THE COURT:  Well, let Mr. Bolton see it and then you

9  can hand it up.

10          MS. MCCOLLUM:  Mr. Roberts has had --

11          THE COURT:  Wait a minute.

12          MS. MCCOLLUM:  -- probably a 20 year relationship

13  with --

14          THE COURT:  Wait a minute.

15          MS. MCCOLLUM:  Oh, I'm sorry.

16          THE COURT:  Wait a minute.  What am I looking for in

17  here?

18          MS. MCCOLLUM:  It was forwarded to me by Mr.

19  Roberts.

20          THE COURT:  Hold on.  Is there some reference to Mr.

21  Roberts in here, or are you just saying this is -- the fact

22  that they sent this to Mr. Roberts is evidence that they

23  consider him a current client?

24          MS. MCCOLLUM:  Your Honor, I'm -- I'm saying that

25  the fact that they sent that is evidence that they believe

1    they have some sort of relationship with him.  That we believe

2    is a current client relationship.  That at the very least is a

3    former client relationship and that that would preclude them

4    from representing Mr. Savoy and his associate entities in this

5    proceeding.

6        I do not -- I'm not saying that that particular email

7    newsletter has anything specifically directed to the debtor.

8    I believe it's a sort of standard newsletter that larger firms

9    do send -- tend to send out to their clients and client

10   contacts just advising them of -- of -- of things.  I

11   certainly did that sort of thing when I worked for Pepper,

12   Hamilton.  I'm just saying we didn't send it to anybody we

13   didn't think was a current client or a -- or relationship with

14   the -- was in a relationship with the firm.

15           THE COURT:  Well, one of the things that's --

16   appears to be undisputed and I think is in Mr. Jacobs'

17   affidavit, is that over the years among other things Ralph

18   Roberts has been a source of referrals of clients.

19           MS. MCCOLLUM:  Correct.

20           THE COURT:  To him.  This is titled real estate

21   newsletter, real e-state newsletter, electronic newsletter for

22   real estate professionals.  Certainly Mr. Roberts is a real

23   estate professional.  And -- and as a -- although the current

24   dispute may -- might change things going forward and at least

25   in the past he's referred clients to Maddin, Hauser, right?

1        MS. MCCOLLUM:  Yes.

2        THE COURT:  Okay.  Let me hand this back to you.  Go

3   ahead.

4        MS. MCCOLLUM:  Essentially Maddin, Hauser and Mr.

5   Jacobs, the thrust of their response is that well, although we

6   have had a client relationship with Mr. Roberts in the past,

7   he is certainly not a current client and we've never advised

8   him with respect to the matters that are the subject of this

9   lawsuit.  In other words his investor relations, investor

10  programs, Mr. Roberts' dealings with his investors.

11       And our point is made in our motion is that Maddin,

12  Hauser and Mr. Jacobs have provided exactly those services.

13  In fact Mr. Jacobs advised Mr. Roberts with respect to an

14  issue that Mr. Savoy was having several years ago with respect

15  to a land contract.

16       Mr. Jacobs was email -- was emailing back and forth with

17  Mr. Roberts in November.  And I believe that that was attached

18  to the -- to the motion regarding land contract issues from

19  Mr. Roberts' investors.

20       Mr. Roberts did solicit and Mr. Jacobs did provide legal

21  advice with respect to Mr. Roberts' investor relations program

22  which is exactly what we're suing Mr. Savoy for

23  non-performance under.

24       THE COURT:  Are you referring to the November 12, I

25  think it was request or communication where Mr. Roberts you

 1    say asked for advice?

 2              MS. MCCOLLUM:  Yes.  The November 5th --

 3              THE COURT:  I'm sorry, November 5th.

 4              MS. MCCOLLUM:  There is a November 5th email.  That

 5    was a follow up to a phone conversation between Mr. Roberts

 6    and Mr. Jacobs where Mr. Jacobs said, I'm traveling, could you

 7    please send me what you need me to look at.  And so this email

 8    was the follow up.  That was the -- the written information

 9    that we had and that's why I attached it.

10              THE COURT:  So the November 5 email is Mr. Roberts

11    sending Mr. Jacobs, he says some articles about the safe act.

12              MS. MCCOLLUM:  Yes.  And that is a -- a --

13              THE COURT:  And he says -- Mr. Roberts says, we

14    appreciate you looking into the law on this.  We do not

15    believe we act as a loan originator.

16              MS. MCCOLLUM:  Yes.

17              THE COURT:  So did Mr. -- now, Mr. Jacobs in his

18    affidavit I think, as I recall, denied that he provided any --

19    actually provided any advice about this to Mr. Roberts.

20              MS. MCCOLLUM:  And I don't believe that's the case.

21              THE COURT:  So Mr. Roberts contends that he did

22    provide him some advice about this?

23              MS. MCCOLLUM:  Yes.

24              THE COURT:  And that was provided when?

25              MS. MCCOLLUM:  Roughly in November of this year.

1  Now the way this often works is that Mr. Roberts will discuss

2  -- and Mr. Roberts can clarify this if I'm wrong.  But how I

3  understand that it works is Mr. Roberts will call Mr. Jacobs

4  for input and Mr. Jacobs may bill the individual investor with

5  whom Mr. Roberts believes treats as though he is a partner

6  pursuant to these split contracts that we've heard so much

7  about in -- in this case.

8     So we did not retain Mr. Jacobs in this bankruptcy

9  because he didn't necessarily bill the debtors for these

10  services.  But he certainly does provide legal advice to the

11  debtors and he certainly does provide legal advice to the

12  debtors' investors.

13     So we do believe that he is -- he treats Realty and Mr.

14  Roberts as his clients.  And we believe they're current

15  clients who didn't consent to this and that the matters are

16  substantially similar.

17        THE COURT:  Well, in terms of being current clients,

18  is there anything after November in terms of a request for

19  advice or advice given as between Mr. Roberts and Mr. Jacobs?

20        MS. MCCOLLUM:  I don't believe so.  Did you have any

21  discussions with him after November?  Mr. Roberts doesn't

22  remember offhand, but it's possible.

23        THE COURT:  Well, all right.  So go ahead.

24        MS. MCCOLLUM:  That was -- that was the thrust of my

25  argument, is that --

1          THE COURT:  Well --

2          MR. BOLTON:  Your Honor, if I may interject.

3          THE COURT:  Sit down.  You'll get a turn in a

4    minute.

5          MR. BOLTON:  All right.  Thank you, Your Honor.

6          THE COURT:  I'm going to ask a question.  The

7    question -- and of course Ms. McCollum, you saw the response

8    filed and the affidavit of Mr. Jacobs filed which includes, I

9    think, the firm and Mr. Jacobs saying the advice provided is

10   unrelated to the subject of the adversary proceeding.

11       Now I did review the -- the complaint that you filed in

12   the adversary proceeding.  There's been no answer by the

13   defendants yet or the Court's extension of time for them till

14   February 11th to respond.

15       But I did read the complaint that you filed.  It's

16   adversary number 12-6131, I believe.  What's -- what subject

17   matter in there specifically, or that's -- that's part of that

18   adversary proceeding was the subject of advice given by Mr.

19   Jacobs at any point in the past to Mr. Roberts?

20         MS. MCCOLLUM:  Mr. Jacobs advised Mr. Roberts with

21   respect to an issue Mr. Savoy was having with one of his land

22   contract vendee -- vendors -- vendors, I believe.  I'm sorry,

23   I was confused.

24       And has provided on multiple occasions general advice to

25   Mr. Roberts about this investor program.  In other words the

1  program in which investor -- Mr. Roberts will for a finder's

2  fee purchase a property for an investor who will then agree to

3  pay Mr. Roberts 50% of the upside when the property sold.

4      Mr. Jacobs has advised Mr. Roberts with respect to that

5  program, and it is that program that we are essentially suing

6  Mr. Savoy under.  We also know that Mr. Savoy -- you know, Mr.

7  Savoy has a number of connections in this case as well.  He --

8  we just learned that he is a partner with Mr. Bob Carson in

9  some investment issues too.

10     And we think that there is a number of issues that this

11  raises in this case.  And that we think that -- that his inner

12  connection with Maddin, Hauser and the debtors means that

13  Maddin, Hauser cannot represent him in defending against this

14  adversary proceeding which involves this investor program that

15  he is a member of.

16         THE COURT:  Well, let me go back to the first thing

17  you said when I asked you for more specifics about.  And

18  you've mentioned this a couple times.  You said they had a

19  hearing about Mr. Jacobs advising -- giving advice to Ralph

20  Roberts about a problem Mr. Savoy was having concerning a land

21  contract several years ago.  Can you be an more specific about

22  that?

23         MS. MCCOLLUM:  Your Honor, may I ask Mr. Roberts to

24  -- to speak to this matter?  Because I don't -- I don't know

25  any more specifics.

1          THE COURT:  Yes.

2          MR. ROBERTS:  I don't have the file.  But currently

3  -- currently Maddin, Hauser is representing me in a file with

4  a Mr. Doug Booths.  Doug Booths is one of my partners in 19

5  properties and we've had a problem with the condo association

6  that Maddin, Hauser's firm is handling.

7          And I've interacted with John Jacobs on that particular

8  situation over the last 18 months.  And I recently had a

9  property close a few months ago with Doug Booths where I --

10  part of what I -- the profit share was is that I paid for half

11  of the Maddin, Hauser bill because I'm half of the upside or

12  half of the down side on that particular investor.

13          THE COURT:  All right.  But with respect to this

14  problem that -- that Mr. Savoy was having regarding a land

15  contract a few years ago, do you -- do you need to review your

16  file to -- to tell me any specifics, is that what you're

17  saying?

18          MR. ROBERTS:  Yeah.  There is a particular file, but

19  generally while we're discussing it about Jon Savoy's

20  properties, you're only allowed to have so many land contracts

21  in Michigan as a real estate broker.  You can only service

22  ten.  So we went to John to get advice not only for Jon Savoy,

23  but for the other investors too that if you had more than ten

24  properties you needed to be a licensed servicer in the State

25  of Michigan.  And then the next step of that later, this one

1  that John was working on in November for me, was this national

2  -- was the --

3          MS. MCCOLLUM:  The safe act.

4          MR. ROBERTS:  -- the safe act to make sure that --

5  the government was trying to protect the community from

6  mortgage fraud.  So I just had went to John to find out if --

7  if as a real estate broker selling properties on land contract

8  put us in any harm's way.  And John reported back to me, he

9  was flying to a wedding and called me back and said no, as a

10  realtor you're exempt from the act.

11      And then I felt comfortable.  I went to my meeting the

12  following Wednesday with my investors.  And I told them I went

13  to John Jacobs who is my lawyer and he's an expert in the

14  mortgage arena.  And he advised me that we're in good shape

15  because I'm a licensed real estate broker and I can sell the

16  houses for you on land contract.

17          THE COURT:  All right.  Thank you.  Ms. McCollum,

18  back to you.  You've mentioned also that -- that there --

19  there's been advice given a number of times over the years by

20  Mr. Jacobs to Mr. Roberts regarding the investor program, the

21  basic program.  Do you have any more specifics on that?

22          MS. MCCOLLUM:  Your Honor, no other than what Mr.

23  Roberts says.

24          THE COURT:  All right.

25          MS. MCCOLLUM:  He consults with Mr. Jacobs on a

1  regular basis with respect to these.

2         THE COURT:  This thing about Doug Booths that Mr.

3  Roberts was mentioning.  I don't think there was -- I think

4  that's the first time that's been mentioned specifically,

5  right?  That's not in your papers.

6         MS. MCCOLLUM:  Yes, Your Honor.  It was not in my --

7  it was not in my initial motion.

8         THE COURT:  All right.  All right.  What else would

9  you like to say before we hear from Mr. Bolton?

10         MS. MCCOLLUM:  Your Honor, I have nothing further.

11         THE COURT:  Mr. Bolton.

12         MR. BOLTON:  Good afternoon, Your Honor.  I'm Ian

13  Bolton on behalf of Maddin, Hauser.

14      Your Honor, without getting too deep into the law and the

15  facts of the case, I think that the -- the testimony, I don't

16  know what else to call it, but testimony by Mr. Roberts on the

17  Savoy --

18         THE COURT:  Well, it's not testimony at this point.

19         MR. BOLTON:  Okay.  I -- okay.  There's -- there's

20  no affidavit to support the allegations they're making.  And

21  that some of the allegations they're making today aren't on

22  the documents.

23      But the -- but the fact that was discussed between Mr.

24  Roberts and the Court, that John Jacobs advised Ralph Roberts

25  regarding the issue Jon Savoy was having, is exactly the point

1  of why this is not a conflict.  Ralph Roberts is not the

2  client in that instance, Jon Savoy is the client.

3      If Ralph Roberts acted as Mr. Savoy's agent, then that

4  was his limited role.  He has a business relationship with --

5  and ongoing at least until recently, an ongoing business

6  relationship with John Jacobs he would refer to him clients.

7      And again without knowing too much of the information, my

8  guess is it's the same with Mr. Booths.  Mr. Booths may be the

9  client of Maddin, Hauser and Ralph may be involved.  Of course

10 he and John go way back, they have a relationship.  Mr.

11 Roberts and Mr. Savoy have a relationship.

12     It doesn't mean that Mr. Roberts is a client of Maddin,

13 Hauser.  He is not a current client of Maddin, Hauser.  In

14 fact his counsel admitted that he's not a current client of

15 Maddin, Hauser in an email they attached to the motion.

16         THE COURT:  Well, not exactly.

17         MR. BOLTON:  Your Honor, if I may.  Exhibit D to the

18 motion --

19         THE COURT: Yeah.

20         MR. BOLTON:  Wherein Mr. Roberts --

21         THE COURT:  It did -- I read -- excuse me, I did

22 read that email.  That email Ms. McCollum's addressed to John

23 Jacobs, right?

24         MR. BOLTON:  That's correct, Your Honor.

25         THE COURT:  Okay.  So she does refer in there as Mr.

1  Roberts he's a former client of you and your firm, et cetera.

2  I see that.  But then she also says later in the email, it is

3  also Mr. Roberts' view that he may in fact be a current client

4  of yours.  In which case the conflict is even more apparent.

5  So she didn't just say that he's only a former client in that

6  email, right?  Said he may also be a current client, didn't

7  she?

8         MR. BOLTON:  Okay.  I -- I -- I assume, Your Honor,

9  it could be an inconsistent statement.  In either event is it

10 Maddin, Hauser's position that he is a -- I'm sorry, former

11 client in that -- in that he has not -- there's been almost --

12 virtually no matters that Mr. Jacobs has represented Mr.

13 Roberts individually on in the last ten years, but there have

14 been a few.

15     And as they noted, the most recent, if it even was a

16 matter, occurred in November of last year.  And even by Mr.

17 Roberts' own account just a few minutes ago in the Court, that

18 matter has concluded.  Mr. Jacobs had a call with Mr. Roberts,

19 said you're -- you're good to go and that was it.  The matter

20 is concluded, it's not ongoing.

21     Lawyer client relationship is -- is a relationship of

22 contract.  There is no current contract between the parties.

23 There is no current relationship between the parties.

24     And in terms of the -- the former client, as I said, the

25 -- the one issue they brought up direct from the adversary was

1  -- was Mr. Jacobs advising Mr. Savoy, not Mr. Roberts.  So

2  there is no same or similar -- similar matters before the

3  Court.

4       In addition, Your Honor, if the -- if the Court was at

5  all concerned about that limited issue of whether it's the

6  same, similar matters, there are other avenues other than

7  disqualification of Maddin, Hauser.  We could -- for example

8  Maddin, Hauser could agree or the Court could order a -- a

9  Chinese wall procedure where Mr. Jacobs is left out of this.

10      No other attorney in the firm as far as I understand as

11  far as Mr. Roberts has alleged, has a relationship with Mr.

12  Roberts, a lawyer client relationship.  So if that needs to be

13  done, that's an easy process that could resolve the --

14           THE COURT:  Well, how does a Chinese wall solve the

15  disqualification issue or problem if I conclude that Michigan

16  Rule of Professional Conduct 1.9(a) applies and if Mr. Roberts

17  continues to refuse to consent to the dual representation.

18           MR. BOLTON:  It would not resolve that issue, Your

19  Honor.  If you -- if you conclude that 1.9(a) --

20           THE COURT:  Former client or substantially related

21  matter.  If I find all of that in Mr. Roberts' favor and he

22  doesn't consent, your firm has to be disqualified.  Do you

23  agree?

24           MR. BOLTON:  I agree, Your Honor.  I agree.

25           THE COURT:  Okay.  All right.  Go ahead.

1      MR. BOLTON:  So, anyway, Your Honor, the -- the only

2  facts that I think are before the Court are the facts that the

3  exhibits to the motion and exhibits to the response.  The only

4  -- the affidavit attaches that of Mr. Jacobs.  There is no

5  competing affidavit.

6      Everything said in Mr. Jacobs' affidavit therefore is

7  uncontested at this point.  I understand that Mr. Roberts

8  today has raised certain issues with that, but generally

9  speaking nothing before the Court, nothing in the record

10  contests those statements.

11      And if those statements aren't contested, it is -- it is

12  clear that Mr. Roberts is a former client and that this matter

13  is not the same or substantially related and as such the

14  motion should be denied.

15      THE COURT:  All right.  Anything in reply, Ms.

16  McCollum?

17      MR. BOLTON:  Your Honor, the -- I mean just -- just

18  briefly to touch on it, the January 21st email letter --

19      THE COURT:  Well, I was calling on her.  Now do you

20  want to add something?

21      MR. BOLTON:  Oh, I'm sorry.  I thought you said

22  anything --

23      THE COURT:  Do you want to add something?

24      MR. BOLTON:  No.  No, Your Honor, that's it.

25      THE COURT:  I -- I was saying, asking her whether

1    she had anything further.

2         MR. BOLTON:  I apologize, Your Honor, I

3    misunderstood.

4         THE COURT:  In reply.  As movant, I give her the

5    opportunity to reply.

6         MR. BOLTON:  Gotcha.  That's okay, Your Honor.

7         THE COURT:  Okay.

8         MR. BOLTON:  Thank you.

9         THE COURT:  Ms. McCollum.

10         MS. MCCOLLUM:  Your Honor, I just want to make the

11   point that in the parties more than 20 year relationship, in

12   other words Mr. Roberts and Mr. Jacobs, they never had any

13   formal contract or engagement letter.  So the fact that this

14   is a -- Mr. Bolton says that this is a matter of contract, I

15   think Mr. Roberts certainly believed that he had to serve an

16   ongoing lawyer client relationship with Mr. Jacobs.

17        And in fact there were at least six instances where Mr.

18   Roberts asked Mr. Jacobs for advice and was told by Mr. Jacobs

19   that he could not provide that advice because there was a

20   conflict with an existing Maddin, Hauser client.

21        So as I've said in my motion, at the very least we

22   believe -- the debtors believe, Mr. Roberts believes that he

23   is a former client of Maddin, Hauser and that the matter is

24   substantially related.  And that he does not consent and he --

25   he believes that he is a current client and still does not

1  consent.  Thank you.

2          THE COURT:  All right.  Well, thank you both.

3      There -- there is enough here to raise an issue or issues

4  that in my view under Michigan Rule of Professional Conduct

5  1.7 and 1.9, the current client rule and the former client

6  rule regarding conflicts which the parties have argued about

7  in their papers and in the hearing today, to require an

8  evidentiary hearing as to both the issue -- as to the

9  following issues.

10     Is -- is Mr. Roberts in fact a current client of Maddin,

11 Hauser.  And obviously if he is a current client within the

12 meaning of Michigan Rule of Professional Conduct 1.7's

13 references to client meaning essentially a current client,

14 then the Maddin, Hauser firm must be disqualified absent

15 consent of Mr. Roberts.

16     Further issues that need evidentiary hearing are the

17 issues that arise under Michigan Rule of Professional Conduct

18 1.9(a).  There is no dispute or no doubt that -- that John

19 Jacobs and therefore Maddin -- the Maddin, Hauser firm has

20 formerly represented Mr. Roberts in matters in the form of

21 giving him advice from time to time about matters.

22     The question though that requires an evidentiary hearing

23 is of those matters are there any that are the same or

24 substantially related matters to the matter or matters in the

25 pending adversary proceeding that the debtor Ralph Roberts

1  Realty has filed against Jon Savoy and others, adversary

2  number 12-6131 within the meaning of Rule 1.9(a).

3      If there are then give Mr. Roberts' refusal to consent

4  under that rule, disqualification again would be required.

5  There is a substantial dispute between the parties on -- on

6  these issues.

7      I need in order to make in my view an intelligent

8  decision and an accurate assessment of these issues, I need to

9  hear evidence in the form of testimony and any relevant

10 exhibits that might be admitted.  And really what I need as

11 much as possible is specifics.

12     Specific -- specific facts and -- and evidence

13 particularly regarding what matters on which Mr. Jacobs has

14 given Mr. Roberts advice in the past with respect to the

15 disqualification ground alleged under Rule 1.9(a) of the

16 Michigan Rules of Professional Conduct.  And so, absent some

17 sort of resolution by agreement of the parties on this motion,

18 we're going to have to have an evidentiary hearing.

19     Now, I -- I think the first thing I want to know is

20 whether either side requests leave to conduct discovery

21 regarding this motion before we have that evidentiary hearing.

22 Ms. McCollum.

23         MS. MCCOLLUM:  Your Honor, we would like to have a

24 brief period to conduct discovery, no more than 30 days.

25         THE COURT:  Thirty days.  Mr. Bolton.

1          MR. BOLTON:  Your Honor, we're -- we're -- Maddin,

2  Hauser is okay with the discovery period of 30 days.  I'd like

3  to limit the discovery -- to limit discovery however.  Just to

4  avoid unnecessary depositions and -- and other costly

5  measures.

6          THE COURT:  Sure.  This is not the kind of issue

7  that I would think either side would view as worth spending a

8  lot of time and money on fighting over.

9          But that doesn't mean it's not important.  But -- it is

10  in terms of the adversary proceeding, in a sense a bit of a

11  side show or side issue.  But it is -- it doesn't mean it's

12  not important.  So -- to each side.

13          So all right.  Each side, the Maddin, Hauser firm and the

14  debtors are granted leave to conduct discovery regarding this

15  motion.  Discovery must be completed no later than 30 days

16  from today which is February 22, 2013.  That's a Friday.

17          I'm looking for an evidentiary hearing date here to set,

18  so one moment.  I normally would set this for a Monday

19  afternoon as soon as possible after February 22.  What I'm

20  struggling with is that I'm very jammed up for the month or so

21  after that on Monday afternoons with other evidentiary

22  hearings already.

23          Primarily because of one particular case that's just

24  taking a very long time to -- to conclude the evidentiary

25  hearing.  Hold on.  All right.  I can do the evidentiary

1  hearing on Tuesday, March 5, 2013 at 9:00 a.m.  Does that date

2  and time work on your calendars?

3          MR. BOLTON:  Yes, Your Honor.

4          THE COURT:  Ms. McCollum.

5          MS. MCCOLLUM:  Mr. Roberts is unavailable on

6  Tuesdays because of sheriff's sales.

7          THE COURT:  Well --

8          MS. MCCOLLUM:  Tuesdays and Fridays.  He can do

9  pretty much any other day.

10          THE COURT:  Hold on a minute.  Thursdays are

11  normally my Chapter 13 call and the courtroom is booked up all

12  day, but I'm not having one of those -- hold on a minute, on

13  Thursday, March 14.  So I could do the evidentiary hearing on

14  March 14 at 10:00 a.m. -- 10:00 a.m.  Does that date and time

15  work on your calendars?

16          MS. MCCOLLUM:  Yes, Your Honor.

17          MR. BOLTON:  Yes, Your Honor.

18          THE COURT:  All right.  That will be the date of the

19  evidentiary hearing.

20          MR. BOLTON:  You know, I'm sorry, Your Honor.  Of

21  course I'll have to check.  Mr. John Jacobs will be appearing

22  to testify and I'll have to check and make sure he's available

23  that day as well.  But --

24          THE COURT:  Well, if you discover after going back

25  to your office that you have a -- there's a problem there,

1 talk to Ms. McCollum about it and see if the parties can agree

2 on an alternative date.  The backup date I would -- hold on.

3 A backup date would be two weeks later on March 28 at 10:00

4 a.m.

5          MR. BOLTON:  Thank you, Your Honor.

6          THE COURT:  That's another Thursday on which I don't

7 have a Chapter 13 full blown calendar call scheduled.  But

8 let's -- let's assume it's the 14th unless I hear from the

9 parties otherwise.

10      So I'll prepare and enter an order that reflects this --

11 what I've said about this evidentiary hearing and discovery

12 and so forth.  The scheduling of it -- basically a scheduling

13 order.

14      The order will also require each side to serve on the

15 other no later than one week before the evidentiary hearing so

16 that will be March 7 deadline to serve on each other witness

17 list, exhibit list, and a copy of all marked exhibits that the

18 party may wish to use at the evidentiary hearing.  You don't

19 need to file those things, but you do need to serve them on

20 each other no later than that March 14 date.

21      All right.  So I will prepare and enter that scheduling

22 order and we'll go from there.  If the parties do work out any

23 sort of agreed resolution of this motion between now and the

24 date of the hearing, just let us know that as soon as

25 possible.

1    The -- now I -- I -- I assume the parties -- one of the

2  reasons the parties agreed to extend the answer deadline in

3  this adversary proceeding that's pending against Mr. Savoy at

4  all is because of the pendency of this motion to disqualify.

5  If the parties need a further extension of time beyond

6  February 11 or want one because of the pendency of this matter

7  still, I'll be amenable to that.  Just file a stipulation and

8  submit an order.

9         MR. BOLTON:  Your Honor, just to be clear.  The

10  parties hadn't stipulated to it.  I had to file an ex parte

11  motion for an extension of time.

12         THE COURT:  Oh, I -- I was thinking you had agreed

13  to it.

14         MR. BOLTON:  No, but I will -- I will try to seek a

15  stipulation again before I file the motion, but otherwise I

16  will be filing the motion.

17         THE COURT:  Ms. McCollum, do you agree that until we

18  get this resolved that Maddin, Hauser should not be filing an

19  answer or other pleadings in the case?

20         MS. MCCOLLUM:  Yes, absolutely.

21         THE COURT:  Okay.

22         MS. MCCOLLUM:  So I'm certainly amenable to an

23  extension of the answer deadline.

24         THE COURT:  So you guys can agree on a stipulation

25  and order, I assume.

1          MS. MCCOLLUM:  Yeah.

2          THE COURT:  And we'll do that.  Okay.  Be sure to

3    cover that though with an order -- in an order because -- you

4    know, so that we have that in the record that the answer

5    deadline is -- is further extended.

6          MR. BOLTON:  Absolutely.

7          THE COURT:  All right.  Is there anything else we

8    need to talk about today on -- on this -- this motion?

9          MS. MCCOLLUM:  No, Your Honor.

10         MR. BOLTON:  No, Your Honor.

11         THE COURT:  All right.  Thank you all.  All right.

12   That leaves then -- that concludes the matters for today on

13   the Ralph Roberts case.

14      (Court Adjourned at 1:40 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7   We certify that the foregoing is a correct transcript from the

8   electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 1-18-13
    Jamie Laskaska
12

13

14

15

16

17

18

19

20

21

22

23

24

25